# United States Court of Appeals

*for the*

# Fifth Circuit

Case No. 23-10008
consolidated with
Case No. 23-10536

CHARLENE CARTER,

*Plaintiff-Appellee/Cross-Appellant,*

v.

LOCAL 556, TRANSPORT WORKERS UNION OF AMERICA;
SOUTHWEST AIRLINES COMPANY,

*Defendants-Appellants/Cross-Appellees.*

Consolidated with
Case No. 23-10836

CHARLENE CARTER,

*Plaintiff-Appellee,*

v.

SOUTHWEST AIRLINES COMPANY,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION, CASE NO. 3:17-CV-2278
HONORABLE BRANTLEY D. STARR, U.S. DISTRICT JUDGE

## BRIEF FOR *AMICUS CURIAE* AIRLINES FOR AMERICA IN SUPPORT OF DEFENDANT-APPELLANT

PATRICIA N. VERCELLI
RIVA PARKER
AIRLINES FOR AMERICA
1275 Pennsylvania Ave. NW,
  Suite 1300
Washington, DC 20004
(202) 626-4001


ANDREW R. HELLMAN
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300

ANTON METLITSKY
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
(212) 326-2000

JASON ZARROW
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, California 90071
(213) 430-6005

*Attorneys for Amicus Curiae*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

*Nos. 23-10008, 23-10536, 23-10836, Carter v. Local 556, et al.*

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that the following listed persons and entities, in addition to those listed in the parties' briefs, have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

*Amicus curiae*: Airlines for America is a non-profit entity with no parent corporation, and no publicly traded corporation has an ownership interest in it of any kind.

*Counsel:* Anton Metlitsky, Jason Zarrow, and Andrew R. Hellman of O'Melveny & Myers LLP, and Patricia N. Vercelli and Riva Parker of Airlines for America.

/s/ Anton Metlitsky
Anton Metlitsky
*Counsel for Amicus Curiae*

-i-

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICUS CURIAE*................................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................3

ARGUMENT ..................................................................................................7

I.   EMPLOYEE MORALE IS ESPECIALLY IMPORTANT TO THE SMOOTH FUNCTIONING OF THE AIRLINE INDUSTRY.....................7

II.  NEITHER TITLE VII NOR THE RLA SHOULD BE INTERPRETED IN WAYS THAT WOULD UNDERMINE AIRLINE EMPLOYEE MORALE ............................................................14

    A.   Title VII Does Not Bestow A Right To Harass Based On Religious Conviction.........................................................16

    B.   The RLA Does Not Bestow A Right To Harass Based On Union Disagreements ........................................................20

CONCLUSION ..............................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*ABM Onsite Servs—W., Inc. v. NLRB,*
   849 F.3d 1137 (D.C. Cir. 2017) ............................................................23

*ABX Air, Inc. v. Int'l Pros. Ass'n of the Int'l Bhd. of Teamsters,*
   266 F.3d 392 (6th Cir. 2001) ...............................................................12

*Air Cargo, Inc. v. Local Union 851, Int'l Bhd. of Teamsters,*
   733 F.2d 241 (2d Cir. 1984) .................................................................12

*Air Line Pilots Ass'n, Int'l v. United Air Lines, Inc.,*
   802 F.2d 886 (7th Cir. 1986) ...............................................................12

*Allied Pilots Ass'n v. Am. Airlines, Inc.,*
   643 F. Supp. 2d 123 (D.D.C. 2009) .....................................................12

*Am. Airlines, Inc. v. Allied Pilots Ass'n,*
   228 F.3d 574 (5th Cir. 2000) ...............................................................12

*Am. Airlines, Inc. v. Transp. Workers Union of Am.,*
   2019 WL 3774501 (N.D. Tex. Aug. 12, 2019) ....................................12

*Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l,*
   343 F.3d 401 (5th Cir. 2003) ...............................................................10

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters,*
   928 F.3d 1102 (D.C. Cir. 2019) ............................................... 11, 12, 13

*Bhd. of Locomotive Eng'rs & Trainmen v. Union Pac. R.R. Co.,*
   31 F.4th 337 (5th Cir. 2022) ......................................................... 21, 22

*Brener v. Diagnostic Center Hospital,*
   671 F.2d 141 (5th Cir. 1982) ...............................................................18

*Bruff v. North Mississippi Health Services, Inc.,*
   244 F.3d 495 (5th Cir. 2001) ...............................................................18

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*,
238 F.3d 1300 (11th Cir. 2001) ..............................................12

*Groff v. DeJoy*,
600 U.S. 447 (2023) ...................................................... *passim*

*Johnson v. Express One Int'l, Inc.*,
944 F.2d 247 (5th Cir. 1991) ................................................23

*Konop v. Hawaiian Airlines, Inc.*,
302 F.3d 868 (9th Cir. 2002)................................................22

*Nat'l Airlines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers*,
416 F.2d 998 (5th Cir. 1969) ................................................12

*NLRB v. Allied Aviation Fueling of Dallas LP*,
490 F.3d 374 (5th Cir. 2007)................................................23

*NLRB v. Arkema, Inc.*,
710 F.3d 308 (5th Cir. 2013) ................................................23

*Pan Am. World Airways, Inc. v. Indep. Union of Flight Attendants*,
1981 U.S. Dist. LEXIS 13669 (S.D.N.Y. July 20, 1981) ...................12

*Spirit Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*,
2017 WL 2271500 (S.D. Fla. May 9, 2017) ........................................12

*Stewart v. Spirit Airlines, Inc.*,
503 F. App'x 814 (11th Cir. 2013)........................................21

*Sullivan v. Endeavor Air, Inc.*,
856 F.3d 533 (8th Cir. 2017) ................................................9

*Sw. Airlines Co. v. Aircraft Mechs. Fraternal Ass'n*,
2020 WL 1325224 (N.D. Tex. Mar. 20, 2020) ..................................12

*Tex. Int'l Airlines, Inc. v. Air Line Pilots Ass'n Int'l*,
518 F. Supp. 203 (S.D. Tex. 1981)........................................12

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Trans World Airlines, Inc. v. Hardison*,
    432 U.S. 63 (1977) ........................................................ 2, 8, 16

*Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants*,
    489 U.S. 426 (1989) ............................................................21

*United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*,
    563 F.3d 257 (7th Cir. 2009) ..............................................12

*United Air Lines, Inc. v. Int'l Ass'n of Machinist & Aerospace
    Workers*,
    243 F.3d 349 (7th Cir. 2001) ..............................................12

*US Airways, Inc. v. U.S. Airline Pilots Ass'n*,
    813 F. Supp. 2d 710 (W.D.N.C. 2011)................................12

*Weber v. Roadway Exp., Inc.*,
    199 F.3d 270 (5th Cir. 2000) ................................... 16, 18, 19

*Wightman v. Springfield Terminal Ry. Co.*,
    100 F.3d 228 (1st Cir. 1996) ....................................... 21, 22

**<u>Statutes</u>**

42 U.S.C. § 2000e .................................................................1

42 U.S.C. § 2000e(j) ...........................................................16

42 U.S.C. § 2000e-2(a)(1)...................................................16

45 U.S.C. § 151 .....................................................................1

49 U.S.C. § 40101(a) ..........................................................14

## INTEREST OF *AMICUS CURIAE*[1]

Airlines for America ("A4A") is the Nation's oldest and largest airline trade association, representing passenger and cargo airlines throughout the United States. Together, as of June 2023, A4A's members and their wholly owned subsidiaries directly employed more than 90% of the airline industry's 746,000 full-time equivalent workers. A4A member airlines and their marketing partners account for more than 90% of U.S. airline passenger and cargo traffic. Commercial aviation, moreover, drives 5% of U.S. gross domestic product and helps support more than 10 million U.S. jobs.

As part of its core mission, A4A works to foster a business and regulatory environment that ensures a safe, secure, and healthy U.S. air transportation industry—including stable, uniform, and predictable legal rules to govern it. Thus, throughout its seventy-five-plus-year history, A4A has been actively involved in the development of the federal law applicable to commercial air transportation, including the application to the airline industry of generally applicable federal laws such as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.*

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored any part of this brief. No party, party's counsel, or any person other than *amicus curiae*, its members, or its counsel contributed money intended to finance the preparation or submission of this brief.

1

A4A writes here to emphasize the immense practical implications for air transportation of the Court's decision in this case.  Nearly half a century ago, *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977), rightly held that an employee's religious observances must yield to the rights of fellow employees pursuant to the workings of a bona fide seniority system.  Lower courts then applied *Hardison* to develop the law governing airlines' and other businesses' obligations regarding a wider range of reasonable accommodations for their employees' religious practices.  Recently, in *Groff v. DeJoy*, 600 U.S. 447 (2023), the Supreme Court held that the lower courts had erred in understanding *Hardison* to require employers to show merely "'more than a *de minimis* cost' … to establish 'undue hardship' under Title VII."  *Id.* at 468.  "Having clarified the Title VII undue-hardship standard," however, the *Groff* Court deemed "it appropriate to leave the context-specific application of that clarified standard to the lower courts in the first instance."  *Id.* at 473.  This case offers one of the first opportunities for a court of appeals to apply that standard, and it is vitally important to A4A and its members—and, by extension, the Nation's commerce—that Title VII continue to allow airlines to apply facially neutral policies and practices that are essential to their operations.

The district court, however, misinterpreted both Title VII *and* the RLA to grant an airline employee a "right" to barrage her colleague with hostile and

graphic messages—contrary to reasonable and commonplace anti-harassment and civility policies maintained by her employer—because she claimed that these messages constituted religious practice and union-related speech protected by those statutes. If allowed to stand, that decision would compromise A4A's mission by undermining commonsense, neutral policies that all major airlines employ to promote employee morale, an essential prerequisite for the complex choreography required for the Nation's airlines to function. For the reasons explained below, A4A members' operations, and thus interstate and international commerce, depend on maintaining airlines' ability to protect their employees and business from the wide range of hostile conduct that the district court's decision would allow. It is thus vitally important to A4A's members (and to the public interest) that this Court affirm the principle that neither Title VII nor the RLA gives airline employees license to harass their colleagues in defiance of reasonable policies that promote the civility and, in turn, workforce morale necessary for the entire airline industry to function.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Title VII of the Civil Rights Act of 1964 requires employers to provide employees a religious accommodation so long as the accommodation does not impose an "undue hardship" on the employer. As the Supreme Court explained in *Groff v. DeJoy*, 600 U.S. 447 (2023), "an employer must show that the burden of

granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id.* at 470.  The Supreme Court expressly endorsed the commonsense understanding, long reiterated by this Court, that "an accommodation's effect on co-workers may have ramifications for the conduct of the employer's business," but clarified that "a court cannot stop its analysis without examining whether that further logical step is shown in a particular case." *Id.* at 472.

The nature of the airline industry makes it unmistakably clear that the accommodation plaintiff Charlene Carter seeks would grossly disrupt the conduct of the business of her employer, Southwest Airlines.  Carter, upset that her union participated in the 2017 Women's March, made graphic anti-abortion posts on Facebook and bombarded the union president with hostile messages; one, for example, included a photo of a bloody aborted fetus and text stating, "You truly are Despicable in so many ways."  After an investigation, Southwest concluded Carter's conduct violated both its Workplace Bullying and Hazing Policy and its Social Media Policy.  Southwest terminated her employment, and a neutral arbitrator later determined that Carter's violations of company policy gave Southwest just cause for termination.

The district court held, however, that the religious accommodation Carter demanded—that she be allowed to send these messages in violation of Southwest's

neutral policies—was required by Title VII.  That cannot be right.  Such an accommodation to neutral company policies would allow any employee to harass other employees with hostile messages if her religious practice so required—an accommodation that would take a grave toll on airlines' businesses.  Southwest and other airlines have neutral, reasonable policies in place to promote civility and respect in the workplace, ultimately in the interest of workforce morale.  Employee morale is important to any business, of course, but especially so in the airline industry, where employees also often work together in close quarters, often (as on an airplane) with no supervisors on site, and must navigate stressful situations.

Crucially, the significant disruptions to airlines' businesses that would ensue if the district court's decision is left to stand necessarily translate into significant disruptions to the Nation's commerce.  Airlines' national and international networks require intricate coordination and choreography to run smoothly, and employee morale issues can disrupt airlines' careful planning and cause operational problems that have increasingly severe ripple effects.  A large airline operates thousands of flights a day, and maximizing the likelihood that those flights take off and land when they are supposed to requires thousands of employees working together all hours of the day and night in different capacities and in numerous different locations throughout the country.  Employee morale problems frequently lead to performance issues—disgruntled employees calling in

5

sick or showing up late, for example, or taking longer than usual to perform their work—that can lead to flights being cancelled or delayed.  And when one flight is cancelled or delayed, that means the same thing for flights downstream in the airline's network—if a plane is late taking off on a route from San Francisco to Dallas, the flight from Dallas to New York on that same plane will also be delayed (and so on).  Thus, small-scale problems can easily cascade into bigger-scale problems, including not only for airline employees but for their passengers, and, ultimately, for anyone who relies on planes taking off and landing on time.  Policies to prevent conflict between coworkers are essential to keeping the entire system running, and the district court's interpretation of Title VII would severely undermine airlines' ability to keep the peace between employees, and thus to keep their networks running properly.

The district court's decision under the RLA would likewise wreak havoc on airlines' business.  The district court interpreted that statute to protect Carter's speech because, she claimed, it involved her union.  But the RLA protects employees' rights relating to the formation of a union; once a union is certified, the RLA applies in narrower circumstances, mostly related to when a company expresses extreme anti-union animus.  Those circumstances were obviously absent in this case, where Southwest *protected* the union's president from Carter's harassment.  And whatever speech the RLA protects in the post-certification

context, it does not protect offensive or hostile language, such as Carter's messages here. The district court's misunderstanding of the RLA, if upheld, would allow employees to harass one another whenever they could claim to be discussing union issues, and that erroneous decision would have the same deleterious consequences as the district court's decision under Title VII.

The decision below thus seriously misinterprets two different statutes, and each error independently threatens to substantially harm A4A and its members— and thus the Nation, which relies on the airline industry functioning effectively. For these reasons, and those detailed below and in Southwest's opening brief, this Court should reverse.

## ARGUMENT

## I.    EMPLOYEE MORALE IS ESPECIALLY IMPORTANT TO THE SMOOTH FUNCTIONING OF THE AIRLINE INDUSTRY

Today's major airlines serve destinations around the globe. Carriers must continually update routes and vary staffing levels according to market and economic conditions, as well as the specific directives of the Federal Aviation Administration (FAA) concerning the number of pilots and flight attendants who must work on a flight as well as when and where airplanes can take off and land. Airlines must fill a wide variety of roles around the clock—from pilots, to flight

attendants, to ground crew such as mechanics, baggage handlers, and ticket counter and gate agents.

Staffing these jobs across an airline's entire nationwide network in a manner that ensures on-time departures and arrivals, and a satisfactory traveler experience, requires a complex choreography. Thousands of employees must work together seamlessly day and night for passengers and their luggage to arrive to their destinations on time.

This feat is accomplished by two sets of rules: collective bargaining agreements (CBAs) negotiated between employee unions and airlines, and corporate policies established by the airlines. The Supreme Court in *Hardison* considered an employee's request for an exception from rules established by one of these CBAs, which among other things provide that the allocation of job vacancies and schedules across the airline's workforce is accomplished through seniority-based systems. *See Hardison*, 432 U.S. at 79 ("Collective bargaining, aimed at effecting workable and enforceable agreements between management and labor, lies at the core of our national labor policy, and seniority provisions are universally included in these contracts."). Seniority systems are necessary because job assignments and shifts vary greatly in their desirability—a scant few employees would volunteer to work outside on the ramp loading and unloading bags in the dead of night during the winter in Boston or at high noon during the summer in

Phoenix.  Yet many employees must, and airlines and their employees' unions have determined over decades that the most effective, sustainable, and fair way to ensure that the operation runs as smoothly as possible is to assign jobs and shifts by seniority.  Relying on seniority systems is thus one important way that airlines help maintain employee morale, which is imperative for airlines to keep their complex operations running effectively.

This case concerns policies and codes of conduct to prevent inter-employee conflict and promote positive working relationships across the workforce; along with CBAs, company policies are an essential measure for airlines to maintain the employee morale that is indispensable to their airlines' overall functioning.  Many airline employees work in challenging customer-facing roles that require them to interact with travelers who may be stressed or frustrated for reasons beyond the employees' control.  Many employees—particularly flight attendants—also must work together in close quarters, navigating often stressful situations (like unruly passengers or severe turbulence) in confined spaces.  Airlines have thus adopted reasonable policies designed to promote respect, civility, and collaboration.  Breaches of these policies threaten fleetwide morale, and airlines thus understandably take enforcing these policies seriously.  *See, e.g.*, *Sullivan v. Endeavor Air, Inc.*, 856 F.3d 533, 538-39 (8th Cir. 2017) (describing arbitral board's decision that airline had just cause to terminate employee under CBA

based on "offensive conduct" that violated airline's "anti-harassment policy"); *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 409 (5th Cir. 2003) ("Indeed, the Board determined that Balser's 'violation' of American Eagle's 'anti-harassment policy' provided American Eagle with 'not only a right, but a duty to rid the workplace' of Balser's conduct.").

Southwest's own policies offer a good example. Southwest's overarching Mission Statement provides that "Employees will be provided the same concern, respect, and caring attitude within the organization that they are expected to share externally with every Southwest Customer." ROA.23-10836.3173. To that end, the company's Workplace Bullying and Hazing Policy forbids "hazing and bullying, including cyberbullying," and defines bullying to include "malicious, unwelcome, and/or severe mistreatment that harms, intimidates, offends, degrades, or humiliates an Employee or specific group of Employees." ROA23.-10836.3172. Southwest's Policy Concerning Harassment additionally "prohibits any and all types of harassment, sexual harassment, discrimination and/or retaliation against Employees" and specifies "examples of types of derogatory, sexually suggestive, offensive, threatening, intimidating, hostile or retaliatory conduct that are prohibited," including harassing "comments" or "messages" sent via "email, text messages, or social media." ROA.23-10836.3175. Reasonable policies like these can help any company to maintain respectful working

relationships between employees, which is especially important in the airline industry given its unique challenges.

Such reasonable, neutral employee conduct policies and other tools for promoting civility and employee morale are essential in the airline industry because even small disturbances to airline operations inevitably have downstream effects that can lead to major disruptions in those operations. Dissatisfied employees with unresolved grievances inevitably will work less hard: they will "withdraw their enthusiasm" or "work-to-rule" or, in the post-pandemic vernacular, they will "quietly quit." This is true in any workplace, of course—but in the airline industry, employees have unique and more pernicious ways to disrupt their employer's operations, and thereby disrupt the free flow of interstate and international transportation and commerce. Pilots can taxi and fly aircraft more slowly; they can burn more fuel; they can decline to work extra flights; and they can call in sick or "fatigued"; flight attendants can board the aircraft more slowly; ramp workers can load and off-load baggage more slowly; mechanics can write-up minor cosmetic issues like torn carpet and take longer to repair planes, and on and on. This is not idle speculation; it is how airline employees often express dissatisfaction with the terms and conditions of their employment.[2]

---

[2] The cases are ubiquitous. For a sample, see *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 928 F.3d 1102 (D.C. Cir. 2019); *United Air Lines, Inc. v. Air Line*

The D.C. Circuit detailed the sort of problematic chain reactions that inevitably result from this sort of employee conduct in *Atlas Air, Inc. v. International Brotherhood of Teamsters*, 928 F.3d 1102 (D.C. Cir. 2019), which concerned certain pilot tactics to increase pressure on an airline during union negotiations. Some pilots began to "push back from the gate … precisely on time," rather than "when the aircraft is 'loaded and ready,'" which made particular flights "more likely to arrive late," which in turn "threaten[ed] to cause cascading delays across flights by forcing Atlas to shuffle runways, schedules, and gates, particularly at Atlas's biggest hubs where flights depart every two-to-three minutes." *Id.* at 1113. An uptick in short-notice sick calls "made it more difficult to find substitute crew members, increasing the risk that flights would be cancelled

---

*Pilots Ass'n, Int'l*, 563 F.3d 257 (7th Cir. 2009); *United Air Lines, Inc. v. Int'l Ass'n of Machinist & Aerospace Workers*, 243 F.3d 349 (7th Cir. 2001); *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 238 F.3d 1300 (11th Cir. 2001); *ABX Air, Inc. v. Int'l Pros. Ass'n of the Int'l Bhd. of Teamsters*, 266 F.3d 392 (6th Cir. 2001); *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574 (5th Cir. 2000); *Air Line Pilots Ass'n, Int'l v. United Air Lines, Inc.*, 802 F.2d 886 (7th Cir. 1986); *Air Cargo, Inc. v. Local Union 851, Int'l Bhd. of Teamsters*, 733 F.2d 241 (2d Cir. 1984); *Nat'l Airlines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers*, 416 F.2d 998 (5th Cir. 1969); *Sw. Airlines Co. v. Aircraft Mechs. Fraternal Ass'n*, 2020 WL 1325224 (N.D. Tex. Mar. 20, 2020); *Am. Airlines, Inc. v. Transp. Workers Union of Am.*, 2019 WL 3774501 (N.D. Tex. Aug. 12, 2019); *Spirit Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 2017 WL 2271500 (S.D. Fla. May 9, 2017); *US Airways, Inc. v. U.S. Airline Pilots Ass'n*, 813 F. Supp. 2d 710 (W.D.N.C. 2011); *Allied Pilots Ass'n v. Am. Airlines, Inc.*, 643 F. Supp. 2d 123 (D.D.C. 2009); *Pan Am. World Airways, Inc. v. Indep. Union of Flight Attendants*, 1981 U.S. Dist. LEXIS 13669 (S.D.N.Y. July 20, 1981); *Tex. Int'l Airlines, Inc. v. Air Line Pilots Ass'n Int'l*, 518 F. Supp. 203 (S.D. Tex. 1981).

or delayed." *Id.* at 1115. And when pilots increasingly resisted agreeing to fill in "when both the primary and reserve crew [we]re unable to fly as scheduled," that "create[d] cascading delays" by forcing "the airline [to] move pilots from other flights to cover these shifts," potentially "tak[ing] days to get back to the normal schedule." *Id.* at 1116-17. As *Atlas Air* shows, in the airline industry, even one unhappy employee's refusal to work to the best of their ability can have far wider-reaching ripple effects.

The United States Government similarly has recognized that a disruption in one part of an airline's system can have ripple effects throughout the airline's entire system. In an amicus brief it filed in the Ninth Circuit in *Bernstein v. Virgin America, Inc.*, the government pointed out that "commercial aircraft operate under tight schedules that require the careful coordination and availability of runways, gates, and crewmembers." Br. for the United States as Amicus Curiae, *Bernstein v. Virgin Am., Inc.*, No. 19-15382, 2019 WL 4307414, at *20-21 (9th Cir. Sept. 3, 2019). Thus, "the provision of regular, frequent, and safe air services requires significant coordination and scheduling of aircraft takeoff, landing, and taxi time." *Id.* at *21. And when that careful coordination breaks down—that is, when a flight is delayed or even cancelled—the result is not just a single delayed flight, but delays throughout the air carrier's entire network: "delays in one airport—due to

13

any cause—can easily snowball into delays at other airports throughout the country." *Id.*

Ripple effects within the airline industry can easily lead to ripple effects beyond it. Air transportation is an inherently interstate enterprise, and a major driver of interstate commerce. Congress recognized long ago that the "public interest" requires an "efficient," "complete and convenient system" of "interstate air transportation." 49 U.S.C. § 40101(a). It follows, then, that disruption to airline operations leads to disruption in the Nation's commerce more generally.

Simply stated, air carriers could not function as they currently do without having systems in place to maintain employee morale. That includes policies and practices to ensure that employees treat each other with civility and respect. Airline employees already work in very close quarters and deal with stressful situations. Adding interpersonal hostility to the mix makes it all too likely that employee morale will suffer—and so too will airlines themselves, travelers, and the Nation's economy.

## II.   NEITHER TITLE VII NOR THE RLA SHOULD BE INTERPRETED IN WAYS THAT WOULD UNDERMINE AIRLINE EMPLOYEE MORALE

Congress enacted both Title VII and the RLA for specific purposes—Title VII to shield employees from invidious discrimination, and the RLA to protect employees' right to unionize in the rail and air transport industries. The decision

14

below misconstrues both statutes as offering employees like Carter on-demand

exceptions from reasonable, generally applicable, and facially neutral company

policies designed to promote respect, civility, and collaboration.  As Southwest has

detailed in its opening brief, Carter sent her Southwest colleague hostile, insulting

messages that included graphic, even grotesque images in clear violation of

company policies.  A neutral arbitrator mutually selected by Carter and Southwest

concluded that Carter's violations of multiple company polices gave Southwest

just cause to terminate her employment on several independently sufficient

grounds, and that Southwest did not discriminate against Carter, retaliate against

her, or otherwise treat her unfairly in any way.  That should have been the end of

the matter.

Instead, the district court ruled that both Title VII and the RLA effectively

granted Carter a special right to send threatening, harassing messages based on her

religious beliefs and claim that the messages related to union disagreements.  If

allowed to stand, the district court's interpretations of Title VII and the RLA would

have gravely harmful consequences for the airline industry, and consequently for

interstate commerce.  As just explained, neutral policies like Southwest's are

essential tools for airlines to keep the peace among their workforces and maintain

the employee morale that is necessary to keep the complex operations described

above functioning smoothly.  Left undisturbed, the district court's decision would

permit a wide range of hostile activity that could easily undermine airline employee morale, with far-reaching downstream consequences for customers, the industry, and ultimately the national economy. Neither Title VII nor the RLA requires that result, and this Court should make clear that neither statute hamstrings airlines from taking actions to protect their employees and business.

## A. Title VII Does Not Bestow A Right To Harass Based On Religious Conviction

Title VII of the Civil Rights Act of 1964, as amended, generally prohibits employment discrimination "because of" an employee's "religion," 42 U.S.C. § 2000e-2(a)(1), and defines "religion" to include "all aspects of religious observance and practice … unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* § 2000e(j). The Act does not define "reasonably accommodate" or "undue hardship," but the Supreme Court suggested in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977), that an employer suffers an "undue hardship" whenever an accommodation would require the employer "to bear more than a de minimis cost." *Id.* at 84. Applying *Hardison*, this Court for many years deemed the "mere possibility of an adverse impact" on employee morale "as a result of" a religious accommodation "sufficient to constitute an undue hardship." *Weber v. Roadway Exp., Inc.*, 199 F.3d 270, 274 (5th Cir. 2000).

After the district court entered judgment in this case, however, the Supreme Court revisited *Hardison* and adopted a heightened standard for showing an undue hardship.  In *Groff v. DeJoy*, 600 U.S. 447 (2023), the Court rejected the notion that "showing 'more than a *de minimis* cost,' as that phrase is used in common parlance,'" can "suffice to establish 'undue hardship' under Title VII."  *Id.* at 468. Title VII instead requires "an employer [to] show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business."  *Id.* at 470.  The Court de-emphasized the phrasing of the "undue hardship" standard, instead stressing "that courts must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [the] employer."  *Id.* at 470-71 (internal quotation marks omitted).  These "relevant factors" include "an accommodation's effect on co-workers," which logically "may have ramifications for the conduct of the employer's business."  *Id.* at 472.  "Having clarified the Title VII undue-hardship standard" accordingly, the *Groff* Court deemed it "appropriate to leave the context-specific application of that clarified standard to the lower courts in the first instance."  *Id.* at 473.

While *Groff* thus heightened the undue-hardship standard, the Supreme Court recognized that, as this Court has long understood, the accommodations that

one employee requests can adversely affect other employees, taking a toll on overall employee morale and ultimately imposing taxing burdens on the business. In *Weber*, for example, this Court described how the trucking-company employee plaintiff's requested accommodation—"skipping over [him] to avoid pairing [him] with a female driver"—could "adversely affect other drivers":  "For example, the run Weber passes up might lead his substitute to accept a shorter run than she might otherwise, which provides less compensation and is therefore less valuable. Weber's substitute might also receive less rest and time off between runs than he or she might otherwise." *Weber*, 199 F.3d at 274.  The Court similarly observed in *Bruff v. North Mississippi Health Services, Inc.*, 244 F.3d 495 (5th Cir. 2001), that granting one employee's requested accommodation would take a toll on other employes by requiring them "to assume a disproportionate workload, or to travel involuntarily with Bruff to be available in case a problematic subject area came up." *Id.* at 501.  Likewise in *Brener v. Diagnostic Center Hospital*, 671 F.2d 141 (5th Cir. 1982), where the plaintiff requested that his employer "direct other employees to trade shifts with him," this Court noted how the employer's "experiment with this solution resulted in disruption of work routines and a lowering of morale among the other pharmacists." *Id.* at 146-47.

    *Groff* holds that the "mere possibility of an adverse impact on co-workers as a result of" an accommodation is not by itself "sufficient to constitute an undue

hardship," *Weber*, 199 F.3d at 274—but *Groff* does not hold that an accommodation's effect on coworkers can *never* give rise to undue hardship. Instead, contrary to prior circuit law, the *Groff* Court held that courts assessing undue hardship must proceed to consider how that spillover effect impacts the conduct of the employer's business overall. *See Groff*, 600 U.S. at 472 ("So an accommodation's effect on co-workers may have ramifications for the conduct of the employer's business, but a court cannot stop its analysis without examining whether that further logical step is shown in a particular case."). That does not invalidate this Court's observations in *Weber*, *Bruff*, and *Brener* about how granting one employee's request for an accommodation can adversely affect other employees; rather, the import of *Groff* is that the possibility of such an adverse impact on other employees is no longer enough. The employer must now show how the accommodation would affect the overall conduct of its business.

For the reasons explained in Part I above, an employer can satisfy *Groff*'s heightened standard by showing at trial how requested accommodations from rules meant to protect employee morale lead to costly operational disturbances with domino effects. Requiring airlines to accommodate conduct like Carter's, despite facially neutral policies to the contrary, would have crushing effects on the overall conduct of airlines' businesses. One employee's hostile conduct will foreseeably prompt another to call in sick to avoid having to work with the hostile employee—

or show up late, or underperform—which will have ripple effects throughout the carrier's network. Delaying one flight creates cascading delays for others, throwing off the airline's carefully planned schedules and disrupting the complex choreography necessary to keep its entire business smoothly functioning. And, of course, recognizing one employee's "right" to send harassing, obscene messages to her coworkers based on her religious beliefs would require the airline to recognize the same "right" for other employees, multiplying these deleterious ripple effects many times over. The conduct of airlines' overall business would obviously suffer as a result—and so too would airline employees, air travelers, and the Nation's economy as a whole.

Title VII in no way requires this outcome, but allowing the district court's decision to stand risks that result. Airlines must be able to maintain reasonable policies to ensure civility and respect in the workplace, and to take appropriate remedial actions when employees violate these policies to keep up the morale of their workforces, which in turn facilitates the smooth functioning of the entire industry.

### B. The RLA Does Not Bestow A Right To Harass Based On Union Disagreements

The district court likewise erred in construing the RLA to grant Carter a sweeping right to disregard Southwest's neutral policies and send hostile and offensive communications to a colleague. The district court's misapprehension of

the RLA, like its misunderstanding of Title VII, would have devastating consequences for the airline industry if allowed to stand.

To begin, the RLA is an odd place to find an employee's asserted right to make obscene and hostile communications contrary to company policies because the purpose of that statute is to facilitate employees' negotiation of a CBA *before* they form a union. Since the Supreme Court's "very first opportunity to interpret" §§ 152, Third and Fourth—the provisions under which the district court entered judgment for Carter on her RLA claim—the Court has "viewed them as addressing primarily the precertification rights and freedoms of unorganized employees." *Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants*, 489 U.S. 426, 440 (1989). These provisions are "not usually grounds for judicial intervention once the union has been certified." *Bhd. of Locomotive Eng'rs & Trainmen v. Union Pac. R.R. Co.*, 31 F.4th 337, 343 (5th Cir. 2022); *see also Stewart v. Spirit Airlines, Inc.*, 503 F. App'x 814, 819 (11th Cir. 2013) ("[O]nce a union is certified, the RLA dispute resolution system is put in place and judicial intervention is generally unnecessary and undesirable."). Accordingly, "intervention in a post-certification dispute under §§ 152, Third and Fourth will occur in extremely limited circumstances." *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 234 (1st Cir. 1996).

"Specifically," courts "will intervene upon demonstration of carrier conduct reflecting anti-union animus, an attempt to interfere with employee choice of collective bargaining representative, discrimination, or coercion," or "when a carrier commits acts of intimidation that cannot be remedied by administrative means, or commits a fundamental attack on the collecting bargaining process or makes a direct attempt to destroy a union." *Id.*; *see also Bhd. of Locomotive Eng'rs*, 31 F.4th at 346 ("Federal courts thus have jurisdiction over postcertification disputes alleging that railroad conduct motivated by antiunion animus is interfering with the employees' choice of representatives." (internal quotation marks omitted)). This case does not implicate any of the extraordinary circumstances in which a court may apply the RLA after a union is certified. *Carter*, not Southwest, acted with gross hostility toward the union's president. The RLA protects employees' right to form a union; Carter's conduct had nothing to do with that right, and the district court thus erred in deciding that the RLA gave Carter an avenue to relief here.

But even if the RLA did apply in this post-certification context, the district court still would have erred in construing the statute to protect Carter's obscene conduct. "[S]ome organizing activity may be so flagrant, violent or extreme or so egregious, opprobrious, offensive, obscene or wholly unjustified that it loses the protection of the RLA." *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 883 n.11

(9th Cir. 2002) (internal quotation marks omitted). This Court, applying the National Labor Relations Act (NLRA), has recognized that "[h]arassment and intimidation are not protected union activities; offensive, hostile language and threats are not protected even if under the guise of union activity." *NLRB v. Arkema, Inc.*, 710 F.3d 308, 316 (5th Cir. 2013); *see also NLRB v. Allied Aviation Fueling of Dallas LP*, 490 F.3d 374, 379 (5th Cir. 2007) (recognizing that the NLRA does not deny "the employer's right to maintain order and respect" (internal quotation marks omitted)). That result follows a fortiori under the RLA because the RLA protects organizing activity *more narrowly* than the NLRA. *Johnson v. Express One Int'l, Inc.*, 944 F.2d 247, 251 (5th Cir. 1991); *see ABM Onsite Servs— W., Inc. v. NLRB*, 849 F.3d 1137, 1140 (D.C. Cir. 2017) ("Employees often prefer to organize under the NLRA, as it protects a wider array of 'concerted activity' by employees than does the RLA."). This Court's precedents, then, instruct that the RLA does not protect "harassment," "intimidation," and "offensive, hostile language" any more than the NLRA does.

The district court got that backwards: the court specifically instructed the jury that "[a]ctivity that is intemperate, abusive, insulting, or hyperbolic is protected activity under Section 152 Third and Fourth." ROA.23-10836.13399-13400. For the reasons discussed above and in Southwest's brief, that was error. And that error caused prejudice by misleading the jury into thinking the RLA

23

protected Carter's obscene and offensive messages, even in the face of clear, neutral company policies prohibiting that kind of hostile and inappropriate conduct.

The consequences of the district court's decision, moreover, would be materially identical to those discussed earlier with respect to Title VII. The harassment the decision purports to allow would be based on union disagreements rather than religious conviction, but the result would be the same—foreseeable harm to employee morale, and in turn airlines' operations as a whole. Smaller-scale blips would have ripple effects leading to widespread disruption for airlines, employees, customers, and the economy. *See supra* at 19-20. The RLA does not require this result any more than Title VII does, and the Court should reverse.

## CONCLUSION

For the foregoing reasons, the Court should reverse the judgment below.

Dated:  October 19, 2023

Respectfully submitted,

/s/ Anton Metlitsky

| | |
|---|---|
| PATRICIA N. VERCELLI | ANTON METLITSKY |
| RIVA PARKER | O'MELVENY & MYERS LLP |
| AIRLINES FOR AMERICA | 7 Times Square |
| 1275 Pennsylvania Ave. NW | New York, NY 10036 |
| Suite 1300 | (212) 326-2000 |
| Washington, DC 20004 | |
| (202) 626-4001 | |
| | |
| ANDREW R. HELLMAN | JASON ZARROW |
| O'MELVENY & MYERS LLP | O'MELVENY & MYERS LLP |
| 1625 Eye Street NW | 400 South Hope Street, 18th Floor |
| Washington, DC 20006 | Los Angeles, CA 90071 |
| (202) 383-5300 | (213) 430-6005 |

**Counsel for *Amicus Curiae***
**Airlines for America**

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2023, a true and correct copy of the foregoing was filed electronically using the CM/ECF system, which served counsel for the parties.


<u>/s/ Anton Metlitsky</u>
Anton Metlitsky

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 5,529 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font, except for footnotes in 12-point Times New Roman font per Circuit Rule 32.1.

/s/ Anton Metlitsky
Anton Metlitsky