Nos. 23-10008, 23-10536, and 23-10836

In the

# United States Court of Appeals
## for the Fifth Circuit

CHARLENE CARTER,

*Plaintiff-Appellee/Cross-Appellant*,

v.

LOCAL 556, TRANSPORT WORKERS UNION OF AMERICA;
SOUTHWEST AIRLINES CO.,

*Defendants-Appellants/Cross-Appellees*.

CHARLENE CARTER,

*Plaintiff-Appellee*,

v.

SOUTHWEST AIRLINES CO.,

*Defendant-Appellant*.

On Appeal from the United States District Court for the
Northern District of Texas, Case No. 3:17-cv-02278-X,
Hon. Brantley Starr, *United States District Judge*

## SOUTHWEST AIRLINES COMPANY'S
## RESPONSE AND REPLY BRIEF

Paulo B. McKeeby
Brian K. Morris
REED SMITH LLP
2850 N. Harwood St., Ste. 1500
Dallas, TX 75201

Andrew B. Ryan
RYAN LAW PARTNERS LLP
3811 Turtle Creek Blvd., Ste. 780
Dallas, TX 75219

Shay Dvoretzky
 *Counsel of Record*
Parker Rider-Longmaid
Steven Marcus
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
shay.dvoretzky@skadden.com

*Counsel for Defendant-Appellant/Cross-Appellee Southwest Airlines Co.*

## CERTIFICATE OF INTERESTED PERSONS

**Nos. 23-10008 & 23-10536,** *Charlene Carter v. Local 556, Transport Workers Union of America; Southwest Airlines Co.*

**No. 23-10836,** *Charlene Carter v. Southwest Airlines Co.*

## I.    Appellant Southwest Airlines Co.

Southwest Airlines Co. is a publicly traded entity and is traded on the NYSE (LUV). The Vanguard Group has filed a Form 13G with the Securities and Exchange Commission stating that it beneficially owns more than 10% of the shares of Southwest Airlines Co. Southwest has no parent corporation, no other entity has reported holdings of over 10%, and there is not any other entity related to, or affiliated with Southwest that has a financial interest in the outcome of the claims asserted against it in this case.

## II.    Interested parties

### A.    Opposing counsel

Opposing counsel in the litigation are:

- Matthew B. Gilliam, National Right to Work Legal Defense Foundation

- Milton L. Chappell, National Right to Work Legal Defense Foundation

- Bobby G. Pryor, Pryor & Bruce

- Matthew D. Hill, Pryor & Bruce

- David E. Watkins, Jenkins & Watkins, PC

**B.    Other interested parties**

Additional firms and persons with an interest in the outcome of the litigation are:

- Cloutman & Cloutman, L.L.P.

- Law Offices of Cloutman and Greenfield, PLLC

- Kerrie Forbes, formerly at Southwest Airlines Co.

- Chris Maberry, Southwest Airlines Co.

- Kevin Minchey, Southwest Airlines Co.

- Norton Rose Fulbright US LLP

- Reed Smith LLP

- Ryan Law Partners LLP

- Sheppard Mullin Richter & Hampton LLP

- Skadden, Arps, Slate, Meagher & Flom LLP

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ....................................................i

TABLE OF AUTHORITIES.................................................................... vi

INTRODUCTION ................................................................................1

ARGUMENT......................................................................................7

I.    Carter failed to prove religious-belief-based discrimination as a
      matter of law, and the district court's erroneous undue-
      hardship instruction requires a new trial on religious-practice-
      based discrimination. ................................................................7

      A.    Title VII prohibits an employer from discriminating
            against an employee because of her religious belief or
            religious practice, and provides a defense for employers
            that cannot reasonably accommodate a religious practice
            without undue hardship. ..................................................8

      B.    Carter's religious-belief-based discrimination claim fails
            as a matter of law because she failed to introduce
            sufficient evidence that Southwest fired her because of
            her religious belief.........................................................14

            1.    Carter introduced no direct evidence of belief-based
                  discrimination, and any indirect-evidence theory
                  (which she repeatedly waived) fails as a matter of
                  law as well. ...........................................................15

            2.    Carter's counterarguments are wrong................................18

      C.    A new trial is required on Carter's religious-practice-
            based discrimination claim. .............................................24

# TABLE OF CONTENTS
### (continued)

Page

    1.    The jury instructions contravened this Court's then-controlling precedent holding that the mere possibility of adverse effects on employee morale was an undue hardship—the standard under which Southwest litigated its undue-hardship defense...............26

    2.    Carter's contrary arguments misstate this Court's caselaw, distort the trial record, and rely on inapposite ADA rules............................................................27

    3.    *Groff*'s changed standard continues to require a new trial...........................................................................35

    4.    Carter's counterarguments lack merit. ...............36

II.    The verdict on Carter's RLA retaliation claim must be reversed, and the dismissal of Carter's other RLA claim affirmed, because Carter produced no evidence that Southwest acted with anti-union animus or that she engaged in protected activity. .....................39

    A.    Carter's RLA retaliation verdict must be reversed because Carter produced no evidence that Southwest fired her with anti-union animus. ..................................................40

        1.    RLA § 152 Third and Fourth require a post-certification plaintiff to show anti-union animus, but Carter introduced no evidence of anti-union animus or intent to interfere with the union. ...................40

        2.    Carter's counterarguments lack merit. ...............44

    B.    Carter's cross-appeal lacks merit for the same reasons.............52

        1.    The district court correctly dismissed Carter's RLA claim because Carter failed to allege anti-union animus......................................................................52

# TABLE OF CONTENTS
## (continued)

Page

2.     Carter's counterarguments are wrong...............................53

C.    Even if Carter properly reached the jury on her RLA retaliation claim, a new trial would be required because the district court erroneously instructed the jury that the RLA protects obscene and abusive activity..................................54

1.     The district court's instruction that the RLA protects obscene and abusive activity was wrong. ..........................55

2.     Carter's counterarguments are wrong...............................56

III.   The Contempt Order rests on an invalid judgment, exceeds the district court's civil-contempt authority, and violates the First Amendment........................................................................................60

A.    The Contempt Order must be vacated because the verdict and judgment are invalid.................................................................61

B.    The Contempt Order is invalid even if the Court affirms the underlying judgment. .................................................................61

1.     The Contempt Order is invalid because Southwest substantially complied with the judgment .......................61

2.     The district court exceeded its civil-contempt power by ordering religious-liberty training. ................................62

3.     The Contempt Order violates Southwest's First Amendment rights.................................................................63

CONCLUSION ........................................................................................66

CERTIFICATE OF COMPLIANCE ....................................................67

CERTIFICATE OF SERVICE .............................................................68

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alkhawaldeh v. Dow Chemical Co.,*
851 F.3d 422 (5th Cir. 2017) ...................................................... 16, 17

*Association of Professional Flight Attendants v.*
*American Airlines, Inc.,*
843 F.2d 209 (5th Cir. 1988) ...............................................................42

*Atlantic Steel Co.,*
245 NLRB 814 (1979) ................................................ 6, 55, 56, 57, 58

*Brotherhood of Locomotive Engineers & Trainmen v.*
*Union Pacific Railroad,*
31 F.4th 337 (5th Cir. 2022) .................................................. 41, 46, 53

*Bruff v. North Mississippi Health Services, Inc.,*
244 F.3d 495 (5th Cir. 2001) ...............................................................28

*Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.,*
53 F.4th 368 (6th Cir. 2022) .......................................................... 44, 45

*Clark v. Champion National Security, Inc.,*
952 F.3d 570 (5th Cir. 2020) ...............................................................21

*Cliett v. Hammonds,*
305 F.2d 565 (5th Cir. 1962) ...............................................................61

*Connick v. Myers,*
461 U.S. 138 (1983) ...............................................................................49

*Deffenbaugh-Williams v. Wal-Mart Stores, Inc.,*
188 F.3d 278 (5th Cir. 1999) .................................. 4, 25, 29, 31, 35, 36

*Dixon v. The Hallmark Cos.,*
627 F.3d 849 (11th Cir. 2010) ...................................................... 15, 16

*Dupree v. Younger,*
598 U.S. 729 (2023) ...................................................................... 44, 45

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Equal Employment Opportunity Commission v.*
  *Abercrombie & Fitch Stores, Inc.,*
  575 U.S. 768 (2015) ............................................................ 3, 9, 10, 12,
  .................................................................................. 13, 14, 23, 25, 34

*Equal Employment Opportunity Commission v.*
  *Hacienda Hotel,*
  881 F.2d 1504 (9th Cir. 1989) ...........................................................32

*Federal Communications Commission v.*
  *Fox Television Stations, Inc.,*
  567 U.S. 239 (2012) ...........................................................................65

*Groff v. DeJoy,*
  600 U.S. 447 (2023) .......................................................... 4, 5, 23, 24,
  .............................................................................. 25, 29, 33, 35, 37

*Hawaiian Hauling Service, Ltd.,*
  219 NLRB 765 (1975) ........................................................................58

*Hebrew v. Texas Department of Criminal Justice,*
  80 F.4th 717 (2023) ............................................................... 32, 33, 35

*Heller v. EBB Auto Co.,*
  8 F.3d 1433 (9th Cir. 1993) ......................................................... 32, 33

*Herster v. Board of Supervisors of Louisiana State University,*
  887 F.3d 177 (5th Cir. 2018) ....................................................... 15, 16

*Howard v. Haverty Furniture Cos.,*
  615 F.2d 203 (5th Cir. 1980) ................................. 4, 5, 24, 25, 26, 28

*Hustler Magazine, Inc. v. Falwell,*
  485 U.S. 46 (1988) .............................................................................59

*International Brotherhood of Teamsters v.*
  *United Parcel Service, Co.,*
  447 F.3d 491 (6th Cir. 2006) ...................................................... 42, 43

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Johnson v. Express One International Inc.,*
  944 F.2d 247 (5th Cir. 1991) ................................................49

*Konop v. Hawaiian Airlines, Inc.,*
  302 F.3d 868 (9th Cir. 2002) ........................................... 6, 55, 58, 59

*Lee v. Kansas City Southern Railway Co.,*
  574 F.3d 253 (5th Cir. 2009) ............................................17

*Lewis v. City of Union City,*
  918 F.3d 1213 (11th Cir. 2019) (en banc) ................................ 16, 17

*Lightner v. City of Wilmington,*
  545 F.3d 260 (4th Cir. 2008) ............................................16

*Linn v. United Plant Guard Workers of America,*
  383 U.S. 53 (1966) ........................................... 57, 58, 59

*Loulseged v. Akzo Nobel Inc.,*
  178 F.3d 731 (5th Cir. 1999) ........................................ 33, 34

*Massaro v. Palladino,*
  19 F.4th 197 (2d Cir. 2021) .............................................61

*McDonnell Douglas Corp. v. Green,*
  411 U.S. 792 (1973) .......................................... 2, 3, 16, 17,
  .............................................................. 19, 20, 21, 22, 24

*Miller v. California,*
  413 U.S. 15 (1973) .......................................... 59, 60

*Minjares v. Independent Association of Continental Pilots,*
  293 F.3d 895 (5th Cir. 2002) ............................................46

*Mobil Exploration & Producing U.S., Inc. v.
  National Labor Relations Board,*
  200 F.3d 230 (5th Cir. 1999) ............................................49

*National Collegiate Athletic Association v. Tarkanian,*
  488 U.S. 179 (1988) .......................................... 48, 49, 60

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*National Labor Relations Board v. City Disposal Systems Inc.*,
    465 U.S. 822 (1984).................................................................................55

*National Labor Relations Board v. Collier*,
    553 F.2d 425 (5th Cir. 1977) ....................................................... 16, 17

*Old Dominion Branch No. 496 v. Austin*,
    418 U.S. 264 (1974).............................................................. 57, 58, 59

*Portis v. First National Bank of New Albany*,
    34 F.3d 325 (5th Cir. 1994) ......................................................... 15, 16

*Radio Officers' Union of Commercial Telegraphers Union
    v. National Labor Relations Board*,
    347 U.S. 17 (1954)...................................................................................53

*Renneisen v. American Airlines, Inc.*,
    990 F.2d 918 (7th Cir. 1993) ......................................... 42, 43, 50, 51

*Roscello v. Southwest Airlines Co.*,
    726 F.2d 217 (5th Cir. 1984) ....................................................... 47, 48

*Russell v. National Mediation Board*,
    714 F.2d 1332 (5th Cir. 1983) ............................................. 50, 53, 54

*Steele v. Louisville & Nashville Railroad*,
    323 U.S. 192 (1944)...............................................................................51

*Tagore v. United States*,
    735 F.3d 324 (5th Cir. 2013) ...................................................... 10, 11

*Texas v. Johnson*,
    491 U.S. 397 (1989)...............................................................................59

*Trans World Airlines, Inc. v.
    Independent Federation of Flight Attendants*,
    489 U.S. 426 (1989).......................................................... 5, 41, 45, 46

*United States v. Board of Education for the
    School District of Philadelphia*,
    911 F.2d 882 (3d Cir. 1990) ..................................................................9

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Vaca v. Sipes*,
  386 U.S. 171 (1967) ................................................................ 51

*Weber v. Roadway Express, Inc.*,
  199 F.3d 270 (5th Cir. 2000) ................................. 4, 5, 24, 25,
  ................................................................ 26, 27, 28, 33

*Wightman v. Springfield Terminal Railway*,
  100 F.3d 228 (1st Cir. 1996) ................................. 5, 42, 46

**CONSTITUTION AND STATUTES**

U.S. Const. amend. I ................................. 7, 40, 48, 49, 50,
  ................................................................ 53, 54, 55, 57, 58

National Labor Relations Act,
  29 U.S.C. § 157 *et seq.* ................................. 6, 7, 48, 49, 50,
  ................................................................ 53, 54, 55, 57, 58

  29 U.S.C. § 157 ................................................................ 49, 53

42 U.S.C. § 1981a(a)(3) ................................................................ 34

Title VII of the Civil Rights Act of 1964,
  42 U.S.C. § 2000e *et seq.* ................................. 1, 2, 3, 7, 8, 9,
  ................................................................ 10, 11, 12, 13, 14,
  ................................................................ 16, 17, 20, 21, 22, 23,
  ................................................................ 24, 26, 28, 31, 33, 34,
  ................................................................ 35, 36, 61, 62, 63, 64, 65

  42 U.S.C. § 2000e-2(a)(1) ................................................................ 9

  42 U.S.C. § 2000e(j) ................................. 2, 9, 11, 13, 14, 31

Americans with Disabilities Act,
  42 U.S.C. § 12101 *et seq.* ................................. 4, 25, 27, 28, 33, 34

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Railway Labor Act,
  45 U.S.C. § 151 *et seq.*................................................... 1, 2, 5, 6, 39, 40,
  ................................................................................. 41, 42, 43, 44, 45,
  ................................................................................. 46, 47, 48, 49, 50, 51,
  ................................................................................. 52, 53, 54, 55, 56, 58, 59

  45 U.S.C. § 151 Sixth................................................................. 40, 42, 50

  45 U.S.C. § 152 Third................................................................. 5, 40, 41, 42, 43,
  ................................................................................. 44, 45, 46, 47, 48, 51

  45 U.S.C. § 152 Fourth ............................................................. 5, 40, 41, 42, 43,
  ................................................................................. 44, 45, 46, 47, 48, 51

**RULES AND REGULATION**

Fed. R. Civ. P. 11 ......................................................................................63

Fed. R. Civ. P. 50(b) .......................................................................... 44, 45

Fed. R. Civ. P. 56 .....................................................................................44

29 C.F.R. § 1630.2(o)(3) ..........................................................................34

**OTHER AUTHORITIES**

Fifth Circuit Pattern Jury Instruction ........................................... 28, 29

  Fifth Circuit Pattern Jury Instruction § 11.10 ................................28

1 Clifford S. Fishman & Anne Toomey McKenna,
  *Jones on Evidence* (7th ed. Nov. 2023) ..............................................18

## INTRODUCTION

Southwest terminated flight attendant Charlene Carter's employment because Carter sent unsolicited, graphic, and hostile videos and messages to her coworker, in violation of Southwest's civility and anti-harassment policies. Carter claimed that her termination violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, because (she claimed) Southwest was motivated by Carter's religious beliefs and religious practice in firing her, and violated the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.*, because (she claimed) Southwest fired her after she engaged in protected activity by opposing her union's president. A jury returned a verdict for Carter on both Title VII counts and one RLA count.

Carter's brief confirms that the jury verdict and the Contempt Order it supports cannot stand. Carter's arguments collapse the critical distinction Title VII draws between religious belief and religious practice, writing the undue-hardship defense out of the statute. Her arguments ignore the fundamental definition of direct evidence and the need to show a comparator to prove belief-based discrimination without direct evidence. Her undue-hardship arguments contravene Title VII's text and the Supreme Court's caselaw.

And her RLA arguments, similarly, contravene the well-established requirement that a post-certification plaintiff show anti-union animus.

The Court should reverse.

**I.**    Carter's brief confirms that the Title VII verdicts cannot stand.

**A.**    Title VII draws a critical definitional distinction between "religious belief" and "religious practice." As to practice, the statute does not protect religious conduct if the employer cannot reasonably accommodate that conduct without undue hardship. 42 U.S.C. § 2000e(j). An employee cannot simply convert a practice-based discrimination claim, which is subject to the undue-hardship defense, into a belief-based discrimination claim. To prevail on a belief-based claim, the employee must show discrimination with direct evidence, or, if she has only indirect evidence, by proceeding under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and showing evidence that she was treated less favorably than similarly situated employees not sharing her beliefs.

Carter's contrary arguments collapse belief-based and practice-based discrimination claims and try to create two separate practice-based claims, "unlawful discharge" and "failure to accommodate," while denying the undue-hardship defense to "unlawful discharge" claims. Those arguments

- 2 -

contravene Title VII's text and structure and Supreme Court caselaw. There is only one kind of practice-based discrimination claim, as *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 772 & n.2 (2015), makes clear, and it is subject to the undue-hardship defense.

**B.**     Carter's religious-belief-based discrimination claim fails as a matter of law because she didn't introduce sufficient evidence that Southwest fired her because of her religious beliefs. Carter claims she introduced direct evidence, but direct evidence is evidence that proves the matter asserted without inference. And all the evidence Carter points to is evidence that Southwest fired Carter for her *conduct*—meaning an inference (and an unwarranted one) would be required to find belief-based discrimination. That means Carter had to proceed on an indirect-evidence theory under *McDonnell Douglas*. But Carter repeatedly waived reliance on a *McDonnell Douglas* theory, and her responses don't show otherwise. And she has no response to the fatal problem that she failed to satisfy this theory by identifying a similarly situated employee without her beliefs who was treated more favorably.

**C.**     The Court must also vacate the verdict as to Carter's practice-based-discrimination claim, because the district court gave an erroneous undue-hardship instruction.

**1.**     At the time of trial, this Court's precedent defined undue hardship as including "the mere possibility of an adverse impact on co-workers," *Weber v. Roadway Express, Inc.*, 199 F.3d 270, 274 (5th Cir. 2000), even if the employer "incurred no direct money cost" as a result, *Howard v. Haverty Furniture Cos.*, 615 F.2d 203, 206 (5th Cir. 1980). But the court instructed the jury that undue hardship required "financial costs or disruption of the business." ROA.23-10836.13406-13407. That was error. Carter's defense of the instruction disregards *Weber*'s and *Howard*'s holdings and relies on Americans with Disabilities Act (ADA) rules with no relevance here.

**2.**     After trial, the Supreme Court decided *Groff v. DeJoy*, 600 U.S. 447 (2023), which now requires employers to show financial costs. When controlling law changes after trial and before appeal, this Court remands for a new trial. *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 282 (5th Cir. 1999). That's what should happen here. Carter agrees that, generally speaking, remand is warranted in these circumstances, but argues that Southwest somehow should have predicted *Groff*'s holding—even though

the cert petition in *Groff* wasn't even filed until after trial. And Carter disputes that Southwest showed, or could show, evidence connecting employee morale with financial harm. But Southwest didn't need to put on such evidence at trial given *Weber* and *Howard*. In short, Carter's argument asks the Court to tell parties they cannot rely on controlling precedent.

**II.**    The verdict on Carter's remaining claim, for retaliation under the RLA, also fails, as does Carter's attempt to revive another RLA claim that the district court correctly dismissed.

**A.**    Carter didn't allege, let alone prove, that Southwest acted with the longstanding requirement of anti-union animus. The RLA provisions Carter invokes, § 152 Third and Fourth, "address[] primarily the precertification rights and freedoms of unorganized employees," *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*, 489 U.S. 426, 440 (1989), and post-certification RLA claims apply in only "extremely limited circumstances," where the employer acts with "anti-union animus," *Wightman v. Springfield Terminal Railway*, 100 F.3d 228, 234 (1st Cir. 1996). Carter contends that she either satisfied or did not need to satisfy that requirement because she was fired for engaging in "protected activity" by opposing Audrey Stone as a union officer. But the RLA is concerned with the selection of the

bargaining "representative" — that is the union; in this case, Local 556 — not with the representative's internal politics. Put simply, the law requires anti-union animus by the employer, and does not reach an employee's opposition to individual union officers, rather than the union itself.

**B.** Carter's cross-appeal fails for the same reasons: the district court correctly dismissed her other post-certification RLA claim for failing to meet the anti-union animus requirement.

**C.** The district court's erroneous RLA jury instruction also requires reversal. The court instructed the jury that activity "that is intemperate, abusive, insulting, or hyperbolic is protected," ROA.23-10836.13400, but that instruction misstates the law. The RLA caselaw, which draws from National Labor Relations Act (NLRA) precedent, doesn't protect *all* offensive conduct. *See Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 883 n.11 (9th Cir. 2002). Carter defends the instruction by pointing to other NLRA cases, but those cases don't define the outer bounds of protected activity, and, in any event, they describe NLRA precedent that has since been revisited. The current state of NLRA law is that an employee "who is engaged in concerted protected activity can, by opprobrious conduct, lose the protection of the [NLRA]," *Atlantic Steel Co.*, 245 NLRB 814, 816 (1979), but the district court

told the jury that opprobrious conduct *is* protected. That instruction was wrong, and it requires a new trial.

**III.**   The Contempt Order must be vacated, too. For one thing, the Order rests on an invalid judgment. For another, the Order was unwarranted because Southwest substantially complied with the judgment. And the sanction was as unlawful as it was novel: it exceeded the district court's civil-contempt authority and violated Southwest's First Amendment rights. Carter's contrary arguments fail. She fixates on one word in Southwest's email to its flight attendants, ignoring the clear message of the communication, and she fails to identify *any* precedent for the district court's Order that Southwest attorneys attend religious-liberty training conducted by a partisan organization. The Court should vacate the Contempt Order.

## ARGUMENT

**I.**   **Carter failed to prove religious-belief-based discrimination as a matter of law, and the district court's erroneous undue-hardship instruction requires a new trial on religious-practice-based discrimination.**

Title VII distinguishes between religious-belief-based discrimination and religious-practice-based discrimination, and gives employers an undue-hardship defense as to practice-based discrimination. So a plaintiff prevails

if she shows that her employer terminated her (1) because of her religious belief, or (2) because of her religious practice, but only if the employer can reasonably accommodate that practice without undue hardship. Carter failed as a matter of law to show belief-based discrimination—she presented no direct evidence, or any comparator evidence, as needed for an indirect-evidence case. And the district court gave the wrong instruction (over Southwest's repeated objection) on Carter's practice-based claim.

Carter's responses conflate religious belief and religious practice, even though Title VII makes clear that those two terms are distinct. Indeed, collapsing belief and practice would nullify the undue-hardship defense. Carter's counterarguments also misunderstand Title VII's distinction between direct-evidence cases and indirect-evidence cases. Carter failed to prove belief-based discrimination as a matter of law, and her practice-based discrimination claim cannot stand given the incorrect jury instructions.

**A.** **Title VII prohibits an employer from discriminating against an employee because of her religious belief or religious practice, and provides a defense for employers that cannot reasonably accommodate a religious practice without undue hardship.**

**1.** **a.** As Southwest explained (Br. 39-41), Title VII draws a key distinction between religious-belief-based discrimination and religious-

practice-based discrimination. While Title VII prohibits an employer from discharging an employee "because of [her] religion," 42 U.S.C. § 2000e-2(a)(1), the statute does not protect religious conduct that can employer cannot reasonably accommodate without undue hardship, *id.* § 2000e(j). The statute achieves that result by defining "religion" to include "belief," as well as "religious observance or practice" that can be reasonably accommodated "without undue hardship on the conduct of the employer's business." *Id.* If reasonably accommodating the religious conduct would cause undue hardship, the conduct simply is not "religious practice," and thus not "religion" as the statute defines it. *See United States v. Board of Education for the School District of Philadelphia*, 911 F.2d 882, 886 (3d Cir. 1990). Title VII thus creates two paths to liability: an employee can prevail if she shows that her employer discharged her because of her religious beliefs (*e.g.*, the belief that abortion is wrong), or if she shows that her employer discharged her because of her religious conduct (*e.g.*, sending coworkers graphic videos of abortion), but *only* if that conduct is one that can be reasonably accommodated without undue hardship.

Depending on the nature of the case, courts sometimes refer to practice-based discrimination claims as unlawful discharge claims and

sometimes as failure-to-accommodate claims. *See Abercrombie*, 575 U.S. at 772 & n.2. But no matter the shorthand, there is just one "disparate treatment" "cause[] of action" for discrimination based on religious practice. *Id.* at 771-72. For example, "[f]ailing to hire" "'because of' the plaintiff's 'religious practice'" "is *synonymous* with refusing to accommodate the religious practice. To accuse the employer of the one is to accuse him of the other." *Id.* at 772 n.2. That's because if an employer "is willing to 'accommodate'—which means nothing more than allowing the plaintiff to engage in her religious practice despite the employer's normal rules to the contrary—adverse action 'because of' the religious practice is not shown." *Id.*

**b.** Title VII treats belief-based and practice-based discrimination differently precisely because the undue-hardship defense applies to practice-based claims but not belief-based claims. By the same token, Title VII doesn't allow an employee to repackage the same religious-practice-based discrimination claim as a religious-belief-based discrimination claim to avoid the undue-hardship defense. Thus, for instance, a Sikh employee fired for bringing a sword to work cannot reframe a claim that the employer discriminated against him for his religious practice of sword-carrying as a religious-belief-based discrimination claim to avoid the employer's defense

that accommodating sword-carrying would cause undue hardship. *Tagore v. United States*, 735 F.3d 324, 329-30 (5th Cir. 2013). If accommodating sword-carrying at work causes undue hardship to the employer, the employee cannot avoid the undue-hardship defense simply by claiming, without any additional evidence, that his dismissal for carrying a sword was motivated by animosity towards Sikhs. To be sure, that employee might be able to prevail on a belief-based discrimination claim with additional direct or comparator evidence showing that the employer held animosity towards Sikhs. Without more, however, the mere fact that an employee was terminated for engaging in conduct that causes an undue hardship does not permit the inference that the dismissal violates Title VII's prohibition on discrimination because of *belief*. To hold otherwise would nullify the undue-hardship defense by ignoring the statute's explicit definition of "religion" in § 2000e(j). Southwest Br. 39-41.

**2.    a.**    Carter doesn't engage with Title VII's text or the well-established principle that a religious-practice-based discrimination claim is subject to the undue-hardship defense no matter the shorthand for the claim, like "unlawful discrimination" or "failure to accommodate." Instead, Carter appears to suggest (Br. 31-33) that there is a category of practice-based

discrimination claims treated just like belief-based discrimination claims, to which the undue-hardship defense simply doesn't apply. Specifically, Carter posits (Br. 27, 36) that Title VII creates two paths to liability: an employer is liable (1) if it discharges an employee motivated by the employee's religious beliefs, practices, or observances; and (2) if it fails to accommodate an employee's religious beliefs, practices, or observances. In other words, rather than accepting the well-established, textual reading of Title VII as creating separate frameworks for belief-based and practice-based discrimination, Carter claims that Title VII treats belief, practice, and observance just the same for one set of discrimination claims, while also creating a separate "failure to accommodate" claim for practice-based discrimination. In Carter's view, there is no undue-hardship defense to a practice-based discrimination claim, because undue hardship can be a defense only to a distinct failure to accommodate claim. Proceeding from this view, Carter appears to suggest that the Court should separately analyze a claim Southwest fired her motivated by her religious practice, on the one hand, and a claim that Southwest failed to accommodate her, on the other. *Compare* Br. 27-31, *with* Br. 46.

That view is wrong. It contravenes Title VII's text and the Supreme Court's decision in *Abercrombie*, and lacks any foundation in the caselaw. As

explained (at 12-13), *Abercrombie* makes clear that there is a single type of disparate treatment claim for religious practice: failing to accommodate a religious practice is the same claim as taking an adverse action because of that religious practice, 575 U.S. at 772-73, and the claim is subject to the undue-hardship defense, *see id.* at 771-72 & n.1; 42 U.S.C. § 2000e(j). Indeed, Carter ultimately acknowledges later on that "[f]iring an employee because of her religious practice 'is *synonymous* with refusing to accommodate the religious practice.'" Br. 36 (quoting *Abercrombie*, 575 U.S. at 772 n.2). That makes sense as a matter of basic textual interpretation because, by definition, a religious practice is protected by Title VII *only* if accommodating it does not inflict "undue hardship" on the employer. 42 U.S.C. § 2000e(j).

**b.** Focusing on the "motivating factor" doesn't allow Carter to avoid Southwest's undue-hardship defense, either. Contrary to Carter's argument, *Abercrombie* doesn't suggest that whether her religious practice "was a motivating factor in her termination" is the "only" question. Carter Br. 31. *Abercrombie* didn't address the question of when religious conduct becomes protected religious practice under Title VII, because the "parties concede[d] that" the conduct at issue—the employee's wearing of a head-scarf—was a "religious practice," 575 U.S. at 772, and the undue-hardship

requirement wasn't at issue, *see id.* at 772 & n.1. The *only* dispute was

whether the employee wasn't hired "because of" her religious practice. *Id.*

    **c.**    Carter's description of what she calls her "reasonable accommo-

dation" claim underscores that she has created a framework with no

foundation in Title VII or the caselaw. Carter contends that Southwest

"failed to accommodate [her] religious observances, beliefs, and practices."

Br. 36. But the concept of accommodation, under Title VII's plain definitional

text, applies to an employee's *practices*, not her beliefs. 42 U.S.C. § 2000e(j).

    Construing Title VII correctly matters. Under the correct (and well-es-

tablished) construction of Title VII, Carter needed (but failed) to produce

sufficient evidence of her belief-based claim, without conflating the distinct

concepts of practice and belief, and Southwest was entitled to raise an un-

due-hardship defense to Carter's practice-based claim.

    **B.**    **Carter's religious-belief-based discrimination claim fails as a
matter of law because she failed to introduce sufficient
evidence that Southwest fired her because of her religious
belief.**

    The verdict on Carter's belief-based-discrimination claim cannot stand

because Carter introduced no direct evidence that Southwest fired her for

her religious belief, and an indirect-evidence theory doesn't work, either,

both because Carter waived such a theory and because she didn't produce any comparator evidence. Carter claims that Southwest's acknowledgment that it fired her for her *conduct* is direct evidence of belief-based discrimination. But that argument conflates practice and belief, and would require an *inference* that because Southwest was motivated by Carter's behavior, it was also motivated by her belief. That inference is unwarranted, but most importantly, the need for an inference is what shows Carter has failed to produce direct evidence. And Carter doesn't even try to point to anyone similarly situated who wasn't fired for engaging in similar conduct. The record is devoid of evidence that could indicate that Carter was terminated for any reason other than her violation of neutral company policies.

> **1.    Carter introduced no direct evidence of belief-based discrimination, and any indirect-evidence theory (which she repeatedly waived) fails as a matter of law as well.**

**a.**    Carter introduced no direct evidence—evidence that requires no inference to prove the matter asserted, *see Herster v. Board of Supervisors of Louisiana State University*, 887 F.3d 177, 185 (5th Cir. 2018)—that Southwest fired her because of her religious belief. Direct evidence reveals impermissible discrimination on its face. Examples of direct evidence are statements like "You're fired. … You're too religious," *Dixon v. The Hallmark Cos.*, 627

F.3d 849, 854 (11th Cir. 2010), or "she would be paid less *because she was a woman*," *Portis v. First National Bank of New Albany*, 34 F.3d 325, 329 (5th Cir. 1994). Understandably, direct evidence of religious-belief discrimination is rare. *See Herster*, 887 F.3d at 185. And this case isn't the rare exception. Carter put forward no direct evidence that any Southwest employee, let alone those involved in her termination (many who shared Carter's beliefs about abortion), participated in the decision to fire her motivated by her religious beliefs. Southwest Br. 41-44.

**b.** Lacking direct evidence of belief-based discrimination, Carter needed to pursue the more common route under *McDonnell Douglas*: using indirect evidence to show that Southwest's stated reason for firing her—her noncompliance with facially neutral company policies—was pretextual. But an indirect-evidence case under *McDonnell Douglas* requires the employee to produce "evidence that he was treated less favorably than others 'similarly situated' outside of his protected class." *Alkhawaldeh v. Dow Chemical Co.*, 851 F.3d 422, 426 (5th Cir. 2017). That's because "Title VII was enacted to prohibit *discrimination* on the basis" of race, gender, and religion. *Lightner v. City of Wilmington*, 545 F.3d 260, 262 (4th Cir. 2008) (emphasis added). "Discrimination consists of treating like cases differently," *NLRB v. Collier*, 553 F.2d 425,

428 (5th Cir. 1977)—an inherently "comparative concept," *Lewis v. City of Union City*, 918 F.3d 1213, 1223 (11th Cir. 2019) (en banc). Title VII thus requires an employee with a pretext theory of discrimination to "identify at least one coworker outside of his protected class who was treated more favorably 'under nearly identical circumstances.'" *Alkhawaldeh*, 851 F.3d at 426 (quoting *Lee v. Kansas City Southern Railway Co.*, 574 F.3d 253, 259 (5th Cir. 2009)).

Carter failed to meet that requirement. Indeed, she has repeatedly waived any attempt to satisfy it, by refusing to point to indirect evidence to defend the jury verdict. Southwest Br. 51-52. Carter insisted before trial that "[t]his is not a pretext case," ROA.23-10836.7006, and then claimed after trial that "*McDonnell Douglas* indirect proof" was "unnecessary," ROA.23-10836.10354. That kind of waiver is fatal, as this Court has repeatedly held. *See* Southwest Br. 51 (citing cases). And even if Carter hadn't waived a *McDonnell Douglas* indirect-evidence theory, she still couldn't prevail, because she has never identified a similarly situated employee outside of her protected class who engaged in the same conduct, but was treated differently. *See Alkhawaldeh*, 851 F.3d at 426.

### 2.    Carter's counterarguments are wrong.

**a.**    Carter first contends that she introduced "direct evidence" that she was fired because of her "beliefs, observances, *and* practices." Br. 27. That direct evidence, Carter claims, consists of Southwest's "statements and admissions that it fired Carter for privately sending and publicly posting on her own Facebook page overtly religious pro-life videos, posts, and messages reflecting her belief that abortion is the taking of human life contrary to God's will, and her belief in sharing that message." Br. 29.

That argument reflects a basic misunderstanding of what direct evidence is: statements that Southwest fired Carter for her conduct cannot be direct evidence that Southwest fired Carter for her beliefs, because the latter conclusion would require an inference (and an unwarranted one, at that). Again, direct evidence is evidence that proves the matter asserted *without inference*. When a witness says, "It's raining outside," that's direct evidence that it is raining. When a person walks into the courtroom with a wet umbrella, in contrast, that's indirect evidence that it's raining. That's Evidence 101. *See* 1 Clifford S. Fishman & Anne Toomey McKenna, *Jones on Evidence* § 4:1 (7th ed. Nov. 2023).

Take Southwest's statements that it terminated Carter because her conduct violated company policies. On Carter's view, those statements would be direct evidence that Southwest fired her for her religious *conduct*. (Whether they are evidence that Southwest fired her because of her religious *practice* definitionally turns on whether reasonably accommodating that conduct would impose an undue hardship on Southwest's business. *See supra* pp. 8-10.) But even putting aside Carter's inability to introduce any evidence that any Southwest employee harbored any animus to Carter's religious beliefs, those statements are not direct evidence of belief-based discrimination because the factfinder would have to rely on *inference* to reach that conclusion. Even assuming such an inference were otherwise permissible, that would only make the evidence *indirect*—triggering the *McDonnell Douglas* framework that Carter has repeatedly waived.

Supreme Court and Circuit precedent draw that line between direct evidence and indirect evidence for good reason—indeed, the undue-hardship defense would collapse without it. While evidence of practice-based discrimination might be probative of belief-based discrimination, if a plaintiff could prove belief-based discrimination simply by pointing to practice-based motivation, a plaintiff would always be able to avoid the undue-

hardship defense. *See supra* pp. 10-11. Any practice-based discrimination claim could become, without more, a belief-based claim, writing the undue-hardship defense out of the statute. Of course, that's not how Title VII or Supreme Court or Circuit precedent interpreting the statute work. As explained below, a plaintiff without direct evidence of discrimination (like Carter) must proceed not just with *any* indirect evidence, but evidence that meets the *McDonnell Douglas* test's comparator requirement.

Applying the basic definitions of direct and indirect evidence makes clear that Carter produced no direct evidence of belief-based discrimination: no evidence that, without inference, shows that Southwest fired her because of her religious belief. All of her evidence pertained to conduct—that Southwest fired her for what she *did*.

Resisting this conclusion, Carter says that her "religious Facebook communications were also religious expression observing and practicing her beliefs"; that she has a "religious belief in showing that abortion takes human life"; and that she "told Southwest … that she had a religious belief in showing that abortion takes human life." Br. 29. She also claims that "Southwest targeted the beliefs reflected in the communication's content." Br. 30. But she has pointed to no direct evidence—zero—that Southwest fired her

for her beliefs rather than the conduct that she claims those beliefs moti-
vated. In short, her arguments require inference as to belief-based
discrimination. Indeed, it's well-established that an employee's general
knowledge of a protected characteristic, together with her termination, isn't
direct evidence of discrimination. Southwest Br. 42. That's because a Title
VII plaintiff must show that the employee was discharged *because of* her re-
ligious belief; an employer's knowledge of the belief alone is not enough,
because that fact alone requires an inference. *Clark v. Champion National Se-
curity, Inc.*, 952 F.3d 570, 580-81 (5th Cir. 2020).

    **b.**    Without direct evidence, Carter can succeed on her belief-based
discrimination claim only by producing indirect evidence that satisfies the
*McDonnell Douglas* framework. Carter now claims that she "never waived
her right to present indirect evidence," Br. 30, but she cites only the jury in-
structions, which are irrelevant to the actual question—whether the indirect
evidence Carter submitted was sufficient (*i.e.*, included a comparator). And
on *that* question, Carter's posttrial briefing is clear: she didn't "rely on a 'pre-
text' or 'indirect evidence' theory" at trial, and she's not even trying to argue
that she submitted sufficient evidence of pretext under *McDonnell Douglas*.
ROA.23-10836.10354. And Carter *still* hasn't identified any evidence of

pretext. She doesn't contest that a plaintiff proceeding under an indirect-evidence theory must point to a comparator, *see supra* pp. 16-17, but she points to no evidence that Southwest treated non-Christian or non-pro-life employees any differently than it treated her. Carter's failure to identify a valid comparator is fatal to her ability to prevail under an indirect evidence theory, even if she hadn't waived it.

**c.**    Finally, Carter claims that Southwest did not "assert[] a legitimate *nondiscriminatory* reason for firing Carter," although she never explains how this arguments fits into the Title VII framework. Br. 34. That argument fails. The concept of a legitimate nondiscriminatory reason arises under the *McDonnell Douglas* framework: once the plaintiff puts on a prima facie case that the defendant discriminated against her for a protected characteristic, the defendant can produce contrary evidence that it instead took adverse action against the plaintiff for a legitimate nondiscriminatory reason. *McDonnell Douglas*, 411 U.S. at 802. At that point, the plaintiff then bears the burden of persuasion to show that the defendant's nondiscriminatory reason was pretextual, and the defendant was actually motivated by the protected characteristic. *Id.* at 804. To show pretext, of course, the plaintiff must

identify a similarly situated comparator—something Carter did not and cannot do. *Supra* pp. 16-17.

The problem with Carter's argument is that she conflates whether Southwest produced evidence of a legitimate nondiscriminatory reason for firing Carter with whether she introduced sufficient evidence as a matter of law to carry her burden to show pretext. Southwest indisputably pointed to facially neutral policies it applied to justify firing Carter. Southwest Br. 51. Carter doesn't argue otherwise. Instead, she argues that "Title VII requires *otherwise-neutral* policies to give way to the need for an accommodation." Br. 36 (emphasis added; quoting *Abercrombie*, 575 U.S. at 775). In her view, failing to give her beliefs "favored treatment" "is a *discriminatory* reason." Br. 35. But neither Title VII nor the caselaw interpreting it says that a facially neutral policy becomes discriminatory because it doesn't favor religious belief. Carter's contrary argument once again conflates practice and belief, this time by inserting words that aren't there into a quote from *Abercrombie*. *See* Carter Br. 35. To be sure, the Supreme Court has held that Title VII gives religious *practice* favored treatment by requiring employers to reasonably accommodate it, despite any policy to the contrary, when doing so will not impose an undue hardship. *See Abercrombie*, 575 U.S. at 775; *Groff*, 600 U.S. at

472. But those decisions do not say (and it would make no sense for them to say) that Title VII requires facially neutral policies to favor religious *belief*.

Southwest's policies are facially neutral, and can thus provide a legitimate nondiscriminatory reason for firing an employee. To prevail on a belief-based claim, Carter had to show that Southwest's reliance on those policies was pretext, but she couldn't satisfy her burden as a matter of law under *McDonnell Douglas*. And while Carter was entitled to pursue a practice-based claim that Southwest's policies had to yield to her practice, that claim is also subject to Southwest's undue-hardship defense, as discussed below (at 26-27).

### C.    A new trial is required on Carter's religious-practice-based discrimination claim.

Southwest is also entitled to a new trial on Carter's practice-based claim. Southwest presented its defense under Fifth Circuit precedent holding that an employer satisfied Title VII's undue hardship defense by proving harm to employee morale, without any financial consequences. Southwest Br. 54-56 (citing *Weber*, 199 F.3d at 274, *Howard*, 615 F.2d at 206). But after Southwest rested, the district court instructed the jury, over Southwest's objection and contrary to that precedent, that undue hardship must impose

- 24 -

financial costs. After trial, but before this appeal, the Supreme Court decided *Groff v. DeJoy*, which set out a new test for undue hardship. This Court generally remands for a new trial when the law change after judgment, *see Deffenbaugh-Williams*, 188 F.3d at 282, and that's what it should do here, because Southwest had no reason to expect the changed law.

Carter doesn't dispute the *Deffenbaugh-Williams* principle. Instead, she tries to defend the jury instructions by disregarding *Weber* and *Howard*'s plain holdings and pointing to inapplicable Americans with Disabilities Act caselaw. She also claims that Southwest should have somehow predicted *Groff*'s change in law, even though the cert petition in *Groff* hadn't even been filed by the time the jury reached its verdict, and even though her argument would require the Court to hold that parties cannot rely on then-controlling circuit precedent to present their cases at trial. Finally, Carter contends that Southwest cannot raise an undue-hardship defense at all because it didn't have accommodation discussions with Carter—but that notion finds no support in the statute and is contrary to the statute's text and the principles the Supreme Court articulated in *Groff* and *Abercrombie*.

**1. The jury instructions contravened this Court's then-controlling precedent holding that the mere possibility of adverse effects on employee morale was an undue hardship—the standard under which Southwest litigated its undue-hardship defense.**

At the time of trial, this Court's caselaw made clear that religious conduct that harms employee morale was not protected by Title VII, because accommodating that conduct was understood to create an undue hardship, without any showing of financial harm to the business. *Weber*, 199 F.3d at 274; *Howard*, 615 F.2d at 206. Southwest presented its undue-hardship defense under that standard, introducing evidence that accommodating Carter's conduct would be disastrous to employee morale at Southwest. To that end, Southwest called senior leaders to testify that allowing employees to send unsolicited graphic videos to other employees would be psychologically damaging, would harm recruiting, and would be detrimental to the company's mission. Southwest Br. 54-56. And during the charge conference, Southwest accordingly asked the district court to instruct the jury that undue hardship included "burden to other employees … [that] doesn't actually have to be any kind of monetary loss." ROA.23-10835.13223. That instruction was critical to Southwest's defense.

Despite that then-controlling precedent, however, the district court instructed the jury that Southwest needed to prove "financial costs or disruption of the business" to show undue hardship. ROA.23-10836.13407. That was exactly the opposite of what binding precedent held, and it allowed the jury to disregard Southwest's significant evidence of psychological and morale harm from accommodating Carter's conduct.

> ### 2. Carter's contrary arguments misstate this Court's caselaw, distort the trial record, and rely on inapposite ADA rules.

**a.** Carter first argues that it was "plainly apparent from [this Court's] precedent" that Southwest needed to show evidence connecting harm to employee morale with "financial costs." Br. 43. That's wrong. *Weber* expressly held, in key language Carter ignores, that the "mere possibility of an adverse impact on co-workers" is an undue hardship. 199 F.3d at 270.

Carter is also wrong (Br. 40) that *Weber* considered only harms to coworker compensation. *Weber* held that the employer had shown undue hardship where the proposed accommodation would "[a]ffect[] the scheduling preferences of other employees." 199 F.3d at 275. Moreover, *Weber* rejected the notion that only financial harms to a business count as undue hardship. Indeed, the Court held that the employer need not "wait until it

fe[els] the effects" of the proposed accommodation. *Id.* And in *Howard*, the Court had likewise earlier held that "[t]he fact that [an employer] incurred no direct money cost from [accommodating plaintiff] is not controlling." 615 F.2d at 206; *see supra* pp. 26-27.

**b.**    Carter next tries (Br. 40-41) to rehabilitate the district court's erroneous instruction by contending that the instruction is superficially similar to the Fifth Circuit's Pattern Jury Instructions for *ADA claims*. Those instructions define undue hardship as "an action requiring the employer to incur significant difficulty or expense" and require the jury to consider "the nature and cost of the accommodation," "the overall financial resources … involved in the accommodation," and "the effect on expenses and resources" of the accommodation. Fifth Circuit Pattern Jury Instruction § 11.10.

The argument is a nonstarter. The ADA and Title VII are different statutes, and, as this Court has held, there are dispositive "distinctions between the definitions of 'reasonable accommodation' and 'undue hardship' found in the ADA and those developed by the cases under Title VII." *Bruff v. North Mississippi Health Services, Inc.*, 244 F.3d 495, 502 (5th Cir. 2001). An ADA pattern instruction, assuming the district court had offered one, would have been wrong. What's more, the district court didn't use the "significant

difficulty or expense language," or any of the Pattern Jury Instruction following that language, anyway.

**c.**    Carter next claims that Southwest should have presented "evidence of business costs" anyway, because that's the instruction the district court gave, despite Southwest's objection. Br. 43. That argument fails, too.

To start, the law doesn't require parties to anticipate possible future legal changes and to present extraneous evidence based on that prognostication. As discussed below (at 35-36), the proper course when the law changes after trial is a remand for a new trial under the new standard. *See Deffenbaugh-Williams*, 188 F.3d at 282. Southwest "had no reason to expect a changed rule at the time of trial." *Id.* The cert petition in *Groff*, the Supreme Court decision that changed the undue-hardship standard, wasn't even *filed* until a month after trial here. Southwest Br. 58. When Southwest was developing its trial strategy, noticing expert witnesses, and presenting evidence at trial, it had no reason to anticipate that the governing law would change.

The jury instructions didn't provide any reason, either. That makes sense, because jury instructions come after the parties have presented their cases. And here, contrary to Carter's suggestion, the district court finalized the jury instructions only at the formal charge conference, held *after* the close

of evidence. *See* ROA.23-10836.13223. At that conference, Southwest argued (correctly, under then-controlling law) that the instruction should include "burden to other employees," and that the harm "doesn't actually have to be any kind of monetary loss." *Id.* The district court disagreed. When the district court finalized the instructions, evidence was closed and the deadline to notice experts—the witnesses whom Southwest could have called to connect harm to morale to financial cost, *see infra* p. 26—had passed.

Carter's argument that "Southwest never disclosed experts, expert testimony, or any evidence of financial harm," Br. 45, only proves this point. Southwest didn't disclose experts connecting employee morale with financial cost because this Court's caselaw *rejected* such a requirement. Worse still, Carter's insistence that Southwest should have erred on the side of presenting evidence of business costs ignores the constraints under which the parties tried this case. The district court allotted Southwest only "6 hours of jury time" in a case with multiple claims. ROA.23-10836.7116. Indeed, Carter unsuccessfully sought more time because of "the complexity of the issues in this case." ROA.23-10836.8063; *see* ROA.23-10836.8162. It makes no sense to suggest that Southwest should have cut into limited trial time to present

evidence that could prove helpful under an incorrect view of the law, just in case the district court might erroneously adopt that view.

In short, Carter asks the Court to endorse a bait and switch punishing Southwest for relying on then-controlling precedent. *Deffenbaugh-Williams* forecloses that argument. Southwest Br. 57; *infra* pp. 24-25.

**d.**    Finally, Carter claims that Southwest wasn't even entitled to raise an undue hardship defense at trial because Southwest did not "initiat[e] accommodation efforts" with her before firing her. Br. 37. But there's no such requirement—not in in Title VII itself, and not in the caselaw interpreting it. So it's not surprising that Carter elsewhere in her brief concedes that there's no such rule.

To reiterate, Title VII's undue hardship defense is baked into Title VII's definition of "religion" as including religious practice, except if that practice poses "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Nothing in Title VII's text or structure so much as suggests that an employer must initiate an accommodation process with an employee to invoke the undue-hardship defense if litigation later ensues. To the contrary, Title VII's plain text allows the employer to prove that reasonably accommodating religious conduct would impose an undue hardship. *Id.* To

be sure, that task might be easier for an employer that discussed accommodations with the employee. But that evidentiary practicality is not a waiver rule. Unsurprisingly, Carter later ultimately concedes this point, stating that, "[t]o justify firing Carter without making any accommodation efforts, Southwest would have to show that every possible accommodation would have imposed an undue hardship on Southwest's business." Br. 44. And as explained below (at 35-36), Southwest can make that showing and is entitled to an opportunity to do so.

The decisions Carter cites—two from the Ninth Circuit plus this Court's recent opinion in *Hebrew v. Texas Department of Criminal Justice*, 80 F.4th 717 (2023)—only confirm that Carter's waiver argument is baseless. Start with the Ninth Circuit decisions, which state that an employer must "negotiate with the employee in an effort reasonably to accommodate the employee's religious beliefs." *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1440 (9th Cir. 1993) (quoting *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1512 (9th Cir. 1989)). But in the very next sentence—which Carter ignores—the court explains that "[t]he employer need not make such an effort if it can show that any accommodation would impose undue hardship." *Id.*

In fact, this Court in *Weber* said the same exact thing in distinguishing *Heller*: "even the court in *Heller* does not mandate" an employer to "initiate[] good faith effort to accommodate" if "the employer can show that any accommodation would impose an undue burden." 199 F.3d at 275. That rule forecloses Carter's argument. Southwest showed at trial, under the then-controlling standard, that it couldn't reasonably accommodate Carter's conduct without undue hardship, but the district court erroneously instructed the jury otherwise. Southwest can likewise make that showing at a new trial under the new *Groff* standard, as explained below (at 35-36). Southwest had no obligation to initiate accommodation efforts with Carter. Southwest was, and is, entitled to raise undue hardship.

*Hebrew* doesn't suggest otherwise. In fact, it simply restates the same rule, explaining that an employer must consider "possible accommodations" and that employer "bears the burden of proof" that "any and all accommodations would have imposed an undue hardship." 80 F.4th at 722. *Hebrew* does not hold that an employer cannot raise an undue-hardship defense unless it initiates an accommodation process with the employee.

Contrast Title VII with the ADA, which *does* require employers to "initiate an informal, interactive process" after an employee "has made a

request for an accommodation." *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 735 (5th Cir. 1999). That requirement comes from the ADA's text, which requires an employer to "demonstrate[] good faith efforts, in consultation with the [employee] … who has informed the [employer] that accommodation is needed, to identify and make a reasonable accommodation." 42 U.S.C. § 1981a(a)(3). The ADA's implementing regulations, in turn, require the employer "to initiate an informal, interactive process with the [employee] with a disability in need of the accommodation," 29 C.F.R. § 1630.2(o)(3), after an employee "has made a request for an accommodation." *Loulseged*, 178 F.3d at 735. Congress and the EEOC know how to require an accommodations process, but didn't impose that requirement in Title VII or its regulations. Indeed, the ADA's accommodation process conflicts with Title VII, which requires an employer to accommodate religious conduct even absent a request for one. *See Abercrombie*, 575 U.S. at 774.

The bottom line, then, is that Title VII imposes no requirement that prohibits an employer from asserting the undue hardship defense unless they initiate accommodation discussions. The undue hardship defense is built right into Title VII's definition of religion; nothing in Title VII hints at such a requirement; and none of the decisions Carter cites holds otherwise.

### 3.    *Groff*'s changed standard continues to require a new trial.

As Southwest explained (Br. 57-59), when controlling precedent changes after judgment, but before appellate resolution, this Court "generally remand[s] for a new trial to give parties the benefit of the new law and the opportunity to present evidence relevant to that new standard." *Deffenbaugh-Williams*, 188 F.3d at 282. That's exactly what happened here: The precedent interpreting undue hardship under Title VII changed after judgment. This Court recognized as much in in *Hebrew*: After *Groff*, "'impacts on coworkers is off the table for consideration' unless such impacts place a substantial strain on the employer's business." 80 F.4th at 722 (quoting *Groff*, 600 U.S. at 472). Accordingly, this Court should remand for Southwest to present evidence under the new standard.

On remand, Southwest will have significant evidence to present to meet *Groff*'s new standard. Southwest Br. 58-59. As amicus Airlines for America explains, employee morale is "an essential prerequisite for the complex choreography required for the Nation's airlines to function." Br. 3. Southwest would present evidence, including expert testimony, connecting harm to employee morale with lost revenue and testimony from senior

executives who could describe the multiple business risks that would result from permitting employes to send unsolicited graphic materials to each other. Southwest Br. 58-59.

### 4.    Carter's counterarguments lack merit.

Carter doesn't challenge *Deffenbaugh-Williams*'s clear rule. Instead, she makes inaccurate claims about what Southwest would argue on remand and what the trial record shows.

**a.**    Carter first attacks as "speculation" and "specious" the evidence that Southwest would introduce on remand to connect harm to morale with financial cost. Br. 45. But Southwest hasn't yet had the opportunity to introduce that evidence. And it's not hard to see why allowing employees to send psychologically damaging, graphic, unsolicited materials to each other would cause financial injury to Southwest, including by opening Southwest to liability for hostile work environment claims under Title VII or similar state statutes, and how Southwest could present significant expert testimony and other evidence to connect harm to employee morale with financial harm to Southwest's business. Carter will be free to attack Southwest's evidence on remand, but this Court should not prejudge that evidence.

**b.**    Carter next insinuates (Br. 44) that Southwest admitted at trial that her actions imposed no financial costs. Carter cites the cross-examination of Carter's supervisor, who testified that he was not "aware of" any costs incurred as a result of Carter's *public* Facebook posts about abortion. ROA.23-10836.12305. But that testimony speaks only to one particular witness' lack of knowledge about one aspect of Carter's conduct. It's not evidence (let alone dispositive evidence) that reasonably accommodating Carter's conduct wouldn't impose financial costs, much less an admission to that effect. It doesn't foreclose Southwest from calling, on remand, experts and Southwest executives who could describe how accommodating Carter's conduct would impose a financial cost on Southwest. As Southwest described (Br. 58-59), and Airlines for America confirms (Br. 3), there would be ample evidence for Southwest to present.

**c.**    Finally, Carter argues that Southwest will not be able to "show that every possible accommodation would have imposed an undue hardship." Br. 44. That argument, too, is mistaken.

As *Groff* made clear, each "possible accommodation" must relate to the "employee's practice of religion." 600 U.S. at 472-73. And here, any accommodation of Carter's conduct would impose an undue hardship on

Southwest given the nature of Carter's conduct. Carter made clear that her religious conduct is to "get the word out in any way, to every group as possible" about abortion. ROA.23-10836.14888. That included sending unsolicited graphic videos to a coworker—the conduct she asserted at trial and defends before this Court. Carter testified that she "will do whatever [she] can to save another baby in the womb." ROA.23-10836.12437. The "only way that [she] can express" that opposition to abortion, Carter testified, was sending graphic videos, because only through videos can a person see "what really goes on" with abortion. ROA.23-10836.12497-98. Indeed, Carter emphasized that "the *only way* to get the message across is for people to actually see what [abortion] is," ROA.23-10836.12630 (emphasis added), and then emphasized again that videos and pictures are "the only way that [she] could have gotten [her] point across," ROA.23-10836.12631.

Given the nature of Carter's religious conduct, the only possible accommodation available would have been an exception to Southwest's civility and anti-harassment policies allowing Carter (and other employees who engage in similar religious conduct) to send graphic pictures and videos of abortion to colleagues. Carter has never suggested—not in the district court, and not before this Court—any accommodation, other than blanket

exceptions to Southwest's policies, that would allow her to engage in her religious practice. To the contrary, her argument and the district court's reasoning have always been that Southwest's facially neutral policies must give way to her practice. *See* Carter Br. 35-36; ROA.23-10836.10545. Southwest considered whether it could accommodate Carter by allowing her to send videos and pictures to colleagues, and concluded that that accommodation would be psychologically damaging and would have an "adverse affect on how [employees] work together." ROA.23-10836.12879-12880; *see* ROA.23-10836.12874. And those costs, as Southwest will show on remand, would impose a financial cost on Southwest.

## II. The verdict on Carter's RLA retaliation claim must be reversed, and the dismissal of Carter's other RLA claim affirmed, because Carter produced no evidence that Southwest acted with anti-union animus or that she engaged in protected activity.

Carter's RLA retaliation claim suffered from two fatal flaws: (1) Carter did not satisfy the requirement for post-certification RLA claims to show that Southwest acted with anti-union animus; and (2) the district court wrongly instructed the jury that all conduct—even abusive, obscene conduct—is protected by the RLA. Carter's cross-appeal challenging the dismissal of another post-certification RLA claim fails for these same reasons.

Carter's counterarguments fail. Carter claims that she was fired for engaging in protected activity, so she either need not satisfy, or she necessarily satisfied, the anti-union animus requirement. But that's wrong. *First*, the RLA always requires anti-union animus by the employer for post-certification claims. *Second*, an employee's activity opposing a union *officer*, but not the union itself, is not protected under the RLA. And Carter's defense of the district court's limitless abusive conduct instruction rests on inapposite First Amendment cases and misconstrues Supreme Court precedent.

> **A.    Carter's RLA retaliation verdict must be reversed because Carter produced no evidence that Southwest fired her with anti-union animus.**
>
> **1.    RLA § 152 Third and Fourth require a post-certification plaintiff to show anti-union animus, but Carter introduced no evidence of anti-union animus or intent to interfere with the union.**

**a.**    The RLA provisions that Carter invokes, § 152 Third and Fourth, primarily protect the rights of employees to form a union. Southwest Br. 60-64. Section 152 Third prohibits interference with the "designation of representatives," defined as the "person or persons, labor union, organization, or corporation designated by … employees, to act" on behalf of employees. 45 U.S.C. § 151 Sixth. Section 152 Fourth prohibits employers from interfering

"with the organization of its employees" and from "induc[ing] them to join

or remain or not to join or remain members of any labor organization."

"From the time of [the Supreme Court's] very first opportunity to in-

terpret" § 152 Third and Fourth, the Court has "viewed them as addressing

primarily the *precertification* rights and freedoms of *unorganized* employees."

*TWA*, 489 U.S. at 440 (emphasis added). That's because the "RLA provides

an exhaustively detailed procedural framework to facilitate the voluntary

settlement of major disputes" between employees and employers, and the

"effectiveness of these private dispute resolution procedures depends on the

initial assurance that the employees' putative representative is not subject to

control by the employer." *Id.* at 441 (quotation marks omitted). So § 152

Third and Fourth protect employees' right to select the bargaining repre-

sentative of their choosing, "because noninterference with employees'

chosen representation is a statutory right crucial to the Act's functioning."

*Brotherhood of Locomotive Engineers & Trainmen v. Union Pacific Railroad*, 31

F.4th 337, 343 (5th Cir. 2022).

Once a union is certified, however, the RLA relies on mandatory arbi-

tration set forth in collective bargaining agreements to resolve disputes

between employees (represented by a union) and their employer—and

Carter arbitrated and lost. Thus, § 152 Third and Fourth provide a cause of action after a union is certified only in "extremely limited circumstances." *Wightman*, 100 F.3d at 234. A post-certification cause of action is permissible only when the employer acts with "anti-union animus," because that animus suggests that the dispute-resolution system cannot be trusted to fairly resolve disputes. *See Association of Professional Flight Attendants v. American Airlines, Inc.*, 843 F.2d 209, 211 (5th Cir. 1988).

The anti-union animus requirement comes not just from the RLA's structure and purpose, but also from the text of § 152 Third and Fourth. Those provisions focus on the right to designate and bargain collectively through "representatives"—that is, the entity representing the employee. *See* 45 U.S.C. § 152 Third and Fourth; *id.* § 151 Sixth (defining "representative"). They do not purport to give employees the right to oppose internal officers of employee representatives. The RLA "was not designed to give minority groups within a union a cause of action against their employer when they cannot persuade their own union to take actions they deem to be in the union's best interest." *Renneisen v. American Airlines, Inc.*, 990 F.2d 918, 924 (7th Cir. 1993). Consequently, § 152 Third and Fourth do not create a federal cause of action for internal disputes between unions and employees, or

otherwise relating to internal union organization. *See International Brother-hood of Teamsters v. United Parcel Service, Co.*, 447 F.3d 491, 502 (6th Cir. 2006).

**b.** Carter cannot satisfy § 152 Third and Fourth's anti-union-animus requirement. She didn't allege, much less produce evidence, that Southwest acted with animus towards Local 556 when it fired her. To the contrary, her argument has always been that, as a matter of law, she didn't have to. *See, e.g.*, Carter Br. 22-23; ROA.23-10836.767. Instead, Carter's theory was that Southwest terminated her for expressing opposition to Audrey Stone *as an officer* of Local 556. That's not anti-union animus by Southwest; at best, Carter has alleged that Southwest interfered with an internal union dispute. Southwest Br. 63. Indeed, Carter herself describes how her messages to Stone were "voicing her support for the recall to remove union *officers*." Br. 8 (emphasis added). But the RLA does not extend federal statutory protection to employees for opposing individual officers of their union. *See Renneisen*, 990 F.2d at 294. So Carter's claims under Section 152 Third and Fourth are doubly prohibited: She didn't allege anti-union animus by Southwest, and she didn't allege interference with a "representative."

### 2.   Carter's counterarguments lack merit.

**a.**   Carter first contends (Br. 50) that Southwest waived its RLA argument by failing to object to the court's jury instructions. That's wrong, because at every stage of the litigation before the district court, Southwest pressed the legal argument that § 152 Third and Fourth claims require anti-union animus in post-certification cases. And the "failure to object to jury instructions does not prevent normal appellate review so long as a party ma[kes] all necessary arguments to preserve the issues raised in its appeal in its Rule 56 motion for summary judgment and in its Rule 50(b) motion for judgment as a matter of law or alternatively for a new trial," *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 378 (6th Cir. 2022) (alteration in original). For purely legal arguments, raising the argument on summary judgment alone is sufficient to preserve an issue for appellate review. *See Dupree v. Younger*, 598 U.S. 729, 734 (2023).

Southwest raised its anti-union animus argument thrice over, including at summary judgment and after trial. Southwest moved to dismiss Carter's RLA claims on the ground that Carter failed to allege anti-union animus. *See* ROA.23-10836.858. The district court evidently agreed, dismissing two of Carter's RLA claims, but denying Southwest's motion to dismiss

as to Carter's retaliation claim. *See* ROA.23-10836.861-863; Southwest Br. 17. Southwest then renewed this argument in seeking summary judgment as to Carter's retaliation claim, arguing that Carter "has not presented any evidence of 'anti-union animus.'" ROA.23-10836.2126. The district court rejected Southwest's motion without analysis. ROA.23-10836.6824. And in its Rule 50(b) motion, Southwest argued again that the RLA does not recognize post-certification claims without evidence of "extreme anti-union animus." ROA.23-10836.9485. The district court again rejected that claim without analysis. ROA.23-10836.10416. Southwest repeatedly preserved its anti-union animus argument and is entitled to raise it on appeal, as *Dupree* and *Caudill Seed* make clear.

**b.**     Carter next contends (Br. 49-53) that § 152 Third and Fourth don't require her to prove anti-union animus because she was fired for engaging in protected activity. That's wrong, because § 152 Third and Fourth require a plaintiff to allege anti-union animus by the employer in *all* post-certification cases, and, contrary to Carter's argument, merely opposing union officers doesn't satisfy that requirement.

To start, Carter's contention that she doesn't need to prove anti-union animus contravenes binding precedent. Section 152 Third and Fourth

"address[] primarily the precertification rights and freedoms of unorganized employees," *TWA*, 489 U.S. at 440, so in post-certification cases, courts have a limited role, *see Brotherhood of Locomotive Engineers*, 31 F.4th at 342. Carter ignores both those decisions and their reasoning. As explained (at 40-43), courts have a "historically limited role" in enforcing § 152 Third and Fourth after a union is certified, *Minjares v. Independent Association of Continental Pilots*, 293 F.3d 895, 899 (5th Cir. 2002), because Congress intended, through the RLA, to channel disputes into arbitration, *see Wightman*, 100 F.3d at 234. Unless an employer acts with anti-union animus such that dispute-resolution cannot work fairly, all conflict must be resolved in arbitration.

But Carter didn't allege, let alone prove, that Southwest acted with anti-union animus. Nor did she allege or prove that the RLA's dispute-resolution mechanism was ineffective. Indeed, Carter *used* the dispute resolution process here (where she was represented by Local 556), and never claimed any deficiency with that process. Southwest Br. 64-65. As Southwest explained, "*no federal court* has permitted an employee to pursue a claim under [§ 152] Third and Fourth after the employee has submitted to arbitration under the [CBA]." Br. 66 (emphasis added). Carter does not, and cannot,

identify any decisions permitting an employee to use *both* the CBA dispute resolution process *and* the federal courts.

Nor did Carter allege that Southwest took any actions to weaken Local 556. Just the opposite: Carter's theory is that "Southwest executed the TWU President's wishes to discipline Carter." Br. 50. In other words, Carter claims that Southwest supported Local 556 *so much* that it fired Carter for opposing Local 556. But § 152 Third and Fourth don't create a cause of action for *pro*-union activity. Carter's complaint, then, is really with the union for not fairly representing her. Southwest Br. 65. Recognizing Carter's novel federal cause of action would contravene binding precedent in an area where the Supreme Court emphasizes the doctrine's limited applicability.

Carter defends her argument that anti-union animus isn't required in post-certification cases by pointing to *Roscello v. Southwest Airlines Co.*, 726 F.2d 217 (5th Cir. 1984). Carter appears to argue that when an employee is fired for engaging in "protected conduct," the animus requirement is automatically met or need not be met. Br. 50. Carter's reliance on *Roscello* is misplaced, however, because *Roscello* is not a post-certification case—the plaintiff was discharged a year before a bargaining agreement was reached. 726 F.2d at 219 & n.1. The RLA's protections are at their strongest in cases

like *Roscello*, when employees are selecting a bargaining representative. In fact, the plaintiff in *Roscello* was fired a month after trying to organize unrepresented coworkers. *See id.* at 219. In contrast, the RLA applies in postcertification cases only in extreme circumstances. *Roscello* is no help to Carter: animus was not required in that pre-certification case.

To the extent Carter contends that opposing union officers satisfies the animus requirement or otherwise constitutes protected activity, her argument lacks merit. Section 152 Third and Fourth protect the kind of activity in *Roscello*: organizing unrepresented employees to form a bargaining unit. But merely opposing union *leadership*—an internal union dispute, after the union is certified as a bargaining representative—is not protected activity, because § 152 Third and Fourth are concerned with whether or not there's a bargaining representative chosen by employees without employer interference, not who that representative is. Southwest Br. 63.

**c.** Carter doesn't engage with these problems, which Southwest already identified (Br. 64) in the caselaw. Instead, she turns to First Amendment and NLRA decisions before citing inapposite RLA caselaw.

Carter first cites a litany of First Amendment cases to argue that she engaged in "protected speech." Br. 61-63. But the First Amendment

regulates only government action, not private conduct. *See NCAA v. Tarkanian*, 488 U.S. 179, 191 (1988). Carter's (incorrect) insistence that her conduct was protected by the First Amendment is irrelevant. And even if the First Amendment were relevant to this dispute between private parties, it doesn't give blanket protection to all government employee speech. *See Connick v. Myers*, 461 U.S. 138, 154 (1983).

Carter then turns (Br. 55-56) to inapposite *NLRA* decisions, without identifying them as NLRA rather than RLA cases. To respond to Southwest's argument that the RLA doesn't protect internal union activity, Carter relies (Br. 55-56) on *Mobil Exploration & Producing U.S., Inc. v. NLRB*, 200 F.3d 230 (5th Cir. 1999), for the proposition that challenging union leadership is protected under the RLA. But *Mobil Exploration* is an NLRA case that doesn't mention, much less discuss, the RLA. There, the Court expressly grounded the right to challenge union leadership on the NLRA's right to engage in "concerted activity," *id.* at 240, a right unique to the NLRA that protects a broad swath of employee activity, *see* 29 U.S.C. § 157. But that language is conspicuously absent from the RLA. *Johnson v. Express One International Inc.*, 944 F.2d 247, 252 (5th Cir. 1991). Unlike the NLRA, the RLA does not

establish a statutory right to oppose union leadership. Southwest explained all this in its opening brief (Br. 67), but Carter offers no response.

Later in her brief, Carter says that the RLA protects "efforts to remove unwanted union representatives," and she cites *Russell v. National Mediation Board*, 714 F.2d 1332, 1345 (5th Cir. 1983). Br. 68-69. Carter is right in the sense that the RLA protects employees' choice of representatives, as that term is defined in the RLA—that is, the union (or other entity) that serves as the bargaining representative on behalf of employees. 45 U.S.C. § 151 Sixth; *see supra* pp. 42-43. But the RLA does not protect campaigns to oust individual union officers. *Russell* doesn't say otherwise: In *Russell*, employees who were represented by one union wished to terminate that union's representation and choose a new bargaining representative, but the National Mediation Board (the federal agency charged with certifying bargaining representatives) refused to recognize the new representative. *See* 714 F.2d at 1335-36. This Court held that the Board erred, because the RLA protects the right to decertify a bargaining representative. *Id.* at 1346-47. *Russell* did not hold that the RLA creates a cause of action related to internal disputes about union *officers*. The on-point caselaw, in contrast, makes clear that the RLA doesn't

let employees sue employers over internal union disputes. *See, e.g.*, *Rennei-sen*, 990 F.2d at 924.

To the extent that the RLA regulates internal union disputes, it is through a breach of duty of fair representation claim that a union member can bring against her union. Indeed, Carter herself seems to recognize as much, citing (Br. 50-51) *Steele v. Louisville & Nashville Railroad*, 323 U.S. 192 (1944), and *Vaca v. Sipes*, 386 U.S. 171 (1967). *Vaca*, citing *Steele*, affirmed a judgment against union officers in a suit brought by an employee alleging breach of the duty of fair representation. *Id.* at 177. To be clear: such claims are brought by an employee against her union, and any union officers, *see id.* at 177, *not* against an employer.

The bottom line is that Carter did not allege or show anti-union animus by her employer, which § 152 Third and Fourth require in post-certification cases. And she cannot circumvent that requirement by claiming that she opposed Audrey Stone as a union officer, because that kind of conduct doesn't establish any anti-union animus by Southwest or otherwise qualify for protection under the RLA.

**B.      Carter's cross-appeal lacks merit for the same reasons.**

Carter claims (Br. 66-67) that the district court erred in dismissing one of her other RLA claims, for "interference," because, in her view, a post-certification RLA claim does not require anti-union animus, and because Carter could not raise this interference claim in arbitration. Carter is wrong: as the district court held, post-certification RLA claims require anti-union animus. Carter's contrary rule would expand the scope of the RLA beyond its proper focus on pre-certification organizing.

### 1.      The district court correctly dismissed Carter's RLA claim because Carter failed to allege anti-union animus.

The district court dismissed two of Carter's RLA claims—that Southwest "illegally terminated Carter for engaging in speech protected by the RLA," and "chill[ed] and restrict[ed] employees in their exercise of protected rights," *see* ROA.23-10836.642-645—because Carter failed to allege anti-union animus, as required by the RLA in the post-certification posture. *See* 23-10836.858; *see also supra* pp. 40-43. Carter's cross-appeal asks this Court to revive one of those claims, but the district court correctly dismissed it.

## 2.    Carter's counterarguments are wrong.

Carter challenges only the dismissal of that first RLA claim, contending that she did not need to show "evidence of animus," Br. 67. That's wrong for all the reasons discussed. *Supra* pp. 40-43; Southwest Br. 60-64.

In arguing that the RLA doesn't require animus after certification, Carter relies (Br. 67) on a 1954 case interpreting the NLRA that has nothing to do with the RLA. Rather than grapple with the RLA's requirement to show anti-union animus in the post-certification context, *see Brotherhood of Locomotive Engineers*, 31 F.4th at 343, Carter points to *Radio Officers' Union of Commercial Telegraphers Union v. NLRB*, 347 U.S. 17, 50-51 (1954). But *Radio Officers* interpreted Section 8(a)(3) of the NLRA, which makes it an unfair labor practice for an employer to "encourage or discourage membership in any labor organization." *Id.* at 21. The RLA has no such provision. *Supra* pp. 40-43.

Carter also rehashes her argument that the RLA protects the right to "*continuous* 'self-organization' and 're-organization' campaigns." Br. 68. But she has no support for that claim, which would expand the reach of the RLA far beyond its scope — to protect the right of employees to form a union — and make a federal cause of action out of internal union disputes. Carter

again cites *Russell*, 714 F.2d at 1345, but that decision dealt with the right of employee "to reject" the right of collective bargaining, *id.* at 1343. Carter's dispute isn't with Local 556 as the bargaining *representative*, but with Audrey Stone as an individual *officer* of the union. Local 556, not Audrey Stone, is the "representative" defined in the RLA. The RLA doesn't reach internal union disputes, *supra* pp. 40-43; Southwest Br. 63, and the Court should decline Carter's invitation to rewrite the RLA to do so.

**C.    Even if Carter properly reached the jury on her RLA retaliation claim, a new trial would be required because the district court erroneously instructed the jury that the RLA protects obscene and abusive activity.**

The district court instructed the jury that employee activity is protected under the RLA, even if it is abusive or insulting. That instruction was wrong, because the RLA's protection does not extend to offensive, abusive, and insulting conduct.

In defending the court's instruction, Carter relies on inapposite decisions. *First*, she relies on First Amendment cases, but this dispute involves private parties. *Second*, she relies on two Supreme Court cases that interpret the related provisions of the NLRA. While all agree that NLRA precedent can be relevant to interpreting the RLA, those two decisions don't purport

to set the outer bounds of protected activity, so they don't support the district court's limitless instruction, either.

### 1.    The district court's instruction that the RLA protects obscene and abusive activity was wrong.

The RLA protects employees who want to organize unions, but not *all* organizing activity falls within the Act's protection. Activity that is obscene, violent, or abusive is outside the scope of the RLA. *See Konop*, 302 F.3d at 883 n.11; Southwest Br. 67-68. While the RLA and the NLRA are not coextensive, *see supra* p. 53, NLRA precedent can help define the outer bounds of protected speech. *See Konop*, 302 F.3d at 883 n.11. And Southwest showed that under that caselaw, otherwise protected activity that is pursued in "an abusive manner" may lose the protection of the NLRA. *See* Southwest Br. 67-68; *NLRB v. City Disposal Systems Inc.*, 465 U.S. 822, 837 (1984); *Atlantic Steel*, 245 NLRB at 816. For instance, in *Atlantic Steel*, the NLRB held that an employee who called his supervisor a "lying son of a b****" during a discussion of workplace policies had lost the protection of the NLRA. 245 NLRB at 816-17. The NLRB rejected the employee's insistence that he engaged in protected activity, because accepting the employee's position "would shield any

obscene insubordination short of physical violence," and that "would not be consistent with the [NLRA]." *Id.* at 817.

The district court here gave a directly contrary instruction, telling the jury that conduct "that is intemperate, abusive, insulting, or hyperbolic *is* protected." ROA.23-10836.13400 (emphasis added). That categorical rule misstated the law, because, as described, abusive and insulting conduct can lose the protection of the RLA. Carter's counsel capitalized on that mistake, telling the jury in his closing statement that Carter's conduct was protected speech even if it was "really offensive," ROA.23-10836.13439, and then hammering the point in rebuttal that Carter's conduct protected even if it was "as over the top as you can come up with abusive," ROA.23-10836.13551-13552. The district court should have instructed the jury that intemperate, abusive, insulting, or hyperbolic conduct can lose the protection of the RLA. The court failed to do so, meaning a new trial is required even assuming Carter's claim somehow satisfies the anti-union animus requirement.

### 2.    Carter's counterarguments are wrong.

Carter argues (Br. 59-60) that the RLA protects offensive and abusive activity without limitation. That's wrong as a matter of doctrine and common sense.

**a.**    Carter relies primarily on the 1966 case *Linn v. United Plant Guard Workers of America*, 383 U.S. 53 (1966), and the 1974 case *Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264 (1974). Those decisions, which interpreted the NLRA (*Linn*) and an Executive Order (*Austin*), held merely that federal labor law sometimes preempts state libel laws because some state libel actions "might interfere with the national labor policy." *Linn*, 383 U.S. at 58; *Austin*, 418 U.S. at 275 (same). Neither decision held that labor law extends unlimited protection to even the most offensive conduct.

From those inapposite holdings, Carter (like the district court) extracts the notion that "the [NLRB] tolerates intemperate, abusive and inaccurate statements made by the union during attempts to organize employees." *Linn*, 383 U.S. at 61. That statement—which is dicta—does not define the outer bounds of what constitutes protected speech under the NLRA. *Linn* did not hold that employees have broad license to engage in abusive activity and still win protection of the NLRA. Moreover, *Linn* merely describes NLRB precedent as of 1966. But NLRB precedent has changed significantly over the past 57 years, and the NLRB now interprets the NLRA such that "an employee who is engaged in concerted protected activity can, by opprobrious conduct, lose the protection of the [NLRA]." *Atlantic Steel*, 245 NLRB at

816. *Linn*'s description of the state of NLRB precedent as of 1966 does not govern today, when the NLRB has significantly revised its interpretation of the NLRA. To reiterate: The NLRA (which Carter concedes applies the relevant standard to govern the RLA) does not protect abusive and offensive conduct. To the contrary, otherwise protected activity can lose protection of the NLRA by its "opprobrious" nature. *Id.*; *see also Hawaiian Hauling Service, Ltd.*, 219 NLRB 765, 766 (1975) ("[A]n employee may engage in conduct during a grievance meeting which is so opprobrious as to be unprotected.").

Carter argues that *Atlantic Steel* doesn't govern because it regulates only "employee speech and activities *in the workplace*." Br. 65. That's wrong; the "place of the discussion" is just one of the factors *Atlantic Steel* uses to determine when conduct loses protection. 245 NLRB at 816. The location of the conduct is relevant—but not dispositive—to whether the obscene activity is protected.

Carter also tries (Br. 64) to evade *Konop*'s holding that activity can be so obscene and offensive "that it loses the protection of the RLA," 302 F.3d at 883 n.11, by pointing out that *Konop* cited *Linn* and *Austin*. But that's exactly the point. *Konop* correctly recognized that, contrary to Carter's characterization, *Linn* and *Austin* don't stand for the proposition that the

RLA gives employees carte blanche to engage in conduct that is offensive and abusive.

**b.**    Carter next argues that her "videos and messages were not obscene." Br. 62. But that argument misses the point that Southwest was entitled to a *jury* determination on that issue. The problem is that the district court gave a legally wrong instruction that allowed the jury to disregard Southwest's primary defense (after the district court had incorrectly rejected Southwest's anti-union-animus argument)—that Carter's conduct was offensive and harmful. Southwest Br. 69-70. A properly instructed jury could have agreed with Southwest that Carter's conduct was unprotected obscene conduct. But the district court's instruction prevented the jury from finding Carter's unprotected, because the district court told the jury that even offensive and obscene conduct is protected.

**c.**    Finally, Carter relies on inapplicable First Amendment cases in defending her conduct as not obscene. *See* Br. 61-63 (citing, *e.g.*, *Miller v. California*, 413 U.S. 15 (1973), *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988), *Texas v. Johnson*, 491 U.S. 397 (1989)). Those decisions discuss the First Amendment's limitation on *government* regulation of speech—which is not blanket protection for all abusive speech in any event, *see supra* pp. 48-49—

not limitations on a *private employer*'s disciplining an employee for offensive conduct. *See, e.g.*, *Miller*, 413 U.S. at 18. Of course, the First Amendment prohibits government restrictions on speech, not private restrictions on speech, *see NCAA*, 488 U.S. at 191, so whether Carter's videos and messages are protected against government regulation under the First Amendment is beside the point. As the district court correctly held (in a ruling Carter has not challenged on appeal), "Southwest is not a state actor," so the First Amendment doesn't apply. ROA.23-10836.867.

### III. The Contempt Order rests on an invalid judgment, exceeds the district court's civil-contempt authority, and violates the First Amendment.

The Court should vacate the Contempt Order because the underlying judgment is invalid; because Southwest substantially complied with the judgment; because the Order exceeded the district court's authority by ordering religious-liberty training; and because the Order violates the First Amendment. Carter doesn't dispute that if the underlying judgment falls, the Contempt Order must fall, too. And Carter's other arguments take a myopic view of Southwest's compliance with the judgment and fail to cite *any* civil-contempt cases where training was ordered, let alone training by a partisan organization.

**A.   The Contempt Order must be vacated because the verdict and judgment are invalid.**

Because the verdict and judgment cannot stand, neither can the Contempt Order. Southwest Br. 71; *see Cliett v. Hammonds*, 305 F.2d 565, 570 (5th Cir. 1962). That's because contempt judgments that are premised on erroneous judgments "fall when the order underlying them is vacated." *Massaro v. Palladino*, 19 F.4th 197, 216 (2d Cir. 2021). Carter doesn't dispute this fundamental point.

**B.   The Contempt Order is invalid even if the Court affirms the underlying judgment.**

**1.   The Contempt Order is invalid because Southwest substantially complied with the judgment.**

The district court ordered Southwest to inform employees that Title VII prohibits discrimination based on religion. Southwest Br. 72. Southwest did so by sending all flight attendants the judgment and verdict form, informing them that the district court had entered judgment against it in a religious discrimination case, and posting the verdict form and judgment in all breakrooms. The district court nonetheless fixated on a single word in the email—"does not" versus "may not"—to which the judgment and verdict form were attached. ROA.23-10836.10648-10653. That wording did not change the overall meaning of Southwest's communication.

Carter defends the district court's focus on "does not," arguing that Southwest failed to convey to flight attendants that it "may not discriminate" in the future. Br. 75. But the message in Southwest's many communications was clear: Southwest had violated Title VII by discriminating against Carter. If Carter were right that the text of the email contradicted the attached judgment and verdict form, one would expect that at least one of the 15,000 flight attendants to raise a question. None did.

## 2. The district court exceeded its civil-contempt power by ordering religious-liberty training.

Even if Southwest had violated the judgment, the remedy the district court ordered exceeded its authority. The court ordered three of Southwest's in-house attorneys to attend "religious-liberty training" with the partisan Alliance Defending Freedom. ROA.23-10836.10667. That sanction exceeds the permissible purposes of civil-contempt sanctions: securing compliance with a court order or compensating losses from noncompliance. Southwest Br. 73. Training serves neither purpose—none of the three in-house attorneys has any relationship to Carter—and *religious-liberty* training in particular is even further afield, where a supposed Title VII violation, rather than religious freedom generally, is the question.

Carter's defense of this extreme sanction suffers from the same flawed justifications as the district court's reasoning. Despite insisting that training "is a commonplace civil sanction," Br. 76, Carter is unable to point to *any* order under a district court's civil-contempt power (rather than Federal Rule of Civil Procedure 11, which allows punitive sanctions) that requires training by an ideological group. And Carter's insistence that Southwest's attorneys need "*Title VII* training," Br. 76 (emphasis added), only confirms that the "*religious liberty* training" the court ordered was excessive, Southwest Br. 73. Carter claims (Br. 78) the district court really ordered training on Title VII, but that's not what the Order says. *See* ROA.23-10836.10667.

### 3. The Contempt Order violates Southwest's First Amendment rights.

The Contempt Order must be vacated for another reason, too: the order violates Southwest's First Amendment rights because it both punishes Southwest for expressing its disagreement with the district court's decision and imposes an ongoing prior restraint on Southwest's speech. Southwest Br. 76-77. The district court's unprecedented choice of an ideological trainer only compounds this problem.

Carter insists that the district court didn't sanction Southwest for disagreeing with the court's legal conclusions. But the Contempt Order says otherwise. The court found Southwest in contempt because it sent a memo to its flight attendants "lambast[ing] Carter" by "saying that Southwest believes that her conduct underlying this case 'crossed the boundaries of acceptable behavior,' was 'inappropriate, harassing, and offensive,' and 'did not adhere to Southwest policies and guidelines.'" ROA.23-10836.10645. That's protected First Amendment speech: the Constitution protects Southwest's right to believe that Carter's conduct violated its policies, and that Southwest will prevail on appeal. The district court's sanction, which targets that protected speech, violates Southwest's First Amendment rights. Southwest Br. 76-77.

Carter also offers conclusory arguments that the district court's order is not a prior restraint, because the training merely "tells Southwest what is legal and what violates Title VII." Br. 82. But Carter ignores the district court's promise to superintend Southwest's speech going forward: "Southwest's right to speak when implementing the Court's injunction ensures a continued partnership in the future." ROA.23-10836.10644. The district court also warned Southwest that it shouldn't speak until it is "[a]rmed with a

better understanding of the legal area at issue." ROA.23-10836.10666. Those

threats have an impermissible chilling effect on Southwest's speech. *See FCC*

*v. Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012).

Finally, Carter disagrees that the district court's appointment of ADF

to conduct the training violates the First Amendment. But Carter cites no

case where a court has appointed a partisan organization to conduct legal

training. Carter's claim that "there is no First Amendment issue with Title

VII compliance training," Br. 83, just elides the issue: There *is* a First Amend-

ment issue with a court order compelling Southwest to listen to an

ideological group's opposing views about Title VII. Endorsing this novel or-

der would open a Pandora's box of orders requiring training by a spectrum

of ideological legal groups.

## CONCLUSION

The Court should reverse the judgment against Southwest and vacate

the Contempt Order.


Dated: January 29, 2024                     Respectfully submitted,

                                            */s/ Shay Dvoretzky*


Paulo B. McKeeby                            Shay Dvoretzky
Brian K. Morris                               *Counsel of Record*
REED SMITH LLP                              Parker Rider-Longmaid
2850 N. Harwood St., Ste. 1500              Steven Marcus
Dallas, TX 75201                            SKADDEN, ARPS, SLATE,
                                              MEAGHER & FLOM LLP
Andrew B. Ryan                              1440 New York Ave., NW
Ryan Law Partners LLP                       Washington, DC 20005
3811 Turtle Creek Blvd., Ste. 780           Telephone: 202-371-7000
Dallas, TX 75219                            shay.dvoretzky@skadden.com

*Counsel for Defendant-Appellant/Cross-Appellee Southwest Airlines Co.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that (1) this brief complies with the type-volume limitation of 13,000 words, as authorized by Federal Rule of Appellate Procedure 28.1(e)(2)(A)(i), because it contains 12,982 words, as calculated by Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), and (2) this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Book Antiqua font.


Dated: January 29, 2024       */s/ Shay Dvoretzky*
                              Shay Dvoretzky

                              *Counsel for Defendant-Appellant/*
                              *Cross-Appellee Southwest Airlines Co.*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 29, 2024, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: January 29, 2024          */s/ Shay Dvoretzky*
Shay Dvoretzky

*Counsel for Defendant-Appellant/*
*Cross-Appellee Southwest Airlines Co.*