# United States Court of Appeals
# for the Fifth Circuit

---

No. 23-10008
CONSOLIDATED WITH
No. 23-10536

---

United States Court of Appeals
Fifth Circuit

**FILED**

May 08, 2025

Lyle W. Cayce
Clerk

CHARLENE CARTER,

*Plaintiff—Appellee/Cross-Appellant*,

*versus*

LOCAL 556, TRANSPORT WORKERS UNION OF AMERICA;
SOUTHWEST AIRLINES COMPANY,

*Defendants—Appellants/Cross-Appellees*,

CONSOLIDATED WITH
---

No. 23-10836

---

CHARLENE CARTER,

*Plaintiff—Appellee*,

*versus*

SOUTHWEST AIRLINES COMPANY,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Northern District of Texas
USDC Nos. 3:17-CV-2278, 3:17-CV-2278,
3:17-CV-2278

---

## ON PETITIONS FOR REHEARING AND REHEARING EN BANC

Before CLEMENT, ENGELHARDT, and WILSON, *Circuit Judges*.

EDITH BROWN CLEMENT, *Circuit Judge*:

No member of the panel nor judge in regular active service having requested that the court be polled on rehearing en banc, the petition for rehearing en banc is DENIED. FED. R. APP. P. 35; 5TH CIR. R. 35. The petition for panel rehearing is GRANTED. We withdraw our prior opinion, *Carter v. Local 556, Transport Workers Union*, 138 F.4th 164 (5th Cir. 2025), and substitute the following:

Southwest Airlines ("Southwest") fired flight attendant Charlene Carter for publicly posting and privately sending to the president of the flight attendants' union graphic images and videos of aborted fetuses. After an arbitrator found Southwest had cause to terminate Carter under three corporate policies, Carter sued Southwest and the union representing its flight attendants, asserting her termination violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Railway Labor Act, 45 U.S.C. § 151 *et seq.* ("RLA").

A jury found for Carter. After trial, the district court permanently enjoined Southwest and the union from interfering with the religious expression of any Southwest flight attendant online or otherwise. The district court also held Southwest in contempt for failing to comply with its judgment. Both Southwest and the union appeal, and Carter cross-appealed.

23-10008
c/w Nos. 23-10536, 23-10836

We REVERSE the denial of Southwest's motion for judgment as a matter of law on Carter's belief-based Title VII claim and RLA retaliation claim and REMAND with instructions for the district court to enter judgment for Southwest. We AFFIRM the judgment against Southwest on Carter's practice-based Title VII claims. We AFFIRM the dismissal of Carter's RLA interference claim against Southwest. We AFFIRM the judgment against the union on all claims. We VACATE the permanent injunction in full and REMAND for additional proceedings. We VACATE the contempt sanction against Southwest and remand for additional proceedings.

## I.

### A.

Charlene Carter began working as a flight attendant for Southwest in 1996. Southwest flight attendants are represented by the Transport Workers Union of America, Local 556 (the "Union"). Carter is a pro-life Christian, who believes abortion is a taking of human life contrary to the teachings of the Bible, and a staunch opponent of organized labor. Although Carter was at one point a member of the Union, she later resigned her membership and was considered a "nonmember objector" with an obligation to pay Union fees. The Union was Carter's exclusive bargaining representative pursuant to its collective bargaining agreement with Southwest.

Carter has been engaged in anti-union speech since 2013. Starting in 2015, through her termination in 2017, Carter vocally opposed the Union's leadership, including then-president Audrey Stone. Carter supported a recall effort against Stone by posting and sending messages on social media expressing disapproval of the Union and its leadership. Carter also sent numerous emails and direct messages to Stone herself—without receiving any response.

23-10008
c/w Nos. 23-10536, 23-10836

In January 2017, Stone and other members of the Union attended a union-sponsored Working Women's Committee meeting in Washington, D.C. Shortly after the meeting during this trip, some union members, including Southwest employees, attended the "Women's March on Washington." While the parties' stipulated facts depict union members' participation in the Women's March as almost inadvertent, the Union's own messaging frames its members' participation in the Women's March differently. The Union posted the following on its website: "Local 556 Working Women's Committee Participates in Women's March on Washington." It also posted to its Facebook page a link to an article entitled "Southwest Planes Light Up Pink For The Women's March," and a photo of members participating in the march with the caption "Members of . . . Local 556 Working Women's Committee are in Washington, DC, today standing with other Union Members and participating in the Women's March on Washington. They're standing up for women's rights!"

Carter was outraged by what she viewed as Union-sponsored support for abortion, and on February 14, 2017, she sent Stone a series of private messages via Facebook Messenger about the march.

The first message contained a video showing an aborted fetus in a metal bowl and stated the Union was "supporting this Murder."

Carter sent a second message with an image of an aborted fetus in the palm of a person's hand, linking to a video described as "[a]n aborted baby alive even after the abortion." In her message accompanying the video, Carter wrote:

> This is what you supported during your Paid Leave with others at the Women's MARCH in DC….You truly are Despicable in so many ways…by the way the RECALL is going to Happen and you are limited in the days you will be living off of all the

23-10008
c/w Nos. 23-10536, 23-10836

[Southwest flight attendants].. cant wait to see you back on line.

In a third message, Carter sent Stone a photo of women wearing costumes depicting female genitalia, stating:

> Did you all dress up like this…Wonder how this will be Coded in the LM2 Financials…cause I know We Payed for this along with your Despicable Party you hosted for signing the Contract….The RECALL [of members on the Union's executive board] is going to Happen we are even getting more signatures due to other [flight attendants] finding out what you guys do with our MONEY!!! Cant wait for you to have to be just a regular [flight attendant] again and not Stealing from of our DUES for things like this!

Carter then sent Stone a link to an article about an organizer of the Women's March, commenting:

> [Y]ou are nothing but a SHEEP in Wolves Clothing or you are just so un-educated you have not clue who or what you were marching for! Either way you should not be using our DUES to have Marched in this despicable show of TRASH!

Carter also sent Stone other private Facebook messages that day expressing her religious beliefs, opposing the Union's involvement with the march, voicing her support for the recall to remove union officers—including Stone—and detailing her support for President Donald J. Trump.

In addition to sending the private messages to Stone, Carter posted similar content to her public Facebook page. Carter shared the same video showing a fetus in a metal bowl that she sent to Stone, and the text above the video read, "If its your body your choice, who is this laying in the fucking bowl?" She included a warning that the video was "VERY GRAPHIC." Carter also shared the video of a fetus in the palm of a person's hand and described abortion as "MURDER."

23-10008
c/w Nos. 23-10536, 23-10836

On February 22, 2017, Stone reported Carter's messages to her manager. Stone stated she found the messages—which she described as "political and religious comments"—"incredibly disturbing," "obscene," "violent," and "threatening." Stone also proclaimed that she "believe[d] [the messages were] a violation of the Harassment policy, Workplace Bullying and Hazing policy, under cyber bullying" and "the social media policy."

Southwest subsequently investigated the allegations. The investigation included "factfinding" meetings with Stone and Carter. Stone stated she perceived Carter's statement that she "[couldn't] wait to see [Stone] back on line" (*i.e.*, working as a flight attendant rather than full-time for the Union) to be a threat. As the basis for her interpretation, Stone noted that other flight attendants in the past had sent her online threats of harm.[1]

Carter, for her part, told Southwest she was "Christian," "conservative," and "pro-life" and that abortion was "a huge issue for [her]." Carter said she has "a deep, deep want to get the word out" about abortion to "more and more people [to] see what actually happens." She explained that "as a Christian, if [she] can get the word out in any way, to every group as possible to touch [on abortion]," she will.

During the meeting, Southwest pointed out other posts on Carter's public page identifying her as a Southwest employee, many of which were several years old. Southwest also asked why Carter continued to send Stone repeated messages over the course of two years, even though Stone never responded.

---

[1] Stone stated messages from other disgruntled flight attendants included a picture that "showed a knife [held] to [her] head" and "a picture of a shooting range and a target."

23-10008
c/w Nos. 23-10536, 23-10836

After its investigation, Southwest's employee relations team (Employee Relations) concluded that "[w]hile the videos depicting abortion are considered to be offensive[,] they do not violate [Southwest's] Harassment, Sexual Harassment, Discrimination and Retaliation Policy." It found that the "images of women dressed as vaginas," on the other hand, "violate[d] the aforementioned policy due to their sexual nature." Accordingly, Employee Relations found that "the allegations against [Carter] [were] partially supported and she should be addressed for this behavior."

On March 14, 2017, Southwest sent Carter a termination notice. The letter explained that Carter's Facebook page identified her as a Southwest employee and represented the company "in a manner that [was] disparaging to Southwest Flight Attendants as well as to all Southwest Employees." It continued to state:

> These Facebook posts were highly offensive in nature, and the private messages you sent to the above-mentioned Employee were harassing and inappropriate. Although your posts and messages may have been made and/or sent outside of work, Southwest is obligated to address such conduct given its impact on the workplace. After considering all information gathered in my investigation, as well as the information presented in your fact-finding meeting, I [Ed Schneider, Denver Base Manager] have determined that your conduct is in direct violation of the Southwest Airlines Mission statement and the following Company Policies/Rules including but not limited to: [the] Workplace Bullying and Hazing Policy [and the] Social Media Policy.

The termination notice concluded by stating Carter's conduct "could also be a violation of Southwest's Policy Concerning Harassment, Sexual Harassment, Discrimination and Retaliation."

23-10008
c/w Nos. 23-10536, 23-10836

In accordance with the Union's and Southwest's collective bargaining agreement, Carter filed a grievance challenging her termination. The Union represented Carter at her grievance hearing. After the hearing, Southwest offered to reinstate Carter and reduce her termination to a thirty-day suspension if she agreed to sign a last-chance agreement that—among other things—required her to comply with the company's policies and sign a confidential settlement agreement. Carter declined the offer, and the dispute proceeded to arbitration.

At arbitration, Carter sought to show (1) she was terminated for criticizing the Union's president for advocating for abortion access; (2) there was no nexus between her conduct and the workplace; (3) she had the right to share her religious and political views on Facebook, whether through private messages or public posts; and (4) Southwest unfairly applied its policies to Carter.

After a two-day hearing where the parties presented thirty-two exhibits and testimony from nine witnesses, the arbitrator rejected Carter's arguments and found Southwest had just cause for firing Carter, stating:

> [T]o sustain this grievance would effectively give Flight Attendants (whether or not members of the Union) a free pass to say anything they want to their coworkers (whether or not they are Union officials) — no matter how graphic or disturbing — so long as those comments were motivated by a political or religious belief. The use of social media has gotten totally out of hand. [Southwest] has the right to regulate this conduct, and has realized the seriousness of what is happening . . . . Enough is enough.

The arbitrator concluded it was "clear beyond a reasonable doubt that [Southwest] had just cause to terminate [Carter]" because Carter violated Southwest's Social Media Policy, Workplace Bullying and Hazing Policy,

and Harassment Policy, and that each of those policy violations was "an independently sufficient basis for termination."

At no point, however, did Southwest attempt to accommodate Carter's desired religious observances, practices, or expression in furtherance of her beliefs.

## B.

Carter sued Southwest and the Union in federal court. Carter alleged (1) Southwest and the Union violated Title VII by "discriminating against Carter's religious beliefs and practices," (2) Southwest and the Union "retaliated against Carter for the exercise of her protected rights under the RLA," and (3) the Union breached its duty of fair representation under the RLA by "caus[ing] and attempt[ing] to cause Southwest to discipline and terminate Carter . . . based on personal animosity towards Carter's speech and activity opposing the union." Carter also alleged, among other things, Southwest violated the RLA by interfering with the designation of union representatives.

Southwest and the Union moved to dismiss the suit. The district court found the case did not concern a "minor dispute" under the RLA, which would have precluded jurisdiction, and that it was premature to determine whether to give preclusive effect to arbitrated issues. The district court dismissed Carter's claim of interference against Southwest under the RLA, finding Carter failed to show Southwest demonstrated anti-union animus. It also dismissed with prejudice Carter's retaliation claim against Southwest to the extent it was based on the exercise of her First and Fifth Amendment rights, while otherwise allowing her retaliation claim to proceed. The district court dismissed Carter's breach of duty of fair representation claim against the Union without prejudice and granted Carter leave to amend her pleading,

23-10008
c/w Nos. 23-10536, 23-10836

dismissed her retaliation claim against the Union based on constitutional violations, and allowed her Title VII claim against the Union to proceed.

Following discovery, Southwest, the Union, and Carter all moved for summary judgment, motions the district court denied. With respect to Carter's Title VII claims, the court found there was a genuine dispute regarding the reason why Southwest fired Carter and why Stone reported Carter to Southwest, declining to determine these questions were preclusively resolved in arbitration. Regarding Carter's RLA retaliation claims, the district court held (1) Carter had a cause of action, (2) the court had jurisdiction to resolve the claims because they did not require interpretations of the collective bargaining agreement or bring any provision of the collective bargaining agreement into dispute, and (3) there was a genuine dispute as to whether Carter had been retaliated against. On the fair-representation claim against the Union, the district court found there was a genuine dispute as to whether Stone acted in her official union capacity when she reported Carter to Southwest, so it denied summary judgment.

The case proceeded to a jury trial. At the end of Carter's case-in-chief, the Union and Southwest moved for judgment as a matter of law, which the district court denied. A jury ultimately decided the case. As discussed in greater detail below, Southwest and the Union objected to several of the instructions provided to the jury, including the district court's definition of "undue hardship" under Title VII and the standard for when union-related activity loses its protection under the RLA.

The jury ruled in Carter's favor, finding in relevant part that: (1) Southwest discriminated against Carter by discharging her due to her sincerely held religious observances, beliefs, or practices; (2) the Union treated Carter less favorably than other employees due to her sincerely held religious observances, beliefs, or practices; (3) the Union and Southwest

unlawfully failed to accommodate Carter's sincerely held religious observances, beliefs, or practices; (4) Southwest failed to prove granting Carter a religious accommodation would have imposed an undue hardship on Southwest; (5) the Union and Southwest retaliated against Carter for engaging in activity protected by the RLA; (6) the Union violated its duty of fair representation owed to Carter; and (7) the Union discriminated against Carter by causing or attempting to cause her discharge due to Carter's sincerely held religious observances, beliefs, or practices.

Southwest—but not the Union—renewed its motion for judgment as a matter of law and moved, alternatively, for a new trial. The district court denied the motion.

The district court awarded relief specific to Carter, including reinstatement and backpay, for which it found Southwest and the Union jointly and severally liable. The district court's judgment also enjoined Southwest and the Union "from discriminating against Southwest flight attendants for their religious practices and beliefs, including—but not limited to—those expressed on social media and those concerning abortion" and "from failing to reasonably accommodate Southwest flight attendants' sincerely held religious beliefs, practices, and observances." Additionally, the district court ordered Southwest to post the verdict and judgment on company bulletin boards and email the same to all flight attendants, informing them of their Title VII and RLA rights.

To comply with the judgment, Southwest reinstated Carter, posted the verdict and judgment in all flight-attendant breakrooms, and emailed all flight attendants the verdict and judgment. The email provided commentary stating that "a federal court in Dallas entered a judgment against Southwest" and "ordered us to inform you that Southwest does not discriminate against our Employees for their religious practices and beliefs." Southwest also

23-10008
c/w Nos. 23-10536, 23-10836

published an internal memo that stated that Southwest believed Carter's messages were "inappropriate, harassing, and offensive," "extremely graphic," and "in violation of several Company policies." The memo further stated that although Southwest would implement the judgment, Southwest was "extremely disappointed with the court's ruling and [was] appealing the decision to the Fifth Circuit Court of Appeals."

Carter subsequently moved the district court to hold Southwest in civil contempt, arguing that these communications violated the judgment. Carter contended the email violated the judgment because Southwest said the airline "does not discriminate" rather than "may not discriminate," which was the language the court's order required. As for the memo, Carter claimed it demonstrated that Southwest *could* continue to discriminate against flight attendants' religious observances, beliefs, or practices. The district court agreed that Southwest violated the notice requirement and held Southwest in contempt. As a contempt sanction, the district court directed Southwest to circulate a statement—verbatim—to its flight attendants "to set the record straight," and ordered three of Southwest's in-house lawyers to attend religious-liberty training with the Alliance Defending Freedom ("ADF").[2]

Southwest, the Union, and Carter appealed various aspects of the case, and their cases were consolidated. Southwest sought a stay of the contempt order pending appeal on September 6, 2023. This court granted a temporary administrative stay but carried the motion to stay pending appeal

---

[2] ADF is "a nonprofit, public-interest legal organization that provides litigation services, funding, and training to protect First Amendment freedoms and other fundamental rights."

23-10008
c/w Nos. 23-10536, 23-10836

with the case. We granted Southwest's motion for a stay pending appeal of
the contempt order on June 7, 2024.

## II.

Our review takes flight by considering the jury's finding that
Southwest violated Title VII, as well as issues relating to its finding that the
Union violated the same. We follow with whether Carter maintained a viable
cause of action under the RLA against Southwest, emanating from
Southwest's appeal of Carter's successful retaliation claim and Carter's
cross-appeal of her dismissed interference claim. We then consider issues the
Union raises under the RLA. On final approach, we address the district
court's permanent injunction and its contempt order against Southwest.

## III.

We begin with whether Southwest and the Union violated Title VII.
Both Southwest and the Union argue Carter's claims under this statute fail
as a matter of law.[3]

Our circuit reviews de novo a district court's denial of a Rule 50(b)
motion for renewed judgment as a matter of law, asking "whether 'a
reasonable jury would not have a legally sufficient evidentiary basis to find for
the party on that issue.'" *Nobach v. Woodland Vill. Nursing Ctr., Inc.*, 799
F.3d 374, 377–78 (5th Cir. 2015) (quoting Fed. R. Civ. P. 50(a)(1)). In

---

[3] Carter's Title VII claims arguably should not have survived a motion to dismiss
or for summary judgment because prior arbitration conclusively resolved essential elements
of her claims against both Southwest and the Union. *See Grimes v. BNSF Ry. Co.*, 746 F.3d
184, 188 (5th Cir. 2014) ("[A]rbitral proceedings *can* have preclusive effect even in
litigation involving federal statutory and constitutional rights . . . ."). While Southwest and
the Union pressed issue preclusion at the district court, neither party advances this
argument on appeal. It is therefore forfeited. *See Rollins v. Home Depot USA, Inc.*, 8 F.4th
393, 397–98 (5th Cir. 2021).

assessing a challenge to the sufficiency of the evidence supporting a jury verdict, the jury's verdict is afforded "great deference" and therefore the court must "view[] all the evidence and draw[] all reasonable inferences in the light most favorable to the verdict." *Thomas v. Tex. Dep't of Crim. Just.*, 220 F.3d 389, 392 (5th Cir. 2000).

Likewise, both Southwest and the Union appeal elements of the district court's jury instructions. While trial courts are given "great latitude in the framing and structure of jury instructions," *Eastman Chem. Co. v. Plastipure, Inc.*, 775 F.3d 230, 240 (5th Cir. 2014), "[t]he legal conclusions underlying jury instructions . . . are reviewed *de novo*," *United States v. CITGO Petrol. Corp.*, 801 F.3d 477, 481 (5th Cir. 2015). This includes "question[s] of statutory construction." *Janvey v. Dillon Gage, Inc. of Dallas*, 856 F.3d 377, 388 (5th Cir. 2017). "[R]eversal is appropriate whenever the charge as a whole leaves [the court] with substantial and ineradicable doubt whether the jury has been properly guided in its deliberations . . . ." *Jowers v. Lincoln Elec. Co.*, 617 F.3d 346, 352 (5th Cir. 2010) (cleaned up). But if an erroneous jury instruction "could not have affected the outcome of the case," this court will not reverse. *Eastman Chem.*, 775 F.3d at 240 (quoting *F.D.I.C. v. Mijalis*, 15 F.3d 1314, 1318 (5th Cir. 1994)).

## A.

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Labor organizations are likewise subject to obligations not to discriminate. *United States v. U.S. Steel Corp.*, 520 F.2d 1043, 1059 (5th Cir. 1975). Unions cannot "exclude or . . . expel from [their] membership, or otherwise . . . discriminate against, any

23-10008
c/w Nos. 23-10536, 23-10836

individual because of his race, color, religion, sex, or national origin" or "cause or attempt to cause an employer to discriminate against an individual" on a prohibited basis. 42 U.S.C. § 2000e-2(c).

"Religion," for purposes of Title VII, is defined to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). To establish a prima facie case of religious discrimination under Title VII,

> the plaintiff must present evidence that (1) she held a bona fide religious belief, (2) her belief conflicted with a requirement of her employment, (3) her employer was informed of her belief, and (4) she suffered an adverse employment action for failing to comply with the conflicting employment requirement.

*Tagore v. United States*, 735 F.3d 324, 329 (5th Cir. 2013), *abrogated by Groff*, 600 U.S. 447.

Both intentional-religious-discrimination claims and failure-to-accommodate claims arise out of 42 U.S.C. § 2000e–2(a)(1). *See Hebrew v. Tex. Dep't of Crim. Just.*, 80 F.4th 717, 721, 724 (5th Cir. 2023) (analyzing religious-discrimination and failure-to-accommodate claims separately). In other words, "Title VII imposes on employers both a negative duty not to discriminate and a positive duty to accommodate." *Hebrew*, 80 F.4th at 721. As a result, a plaintiff has two paths to show a claim of religious discrimination under Title VII, specifically by showing that an employer or labor organization actively discriminated against the employee based on the employee's religion *or* failed to accommodate the employee's religious "observance or practice" where such accommodation would not cause undue hardship.

23-10008
c/w Nos. 23-10536, 23-10836

For intentional-discrimination claims, a plaintiff can either put forth direct evidence of an unlawful motive for an employer's decision (*e.g.*, a supervisor firing an employee while saying that the employee is "too religious," *Dixon v. Hallmark Cos.*, 627 F.3d 849, 854–55 (11th Cir. 2010)), or establish unlawful motive through indirect or circumstantial evidence via the familiar *McDonnell-Douglas* burden-shifting framework, *Herster v. Bd. of Supervisors of La. State Univ.*, 887 F.3d 177, 184–85 (5th Cir. 2018).

Failure-to-accommodate claims, by contrast, can be proven by showing the need for an accommodation was a motivating factor in an employer's decision. *Abercrombie*, 575 U.S. at 772. As mentioned, employers indeed have a defense against a failure-to-accommodate claim if accommodating the employee's religious practice or observance would impose an undue hardship. *See Groff v. DeJoy*, 600 U.S. 447, 468 (2023); *Hebrew*, 80 F.4th at 721 ("Title VII requires employers to accommodate all aspects of religious observance and practice unless the employer demonstrates that he cannot accommodate the employee's religious observance or practice without undue hardship on the conduct of the employer's business." (quotations omitted)). Religious accommodations by employers for observances and practices "often go above and beyond the non-religious accommodations [employers] might otherwise provide." *Hebrew*, 80 F.4th at 721; *Abercrombie*, 575 U.S. at 775 ("Title VII does not demand mere neutrality with regard to religious practices . . . . Rather, it gives them favored treatment . . . .").

Given that Title VII's "because of" causation standard is "broader than the typical but-for causation standard," a plaintiff need only show her "religious practice" was a "motivating factor" in the employer's decision. *Nobach*, 799 F.3d at 378 (citing *Abercrombie*, 575 U.S. at 772–73). When evaluating causation in a Title VII claim, "the critical question is what *motivated* the employer's employment decision." *Id*. This means an

23-10008
c/w Nos. 23-10536, 23-10836

employer can violate Title VII if it takes an adverse employment action "with the motive of avoiding the need for accommodating a religious practice." *Abercrombie*, 575 U.S. at 774.

**B.**

As a threshold issue, Southwest argues religious discrimination claims based on *belief* differ from those based on *practice*. Indeed, a jury found that Southwest violated Title VII by "terminat[ing] Carter for her religious beliefs and for engaging in the religious practice of sharing religious beliefs on abortion" and by "failing to accommodate" Carter's sincerely held religious beliefs, practices, or observances. According to Southwest, belief-based claims are those that allege the employer discriminated against the employee because of the employee's particular religious views—here, that Carter was a pro-life Christian. Alternatively, practice-based claims concern alleged discrimination against an employee based on the employee's conduct or action in furtherance of that belief, conceivably such as sending pro-life messages to others on social media.

The basis for this distinction comes from the text of Title VII: The law's definition of "religion" excludes any "religious observance or practice" an employer is "unable to reasonably accommodate" "without undue hardship." 42 U.S.C. § 2000e(j); *see also United States v. Bd. of Educ. for Sch. Dist. of Phila.*, 911 F.2d 882, 886 (3d Cir. 1990) ("[I]f an employer cannot accommodate a religious practice without undue hardship, the practice is not 'religion' within the meaning of Title VII."). As a result, reasonable accommodation and undue hardship are only relevant for claims based on observance or practice. No undue hardship defense exists for discriminating against an employee's beliefs. Put another way, the only way to prove a belief-based violation is through the vessel of an intentional-discrimination claim. *See Shapolia v. Los Alamos Nat'l Lab'y*, 992 F.2d 1033,

23-10008
c/w Nos. 23-10536, 23-10836

1037 (10th Cir. 1993) (noting in religious-belief cases, "[t]here are no questions regarding accommodation or reasonableness").

The plain text of the Title VII statute requires a court to analyze religious-practice and religious-belief claims separately. *See Hebrew*, 80 F.4th at 717–24; *Seago v. O'Malley*, 91 F.4th 386, 390 (5th Cir. 2024) ("When addressing issues of statutory interpretation, our first step is determining whether the statutory text is 'plain and unambiguous.'" (quoting *United States v. Kaluza*, 780 F.3d 647, 658 (5th Cir. 2015))). We "enforce [Title's VII's] plain meaning, unless absurd." *Trout Point Lodge, Ltd. v. Handshoe*, 729 F.3d 481, 486 (5th Cir. 2013) (quotation omitted).

Such a distinction between religious-practice and religious-belief claims generally aligns with the types of claims already recognized by this court. In *Hebrew*, we considered a practice-based claim where an employer fired a plaintiff for refusing to cut his hair and beard after taking a religious vow to keep them long. 80 F.4th at 719. Our court considered whether the employer could accommodate the plaintiff's religious practice without undue hardship and found a failure-to-accommodate violation. *Id.* at 721–24. We proceeded to consider whether the employer had affirmatively discriminated against the plaintiff because of his religious practice, meaning whether the plaintiff's long hair and beard had been a "motivating factor" in his termination before again concluding it indeed had been. *Id.* at 724–25. But if we had instead concluded the plaintiff's religious practice could *not* have been accommodated without undue hardship, then we would not have needed to proceed to the intentional-discrimination claim because the religious practice would not have been protected under Title VII. No such threshold inquiry exists with respect to belief-based claims. The question becomes whether the belief itself—distinct from any action or practices taken in furtherance of that belief—factored into the employer's decision.

23-10008
c/w Nos. 23-10536, 23-10836

Plaintiffs therefore can show their employer discriminated against them through three types of claims within 42 U.S.C. § 2000e-2(a)(1): first, intentional-discrimination claims based on belief; second, intentional-discrimination claims based on practice; and third, failure-to-accommodate practice claims. The latter two are subject to the same undue hardship defense—meaning a court's analysis of claims within these categories effectively converges. The undue hardship defense, however, is not available for intentional-discrimination claims based on belief, requiring separate treatment.

Carter, for her part, argues she "only had to prove that any aspect of her religious beliefs, observances, or practices, was a factor in Southwest's termination decision." Carter indeed put on evidence showing that Southwest knew she was a pro-life Christian, that her private messages to Stone reflected her religious beliefs, and that Southwest fired her for sending those messages. In Carter's view, Southwest fired her "because of" her religious beliefs and practices.

But Carter's argument would essentially read out the undue hardship defense. By consolidating the analysis of claims based on belief and practice, all an employee would have to show is that a religious practice motivated the employee's discharge without any consideration of whether the practice could be accommodated absent undue hardship.

Consider *Tagore v. United States*, in which this court addressed the firing of a Sikh employee for bringing a sword to work. 735 F.3d at 325–26. Under Carter's proposed approach, the employee in *Tagore* could have established a Title VII violation simply by showing she was fired for her religious practice of sword-carrying, completely avoiding the employer's defense that accommodating sword-carrying would cause undue hardship. That is not how Congress intended Title VII to work.

23-10008
c/w Nos. 23-10536, 23-10836

To be sure, we agree with Carter that an employer's restriction of religious practices can provide a basis for an intentional-discrimination claim. *See Hebrew*, 80 F.4th at 724. But she ignores the fact that such a claim is first subject to the undue hardship defense. That is not the case for belief-based intentional-discrimination claims because the undue hardship defense is not available.

Because the text of Title VII requires belief-based claims to be analyzed separately from practice-based claims, we understand Carter as alleging Southwest violated Title VII in three ways: (1) by intentionally discriminating against her religious beliefs; (2) by intentionally discriminating against her religious practices; and (3) by failing to accommodate her religious practices. We address these claims in turn.

### 1.

Southwest argues Carter's Title VII claims based on her beliefs fail as a matter of law because: (1) Carter failed to introduce evidence of belief-based discrimination, and (2) there is not legally sufficient evidence of pretext.[4]

---

[4] Southwest also argues Carter's ability to rely on indirect evidence is forfeited. Specifically, in objecting to Southwest's draft jury instructions on her "Religious Discrimination Claim," Carter told the district court that "Southwest's instructions incorrectly state that Carter claims Southwest's stated reasons are a pretext. Not so. This is not a pretext case." Additionally, in response to Southwest's Rule 50(b) motion, Carter stated: "Carter presented direct evidence of Southwest's discrimination and discharge of Carter, and did not need to rely on a 'pretext' or 'indirect evidence' theory . . . . When there is direct evidence of discrimination, as there was here, the *McDonnell Douglas* indirect proof paradigm is inapplicable." Although Carter did seemingly "relinquish[] or abandon[] . . . a known right," *Rollins*, 8 F.4th at 397 (quotations omitted), we afford jury verdicts "great deference," and therefore, the court must "view[] all the evidence and draw[] all reasonable inferences in the light most favorable to the verdict." *Thomas*, 220 F.3d. at 392. Because there was insufficient evidence to support the verdict, even considering indirect evidence, we decline to determine whether Carter forfeited her ability to rely on indirect evidence here.

Direct evidence "shows on its face that an improper criterion served as a basis . . . for the adverse employment action." *Herster*, 887 F.3d at 185 (quotations omitted). If given credence by a factfinder, direct evidence "proves the fact of discriminatory animus without inference or presumption." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002). For instance, a demoted bank employee alleging sex discrimination in violation of Title VII presented evidence her supervisor told her that she "wouldn't be worth as much as the men would be to the bank" and "she would be paid less *because she was a woman.*" *Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 329 (5th Cir. 1994) (quotations omitted). Evidence that an employer was generally aware of an employee's protected characteristic, by contrast, is not direct evidence of discrimination because it would require an inference to determine the employer's motive. *See Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 581 (5th Cir. 2020).

Carter contends the evidence showing Southwest fired her because of her social media messages and posts constitutes direct evidence of belief-based discrimination. Specifically, Carter argues her online "messages to the [Union's] [p]resident and posts on her own personal Facebook page showing that abortion is taking of human life contrary to God's will reflect Carter's religious beliefs." Additionally, she argues that "Southwest's numerous statements and admissions that it fired Carter for privately sending and publicly posting on her own Facebook page overtly religious pro-life videos, posts, and messages" provide direct evidence of the airline's discrimination based on her religious beliefs. In other words, Carter contends the content of her online messages and Southwest's response by terminating her for expressing her religious beliefs directly prove her *belief*-based religious discrimination claim.

But Carter fails to point to direct evidence that her pro-life, Christian beliefs were a motivating factor in her termination. To the contrary, the

23-10008
c/w Nos. 23-10536, 23-10836

evidence showed many Southwest employees likewise held pro-life, Christian beliefs, including Southwest's manager of labor relations who was involved in Carter's investigation. The evidence Carter offered instead speaks more neatly to actions she took in furtherance of her religious beliefs than to Southwest's alleged hostility toward those beliefs. *See Snyder v. Arconic, Corp.*, No. 23-3188, 2024 WL 3813173, at *3 (8th Cir. Aug. 14, 2024) (per curiam) (refusing to allow a Title VII plaintiff to transform a claim showing termination for *conduct* into a claim based on termination because of *beliefs*), *cert. denied*, No. 24-733, 2025 WL 663713 (U.S. Mar. 3, 2025) (mem.).

Carter maintains the question of whether the employer's action was motivated by her beliefs or by her practices is the province of a jury, not a court. But accepting her position would essentially eliminate the belief versus practice distinction altogether, and plaintiffs would be able to bypass the undue hardship defense simply by alleging the employer was motivated not by the practice but by secret animus, as the sword-carrying Sikh example illustrates. This would upend how courts have treated Title VII religion-based claims.

We next analyze Carter's argument based on indirect evidence. To prove a Title VII claim by relying upon circumstantial support, Carter must have shown, among other things, she was treated less favorably than others similarly situated but outside of her protected class. *See Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 426 (5th Cir. 2017). To show an employee was "similarly situated," a plaintiff must show her coworker "was treated more favorably under nearly identical circumstances." *Id.* (quotation omitted). The similarly situated coworker,

> known as a comparator, must hold the same job or hold the same job responsibilities as the Title VII claimant; must share the same supervisor or have his employment status determined by the same person as the Title VII claimant; and must have a

23-10008
c/w Nos. 23-10536, 23-10836

history of violations or infringements similar to that of the Title
VII claimant.

*Id.* (cleaned up).

Carter indeed put forth evidence Southwest treated her differently
than other employees who violated its social media policy. For instance, she
showed the chair of the Working Women's Committee, Southwest employee
Jessica Parker, posted about the Women's March on social media.
Specifically, Parker shared the Union's post with the caption of "WHY we
Marched" featuring a picture showing individuals holding a sign escribed
with "my body[,] my choice" and a photographic caption stating that
"[w]omen make only 80 [cents] for every dollar."

Although Southwest did not take adverse action against Parker, Carter
neither put forward evidence Parker sent any direct messages to a coworker,
nor that Parker's posted communications were hostile in nature. Carter also
failed to show Parker "h[e]ld the 'same job' or h[e]ld the same job
responsibilities as [Carter]," "share[d] the same supervisor," or "ha[d] a
history of 'violations' or 'infringements' similar to that of [Carter]," which
are essential to proving that Southwest treated Carter differently than
similarly situated employees. *See Alkhawaldeh*, 851 F.3d at 426. Therefore,
Carter failed to show Parker "was treated more favorably under nearly
identical circumstances." *Id.* (quotation omitted).

In sum, because there was not a legally sufficient evidentiary basis to
find for Carter on her belief-based intentional-discrimination claim, we
REVERSE the district court's denial of Southwest's motion for judgment
as a matter of law and REMAND with instructions for the district court to
enter judgment in favor of Southwest.

**2.**

23-10008
c/w Nos. 23-10536, 23-10836

Carter also claimed Southwest discriminated against her religious practice by terminating her for sending anti-abortion Facebook messages to the Union president and posting other pro-life content on her personal page. Before Southwest terminated Carter, an arbitrator found this conduct violated the airline's Social Media Policy,[5] Workplace Bullying and Hazing Policy,[6] and Harassment Policy,[7] concluding each violation constituted "an independently sufficient basis for termination." Southwest argued it fired Carter for violating these "neutral" social media policies because it could not accommodate her religious practice without an adverse impact on other employees. The jury found for Carter.

---

[5] Southwest's Social Media Policy as of April 2016 prohibited posting various forms of content and uses of content, including "[c]ontent that may be viewed as untrue, disrespectful, persistent, malicious, obscene, violent, harassing, bullying, defamatory, threatening, lewd, intimidating, discriminatory, or retaliatory"; "[c]ontent that may be viewed as damaging Southwest's public perception[,]" and "[c]ontent that may be viewed as a violation of other Southwest rules or policies." It stated that "certain social media content that in any way is later related to Southwest, reflects poorly upon Southwest, or impacts the workplace, is a violation of this policy and may result in discipline, up to and including termination."

[6] Southwest's Workplace Bullying and Hazing Policy as of April 2016 defined "workplace bullying" as "malicious, unwelcome, severe, and pervasive mistreatment that harms, intimidates, offends, degrades, or humiliates an Employee," such as slandering, ridiculing, hurtful name-calling, and personal insults. The policy also prohibited cyberbullying. It further explained that "[v]iolation of this policy will result in disciplinary action up to and including termination of Employment."

[7] Southwest's Harassment Policy as of 2017 prohibited "any and all types of harassment, sexual harassment, discrimination and/or retaliation against Employees by Leaders, fellow Employees, or third parties." Its list of "[e]xamples of types of derogatory, sexually suggestive, offensive, threatening, intimidating, hostile or retaliatory conduct that are prohibited" included "written comments including, email, text messages, or social media online posts." The policy further stated "[a]ny Employee who has been found to have acted inappropriately against another Employee in violation of this policy will be subject to appropriate corrective action up to and including termination."

23-10008
c/w Nos. 23-10536, 23-10836

Southwest on appeal argues it proved accommodating Carter would impose an undue hardship as a matter of law, despite the district court's jury instruction misstating the legal standard at the time of trial. Southwest also seeks a new trial on Carter's practice-based claims under Title VII, citing the Supreme Court's post-trial clarification of the applicable legal standard. *See Groff v. DeJoy*, 600 U.S. 447 (2023).

We begin by analyzing whether the district court erred in its instruction to the jury at the time of trial then assess whether a new trial is warranted because of the intervening change in law. *See Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 282 (5th Cir. 1999) ("When law changes in unanticipated ways during an appeal . . . this court will generally remand for a new trial to give parties the benefit of the new law and the opportunity to present evidence relevant to that new standard.").

**a.**

Carter's practice-based claims turn on whether Southwest showed it would face undue hardship by accommodating her religious practice, which violated Southwest's social media policies. Southwest argues the district court misstated the relevant legal standard in the jury instruction.

Title VII's enduring requirement is that employers must deviate from neutrally applicable policies as a religious accommodation for employees when doing so would not impose undue hardship. *Abercrombie*, 575 U.S. at 775 ("Title VII requires otherwise-neutral policies to give way to the need for an accommodation."). In other words, whether an employer can accommodate an employee by allowing her to violate "otherwise-neutral policies" without imposing an undue hardship is the ultimate test. *Id.*

Our court's precedent at the time of Carter's trial held that an "undue hardship" meant accommodating an employee imposed "more than a *de minimis* cost" on the employer. *Weber v. Roadway Express, Inc.*, 199 F.3d 270,

273 (5th Cir. 2000) ("'Undue hardship' exists, as a matter of law, when an employer is required to bear more than a *de minimis* cost." (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977)). Under this rubric, an employer could demonstrate accommodating an employee would impose an undue hardship by showing even "[t]he mere possibility of an adverse impact on co-workers." *Id.* at 274; *see also id.* ("The mere possibility of an adverse impact on co-workers *as a result of 'skipping over'*" a religious employee in scheduling "is sufficient to constitute an undue hardship" because it "unduly burdens his co-workers, with respect to compensation and 'time-off' concerns." (emphasis added)).

Undue hardship in this court's pre-*Groff* cases included: "depriving [co-workers] of their shift preferences," "compel[ing]" them "to accept less favorable working conditions," and "lowering [employee] morale," *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 147 (5th Cir. 1982), imposing "less favorable working conditions," *id.*, or "upset[ing]" other employees with how the accommodation would impact them, *Eversley v. MBank Dallas*, 843 F.2d 172, 176 (5th Cir. 1988). Proof of other minimal business disruptions was also sufficient to prove an undue hardship. *Howard v. Haverty Furniture Cos.*, 615 F.2d 203, 206 (5th Cir. 1980) (explaining that the fact that an employer incurred "no direct money cost" was "not controlling" because "lost efficiency in other jobs" during a single-day absence "[was] more than de minimis" (quotations omitted)). This meant plaintiffs' Title VII claims often failed if the employer could show an accommodation would impose even slight harm to other employees. *See Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495, 500–01 (5th Cir. 2001) (holding a counselor's request to be excused from counseling on certain topics that conflicted with her religion amounted to an undue hardship where accommodating the request would require coworkers "to assume a disproportionate workload" and to "travel involuntarily" and would require the employer to "schedule multiple

counselors for sessions, or additional counseling sessions to cover [subject] areas [the plaintiff] declined to address").

Take, for instance, *Brener*. In that case, a Jewish pharmacist at a hospital sought to take off work for his Sabbath from sundown on Friday to sundown on Saturday and several Jewish holidays. *Id.* at 142–44. At first, the hospital told the pharmacist to switch shifts with his coworkers and sometimes helped facilitate schedule exchanges. *Id.* at 143. But after a while, the hospital said such shift-switching had caused a "morale problem" and proclaimed it would no longer help arrange any more exchanges. *Id.* at 143–44. The pharmacist failed to arrange an exchange with another pharmacist to cover his shifts that fell on holidays and ultimately resigned. *Id.* Our court held that accommodating the pharmacist would have imposed an undue hardship because it "resulted in disruption of work routines," "lower[ed] . . . morale among the other pharmacists," and would have "compelled" other employees "to accept less favorable working conditions." *Id.* at 147.

In a similar example, a bank employee sought a schedule that would allow him to avoid working on his religion's Sabbath. *Eversley*, 843 F.2d at 174. The bank allowed him to work a "split shift" as an accommodation for years but later eliminated this accommodation upon the recommendation of an outside consultant. *Id.* The bank asked if employees would voluntarily switch shifts with the plaintiff, but all refused. *Id.* at 176. Our court held that mandating another employee switch shifts amounted to an undue hardship because "the employees who 'refused' the request would be upset" if they were required to switch from a day shift to a night shift. *Id.* at 176.

Even against this low bar for employers, discontent from other employees based in sheer "bias or hostility to a religious practice or a religious accommodation" has never been an employer's defense to an employee's reasonable accommodation claim. *Groff*, 600 U.S. at 472. Indeed,

"[i]f relief under Title VII can be denied merely because the majority group of employees, who have not suffered discrimination, will be unhappy about it, there will be little hope of correcting the wrongs to which [Title VII] is directed." *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 775 (1976). While employers

> must tolerate some degree of employee discomfort in the process of taking steps required by Title VII to correct the wrongs of discrimination, [they] need not accept the burdens that would result from allowing actions that demean or degrade, or are designed to demean or degrade, members of its workforce.

*Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 607–08 (9th Cir. 2004).

**b.**

Southwest argues the district court erred by misstating the proper legal standard in the jury instruction.

Our court "review[s] challenges to jury instructions for abuse of discretion and afford[s] the trial court great latitude in the framing and structure of jury instructions." *Young v. Bd. of Supervisors*, 927 F.3d 898, 904 (5th Cir. 2019) (quotations omitted). We are concerned most with whether the district court "correctly and adequately instructed the jury as to the law to be followed in deciding the issues." *In re 3 Star Props., L.L.C.*, 6 F.4th 595, 610 (5th Cir. 2021) (cleaned up).

At trial, the district court instructed the jury that "[a]n undue hardship means more than a de minimis cost on the conduct of the employer's business either in terms of financial costs or disruption of the business." Southwest faults the district court for not explicitly instructing the jury it could consider the burden that accommodating Carter might place on her co-workers. In Southwest's view, the district court should have made

23-10008
c/w Nos. 23-10536, 23-10836

clear the jury could consider lowered morale as a potential "undue hardship on the conduct of [Southwest's] business" regardless of whether it would disrupt Southwest's business or impose any costs on it. 42 U.S.C. § 2000e(j) (emphasis added).

But the instruction nevertheless directed the jury to consider Southwest's evidence of burdens on coworkers—including harm to employee morale—in assessing how accommodating Carter could impose more than de minimis costs on the airline's business conduct. As the district court explained, the definition of "undue hardship" it provided the jury "encompasse[d] the totality of Southwest's business and did not prevent the jury from considering potential burdens on Carter's co-workers" insofar as they would also burden Southwest.

Southwest based its trial strategy on the notion that harm to employee morale amounted to undue hardship. The airline "called senior leaders to testify that allowing employees to send unsolicited graphic videos to other employees would be psychologically damaging, would harm recruiting, and would be detrimental to the company's mission." For instance, an employee testified that watching the videos Carter circulated made her "fe[el] physically ill," leading her to leave her desk and take a lap around the building. A Denver base manager separately explained that allowing employees to send graphic videos to coworkers on such a difficult topic could be "detrimental to someone psychologically."

Southwest also showed Carter's messages adversely affected Stone, the sole recipient of the inflammatory Facebook messages. Stone explained that Carter's messages "hurt [her]" and that she "found [Carter's] messages to be incredibly disturbing, . . . obscene and violent, as well as threatening." Stone stated she saw the videos while she was waiting to board a flight and that she had to "[r]emove[] [her]self from the boarding area,"

23-10008
c/w Nos. 23-10536, 23-10836

and then "sat . . . alone and cried, and . . . contact[ed] a close friend to . . . pull [her]self together enough to board the flight." An arbitrator found Carter's messages to Stone amounted to bullying and harassment as defined by Southwest's policies.[8]

Southwest ultimately failed to convince the jury. But the jury instruction's delineation of Southwest's burden at the time does not amount to reversible error because it nevertheless stated an undue hardship must amount to more than a de minimis cost, encompassing the possibility of cost to Southwest's business operations from changes in employee morale. It follows that a reasonable jury could, based on the jury instruction, assess whether the airline's evidence of harms to employee morale amounted to more than a de minimis cost as the legal standard at the time demanded.

In short, we are not left "with substantial and ineradicable doubt whether the jury ha[d] been properly guided in its deliberations" at the conclusion of trial. *Jowers v. Lincoln Elec. Co.*, 617 F.3d 346, 352 (5th Cir. 2010) (quotations omitted). We therefore cannot say the district court abused its discretion in fashioning the jury instruction.

### c.

We recognize the "undue hardship" standard has evolved since Carter's trial. In *Groff*, the Supreme Court clarified that the "de minimis" threshold "does not suffice to establish 'undue hardship' under Title VII." 600 U.S. at 468; *see Hebrew*, 80 F.4th at 725 ("For decades, inferior federal courts read a single line [from the Supreme Court] for more than it was worth. The de minimis test had no connection to the text of Title VII.").

---

[8] Carter's messages directed at Stone—over the course of multiple years—also attacked her intelligence, accused her of supporting murder, and included graphic and sexualized imagery.

23-10008
c/w Nos. 23-10536, 23-10836

Instead, an employer now "must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business" to prove an undue hardship exists. *Groff*, 600 U.S. at 470. Courts now must consider "all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size[,] and operating cost of an employer." *Id.* at 470–71 (cleaned up). Such a standard imposes on employers "a heavy burden and requires . . . something more akin to 'substantial additional costs or substantial expenditures.'" *Hebrew*, 80 F.4th at 722 (quoting *Groff*, 600 U.S. at 469).

Groff also clarified that "evidence of 'impacts on coworkers is off the table for consideration' unless such impacts place a substantial strain on the employer's business." *Id.* (quoting *Groff*, 600 U.S. at 472). Even if an impact on coworkers places a substantial cost on the employer's business, such an impact "cannot be considered 'undue' if it is attributable to religious bias or animosity," *id.*, or when "the very notion of accommodating [a] religious practice" is rejected by an employer who fails to provide accommodation at all, *Groff*, 600 U.S. at 472. After all, Title VII demands "an employer reasonably accommodate an employee's practice of religion." *Hebrew*, 80 F.4th at 722 (quoting *Groff*, 600 U.S. at 473).

### d.

Groff's post-trial abrogation of our circuit's Title VII religious-discrimination precedent before this appeal has been exhausted does not presumptively signal a new trial is warranted. Our concern is whether fairness requires affording Southwest the opportunity to present evidence in a new trial under the intervening legal standard. *Deffenbaugh-Williams*, 188 F.3d at 282.

23-10008
c/w Nos. 23-10536, 23-10836

Recall that Southwest proposed a jury instruction before trial, outlining that "[a]n 'undue hardship' is an action that imposes more than a *de minimis* burden on the employer or the co-workers of the individual seeking an accommodation." The district court instead provided an instruction stating "[a]n undue hardship means more than a de minimis cost on the conduct of the employer's business either in terms of financial costs or disruption of the business," which substantially captured the legal standard at the time. The jury returned a verdict against Southwest. Now Southwest seeks a mulligan, even though the Supreme Court effectively raised the threshold an employer must satisfy to show undue hardship.

When controlling precedent changes after judgment but before an appellate resolution is entered in our circuit, "[we] will generally remand for a new trial to give parties . . . the opportunity to present evidence relevant to that new standard." *Deffenbaugh-Williams*, 188 F.3d at 282. Our court indeed has remanded for a new trial when intervening caselaw *lowers* the bar for the non-prevailing party. *See Hill v. Int'l Paper Co.*, 121 F.3d 168, 177 (5th Cir. 1997) (plaintiff won a jury verdict by surmounting a low and subsequently raised bar, and the court remanded for further proceedings consistent with the higher bar); *Vicknair v. Formosa Plastics Corp. La.*, 98 F.3d 837, 838–39 (5th Cir. 1996) (defendant secured summary judgment by satisfying a "liberal" test that was subsequently replaced by an "inquiry . . . frequently difficult to accomplish on motion for summary judgment," and the court remanded for further proceedings). But we need not remand if "the need, or certainly the helpfulness, of . . . evidence was reasonably apparent to ordinarily prudent counsel" at trial. *Deffenbaugh-Williams*, 188 F.3d at 282 (cleaned up).

Southwest asserts it lacked the opportunity to present evidence connecting harms on employee morale to monetary strains on business operations, as *Groff* makes clear Title VII demands. The airline avers on

23-10008
c/w Nos. 23-10536, 23-10836

remand it could "present evidence that accommodating Carter's conduct would impose significant costs to its business by devastating employee morale, translating directly to financial losses, and by opening Southwest up to the costly threat of Title VII liability for enabling a hostile work environment."

That may be so, but a duly empaneled jury ruled against Southwest under a lower standard than the law now demands. The airline failed to present a convincing defense, despite—in Southwest's own words— "put[ting] on *ample* evidence of harm to morale, including the effect of Carter's messages on Stone and testimony from senior supervisors that accommodating Carter's practice of sending graphic videos to her coworkers would *destroy* flight attendant morale." Southwest undoubtedly would rely on much of this same evidence on remand. It simply belies reason to conclude Southwest withheld at trial *stronger* evidence of costs to its business that might allow a reasonable jury to side with the airline on remand under the more exacting burden, *see Hebrew*, 80 F.4th at 722, after *Groff*.

This court's precedent does not compel, and equity does not support, granting a new trial to a losing party when intervening caselaw raises the burden on the losing party seeking retrial. Accordingly, we AFFIRM the judgment against Southwest on Carter's practice-based Title VII claims.

## C.

We proceed to the Title VII issues relating to the Union. The jury found Carter proved that: (1) the Union "unlawfully discriminated against [Carter] by causing or attempting to cause her discharge and that such attempt was motivated by [Carter's] sincerely held religious observances, beliefs, or practices"; (2) that the Union "unlawfully discriminated against [Carter] by treating her less favorably than other employees and that such treatment was motivated by [Carter's] sincerely held religious observances,

23-10008
c/w Nos. 23-10536, 23-10836

beliefs, or practices"; and (3) Carter proved that the Union "unlawfully failed to accommodate . . . Carter's sincerely held religious beliefs, practices or observances."

The Union marshals four arguments contesting these findings. First, the Union argues "Carter failed to prove religious[-]belief[-]based discrimination as a matter of law." Second, the Union argues the district court erred in giving a jury instruction that "attempting to cause" an adverse employment action could serve as the basis of a Title VII claim. Third, it argues the Union had no role in Southwest's decision to terminate Carter so it cannot be held liable for damages. And fourth, the Union argues the district court erred in failing to instruct the jury that Carter's religious practice could lose Title VII protection if it caused the Union an undue hardship. We address each in turn.

## 1.

We start with the Union's argument that Carter's belief-based claims fail as a matter of law.[9] The Union's argument contains both legal and evidentiary elements, including that (1) there is a legal distinction between Title VII claims based on religious practice and those based on religious belief; and that (2) Carter failed to present evidence the Union discriminated against Carter because of her beliefs. Right out of the gate, however, we conclude that the Union failed to preserve this argument for appellate review.

---

[9] It is not entirely clear whether the Union challenges the jury's finding that the Union "unlawfully discriminated against [Carter] by causing or attempting to cause her discharge and that such attempt was motivated by [Carter's] sincerely held religious observances, beliefs, or practices"; the finding that the Union "unlawfully discriminated against [Carter] by treating her less favorably than other employees and that such treatment was motivated by [Carter's] sincerely held religious observances, beliefs, or practices"; or both findings. It is irrelevant, however, because the Union failed to preserve both arguments for appellate review.

23-10008
c/w Nos. 23-10536, 23-10836

The Supreme Court has emphasized that "a party must raise a sufficiency-of-the-evidence claim in a post-trial motion to preserve it for review on appeal." *Dupree v. Younger*, 598 U.S. 729, 734 (2023) (citing *Ortiz v. Jordan*, 562 U.S. 180, 191–92 (2011)). Although the Union registered a verbal motion under Rule 50(a) at the close of evidence, the Union failed to file a post-trial motion under Rule 50(b) after the jury rendered its verdict.

We emphasize, however, that a post-trial motion is not needed to preserve "purely legal" challenges already resolved at summary judgment. *Id.* at 735 ("Because a district court's purely legal conclusions at summary judgment are not 'supersede[d]' by later developments in the litigation, . . . [they] merge into the final judgment, at which point they are reviewable on appeal."). While the Union filed a motion for summary judgment, the motion did not discuss the legal distinctions between Title VII claims based on religious beliefs versus practices. Rather, the Union's motion, and the district court's order denying it, focused on evidentiary matters. While there is indeed a legal component to the Union's argument that such a distinction exists, its argument ultimately turns on whether Carter presented evidence of belief-based discrimination. This constitutes a sufficiency-of-the-evidence argument appellate courts are "powerless" to review absent a Rule 50(b) motion.

Southwest's post-trial motion cannot save the Union. As a general matter, unions and employers are treated differently under Title VII, *see, e.g.*, 42 U.S.C. §§ 2000e & 2000e-2, and sufficiency-of-the-evidence arguments are party-specific. The fact Carter did not confront the Union's failure to file a Rule 50(b) motion does not salvage the Union's argument for our review either. *See Ortiz*, 562 U.S. at 189 & n.6 ("Absent [a Rule 50(b)] motion . . . an appellate court is powerless to review the sufficiency of the evidence after trial," *even when an opposing party has failed to raise the issue of forfeiture on appeal.* (quotations omitted)).

23-10008
c/w Nos. 23-10536, 23-10836

Ultimately, the Union failed to preserve its sufficiency-of-the-evidence argument for our review.

**2.**

The Union next argues the district court erred in instructing the jury that Carter could prove the Union violated Title VII by "attempting to cause" Carter's termination because "it is well settled . . . that Title VII claims are predicated upon an 'adverse employment action'" and that "[m]erely attempting to cause an adverse employment [sic] does not meet this well-established bar." According to the Union, the district court instead should have used the Fifth Circuit's Pattern Jury Instructions for Title VII cases brought against employers pursuant to 42 U.S.C. § 2000e-2(a)(2).

The Union confuses Title VII claims brought against *employers* with Title VII claims brought against *labor organizations*. In addition to prohibiting unions from discriminating themselves, 42 U.S.C. § 2000e-2(c)(1)–(2), Title VII also prohibits unions from "caus[ing] or attempt[ing] to cause an employer to discriminate against an individual," *id.* § 2000e-2(c)(3). This means, for instance, "a union may be liable on this basis if it prevents an employer from fulfilling its statutory responsibilities" under Title VII. *Carter v. Chrysler Corp.*, 173 F.3d 693, 703 (8th Cir. 1999). Although there is little caselaw interpreting what "to cause or attempt to cause" discrimination means, the plain language of § 2000e-2(c)(3) makes clear that "attempt[ing] to cause" an adverse employment action is sufficient to establish Title VII liability against a union.[10] Therefore, the instruction requested by the Union for claims brought under 42 U.S.C. § 2000e-2(a)(2) was not a "substantially

---

[10] Moreover, Carter did, in fact, suffer an adverse employment action by being terminated. *See* 42 U.S.C. § 2000e–2(a)(1).

23-10008
c/w Nos. 23-10536, 23-10836

correct statement of the law." *See HTC Corp. v. Telefonaktiebolaget LM Ericsson*, 12 F.4th 476, 484 (5th Cir. 2021).

The district court accordingly did not err by providing this instruction.

**3.**

The Union next argues it had no role in Southwest's decision to terminate Carter so it cannot be held liable for damages. Specifically, the Union contends the district court erred in assigning it partial responsibility for providing Carter with backpay.

Our court has held that "[a] union's role as a party to a collective bargaining agreement can be legally sufficient to impose back pay liability on the union if the agreement violates Title VII," a question which we review for abuse of discretion. *Guerra v. Manchester Terminal Corp.*, 498 F.2d 641, 655 (5th Cir. 1974) (citing *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1381 (5th Cir. 1974)), *overruled on other grounds by Bhandari v. First Nat'l Bank of Com.*, 829 F.2d 1343 (5th Cir. 1987) (en banc).

The Union posits both that the erroneous "causation" instruction resulted in the district court assigning responsibility for backpay to the Union and that the record shows the Union had no role in Southwest's decision to terminate Carter. These arguments lack merit for reasons already discussed. It bears repeating that the district court's "causation" instruction was not erroneous. Additionally, the Union failed to preserve any sufficiency-of-the-evidence argument, such as whether Carter presented any evidence the Union "caused or attempted to cause" Carter's termination, for appellate review. *See* 42 U.S.C. § 2000e–5(g)(1) (relief under Title VII may include backpay "payable by the employer, employment agency, *or labor organization*, as the case may be, responsible for the unlawful employment practice" (emphasis added)).

23-10008
c/w Nos. 23-10536, 23-10836

Therefore, the district court did not abuse its discretion in holding Southwest and the Union jointly and severally liable for backpay.

**4.**

The Union also argues the district court erred in failing to instruct the jury that Carter's religious practice could lose Title VII protection if it caused the Union an undue hardship. Carter responds that the Union forfeited any undue hardship defense by failing to raise it in its answer or at any time before trial.

After reviewing the trial court's denial of leave to amend pleadings for abuse of discretion, *Robertson v. Intratek Comput., Inc.*, 976 F.3d 575, 578 (5th Cir. 2020), we side with Carter. The Union indeed failed to raise an undue hardship defense before trial. The Union did, however, seek to amend its answer after the trial had begun to add the affirmative defense of undue hardship, arguing such an amendment would not prejudice Carter. The district court denied the request "out of consistency" because it denied a "late amendment" request from Carter to amend her complaint for seeking punitive damages under the RLA.

As a general matter, Rule 15 of the Federal Rules of Civil Procedure directs courts to "freely give leave [to amend pleadings] when justice so requires." Fed. R. Civ. P. 15(a)(2). "Though that's a generous standard, 'leave to amend can be properly denied where there is a valid justification.'" *Robertson*, 976 F.3d at 584 (quoting *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1175 (5th Cir. 2006)). "Valid justifications include undue delay, bad faith, and dilatory motive." *Id.*

Indeed, the district court provided at least one valid justification for denying the Union's motion to amend: undue delay. The Union offered no explanation at trial as to why it failed to raise an undue hardship defense in

23-10008
c/w Nos. 23-10536, 23-10836

its answer or at any point in the *five years* between the time Carter filed her complaint and when the case went to trial.

Furthermore, there are colorable legal arguments courts should treat unions differently than employers in the undue-hardship context. Although little caselaw exists explaining the contours of how the undue hardship defense applies to unions, this defense has been recognized for nearly fifty years. *Cooper v. Gen. Dynamics, Convair Aerospace Div., Ft. Worth Operation*, 533 F.2d 163, 173 (5th Cir. 1976) (Brown, C.J., concurring); *id.* at 175 (Rives, J., concurring).[11] Our sister circuits, as well as the Equal Employment Opportunity Commission, have followed course. *See Nottelson v. Smith Steel Workers D.A.L.U. 19806, AFL-CIO*, 643 F.2d 445, 452 (7th Cir. 1981); *E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico*, 279 F.3d 49, 55 (1st Cir. 2002); 29 C.F.R. § 1605.2(b)(2) (interpreting Title VII as "impos[ing] an obligation on . . . labor organization[s] to reasonably accommodate the religious practices of an employee or prospective employee, unless the labor organization demonstrates that accommodation would result in undue hardship").

This is not a case where an intervening change of law alerted the Union to the possibility of a new defense between the time it filed its answer and trial. The Union was aware of the underlying facts that would serve as the basis of an undue hardship defense well before the trial began. It is

---

[11] Our court considered "[b]y [w]hom and to [w]hom" Title VII's accommodation and hardship provisions applied in *Cooper*, and the panel divided as to whether the undue hardship provision applies to unions. 533 F.2d at 170–71. A majority of the panel agreed that unions were both obligated to accommodate an employee's religious practices, *id.* at 171–72 (Brown, C.J., concurring) ("A majority is in agreement . . . that the substantive restraints of Section 701(j) forbidding religious discrimination appl[y] to employer and Union alike and each has a duty of accommodation."), and were entitled to an undue-hardship defense, *id.* at 173 ("It is therefore clear . . . [that] hardship to the Union as well as hardship to the employer should be considered.").

therefore unclear why the Union waited until that stage to raise this defense. Carter did not have the opportunity to offer responsive arguments—and the district court could not have considered them. *See Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 427 (5th Cir. 2004) ("[D]elay alone is an insufficient basis for denial of leave to amend: The delay must be undue, *i.e.*, it must prejudice the nonmoving party or impose unwarranted burdens on the court.").

Understanding the substantial likelihood of prejudice to Carter, the district court did not abuse its discretion in denying the Union's request to amend its answer to raise an undue-hardship defense at trial.

\*　　\*　　\*

In sum, we **AFFIRM** the judgment with respect to the Title VII claims against the Union.

Under Title VII, courts may award the prevailing party "a reasonable attorney's fee," 42 U.S.C. § 2000e-5(k), including "fees incurred on appeal," *Marks v. Prattco, Inc.*, 633 F.2d 1122, 1126 (5th Cir. 1981). Having affirmed Carter's Title VII claims against the Union and her practice-based Title VII claim against Southwest, we **GRANT** Carter's Motion to Remand the Issue of Appellate Attorneys' Fees to the District Court and **REMAND** "to allow the district court to make the initial determination and award of appellate attorney's fees." *Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc.*, 334 F.3d 423, 433 (5th Cir. 2003).

## IV.

In her cross-appeal, Carter separately contends her Facebook posts and messages amounted to labor-organizing activity protected by the Railway Labor Act ("RLA"). This statute, in relevant part, provides that "[e]mployees shall have the right to organize and bargain collectively

23-10008
c/w Nos. 23-10536, 23-10836

through representatives of their own choosing" and that "[r]epresentatives . . . shall be designated by the respective parties without interference, influence, or coercion." 45 U.S.C. § 152, Third & Fourth.

Our court has observed that the RLA principally funnels disputes between employees, unions, and carriers into mediation and arbitration—outside of federal court. *See Bhd. of Locomotive Eng'rs v. Union Pac. R.R.*, 31 F.4th 337, 342 (5th Cir. 2022) (observing that the purpose of the RLA is to "minimize disruptions . . . caused by labor disputes" in the air and rail industries). "To effectuate peaceful dispute resolution, the RLA sets out a mandatory and virtually endless process of negotiation, mediation, voluntary arbitration, and conciliation" for many types of claims outside of the collective bargaining process itself. *BNSF Ry. Co. v. Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers - Transp. Div.*, 973 F.3d 326, 334 (5th Cir. 2020) (quotations omitted).

The Act establishes distinct procedures for resolving "major" and "minor" disputes between carriers and their employees. *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252–53 (1994). "'Major' and 'minor' do not necessarily refer to important and unimportant disputes, or significant and insignificant issues," but "rather, the terms refer to the bargaining context in which a dispute arises." *Sw. Airlines Pilots Ass'n v. Sw. Airlines Co.*, 120 F.4th 474, 480 (5th Cir. 2024) (quoting *Int'l Bhd. of Teamsters v. Sw. Airlines Co.*, 875 F.2d 1129, 1133 (5th Cir. 1989) (en banc)). "Major disputes," which involve the collective bargaining process, give rise to federal court jurisdiction. *See Consol. Rail Corp. v. Ry. Labor Execs. Ass'n*, 491 U.S. 299, 302–03 (1989). On the other hand, most "minor dispute[s]" or grievances, which generally "contemplate[] the existence of a collective agreement" and "relate[] either to the meaning or proper application of a particular provision," do not. *Sw. Airlines Co.*, 120 F.4th at 481 (quotations omitted).

23-10008
c/w Nos. 23-10536, 23-10836

Carter's dispute does not fit neatly into either category. We note only that the district court erroneously analyzed the *post-certification* conflict[12] between Carter and Southwest as a major dispute, which in most cases "involve[s] attempts to change rates of pay, rules, or working conditions not adjusted by the parties in conference." *Ass'n of Pro. Flight Attendants v. Am. Airlines, Inc.*, 843 F.2d 209, 211 (5th Cir. 1988) (quotations omitted); *BNSF*, 973 F.3d at 334 ("Major disputes relate to the formation of collective agreements or efforts to secure them." (cleaned up)). This is not one of those cases.

Without deciding whether Carter's conflict instead amounted to a "minor" dispute, we emphasize that federal courts retain jurisdiction to resolve non-major disputes if (1) the "dispute-resolution framework of the RLA is either ineffective or unavailable" or (2) actions were taken by the carrier with anti-union animus "for the purpose of weakening or destroying a union." *Bhd. of Ry. Carmen (Div. of TCU) v. Atchison, Topeka & Santa Fe Ry. Co.*, 894 F.2d 1463, 1468 n.10 (5th Cir. 1990) (citations omitted).

At trial, Carter alleged Southwest and the Union breached the RLA in three ways relevant to this appeal. First, Carter argued Southwest and the Union retaliated against her for engaging in anti-union organizing activities and opposing union leadership (the "retaliation claim"). Second, Carter contended that Southwest interfered with how its employees organize (the "interference claim"). And third, Carter claimed the Union breached its duty of fair representation. A jury found in Carter's favor on the claims for

---

[12] These conflicts arise *after* a union has been certified as part of a collective bargaining agreement to represent employees. *See Bhd. of Locomotive Eng'rs*, 31 F.4th at 343.

23-10008
c/w Nos. 23-10536, 23-10836

retaliation and breach of the duty of fair representation, while the district court dismissed Carter's interference claim before trial.

Carter's cross-appeal of the district court's dismissal of her RLA claims under Rule 12(b)(6) is reviewed de novo. *Vizaline, LLC v. Tracy*, 949 F.3d 927, 931 (5th Cir. 2020) (quoting *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 765 (5th Cir. 2019)). Southwest's appeal of the district court's denial of its motion for renewed judgment as a matter of law on Carter's retaliation claim is likewise reviewed de novo. *Nobach*, 799 F.3d at 377.

## A.

Carter maintains on appeal that she has a viable retaliation claim against Southwest and the Union and a viable interference claim against Southwest under the RLA. However, the RLA does not provide a cause of action that allows Carter to bring such claims.

The district court dismissed Carter's interference claim because she failed to plead "either . . . anti-union animus" or "a fundamental attack on the collective bargaining process on the part of Southwest necessary to bring a post-certification dispute within the jurisdiction of the district court." It further noted that "[e]ven as a nonmember objector, [Carter] had access to, and in fact utilized, the contractual dispute resolution procedure under the [collective bargaining agreement] to address her grievances in arbitration." Nonetheless, the district court allowed Carter's retaliation claim (based on protected activities) to advance without explaining why a showing of anti-union animus was not required. In later rejecting Southwest's motion for summary judgment, the district court concluded it had subject matter jurisdiction to hear this claim under the RLA based on an *implied* right of action.

Indeed, federal courts have had a "historically limited role . . . in enforcing the RLA." *Minjares v. Indep. Ass'n of Cont'l Pilots*, 293 F.3d 895,

23-10008
c/w Nos. 23-10536, 23-10836

899 (5th Cir. 2002). "Generally speaking, a court's jurisdiction in a labor dispute is limited to preserving and enforcing the RLA's dispute resolution procedures." *BNSF Ry. Co.*, 973 F.3d at 337. "[J]udicial intervention in RLA procedures [is] limited to those cases where but for the general jurisdiction of the federal courts there would be no remedy to enforce the statutory commands . . . [in] the Railway Labor Act." *Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants*, 489 U.S. 426, 441 (1989) (quotations omitted) (hereinafter "*TWA*"); *see also Ass'n of Pro. Flight Attendants*, 843 F.2d at 210 ("Resort to the courts is . . . reserved for a small category of serious disputes."). Additionally, we have noted:

> [W]hen a [collective bargaining agreement] that is formed pursuant to the RLA establishes a mandatory, binding grievance procedure and gives the union the exclusive right to pursue claims on behalf of aggrieved employees, one whose employment is governed by the [collective bargaining agreement] lacks standing to attack the results of the grievance process in court, except only that an employee has standing to bring a claim of unfair representation.

*Mitchell v. Cont'l Airlines, Inc.*, 481 F.3d 225, 234 (5th Cir. 2007).

The Supreme Court has explained that 45 U.S.C. § 152, Third and Fourth "address[] primarily the *precertification* rights and freedoms of unorganized employees." *TWA*, 489 U.S. at 440 (emphasis added). We have further clarified that "[q]uite plainly, the RLA protects the employees' right to establish a union." *Johnson v. Express One Int'l, Inc.*, 944 F.2d 247, 252 (5th Cir. 1991). As a result, in precertification cases, we have recognized the RLA's protections are more robust than in cases where a collective bargaining agreement already exists. *See Bhd. of Locomotive Eng'rs*, 31 F.4th at 343. Nonetheless, the statute broadly protects employees, including non-union members, *before* the employer has recognized a union or when a union has been certified to represent employees. This is because

44

23-10008
c/w Nos. 23-10536, 23-10836

the effectiveness of the private dispute resolution procedures
[contemplated in the RLA] depends on the initial assurance
that the employees' putative representative is not subject to
control by the employer and on the subsequent assurance that
neither party will be able to enlist the courts to further its own
partisan ends.

*TWA*, 489 U.S. at 441.

We also adjudicated an unlawful discharge claim under the RLA in
*Roscello v. Southwest Airlines Co.*—notably, assuming without deciding a
cause of action existed under the RLA—when a plaintiff was discharged for
engaging in organizing activity *before* a union was certified. 726 F.2d 217, 219,
220 n.2 (5th Cir. 1984) ("The parties do not question whether the plaintiff
has a private right of action for wrongful discharge under the Railway Labor
Act. Therefore[,] we assume without deciding that plaintiff has properly
stated a claim."). There, the plaintiff, Robert Roscello, was working to
organize Southwest's operations agents with the Teamsters Union. *Id.* at
219. Before an election was ever held, however, Southwest "recognized"
another union, the International Association of Machinists, and fired
Roscello three days later. *Id.* Given that Southwest "recognized" a union
that had not been elected by workers and that Southwest fired Roscello very
shortly after this recognition, evidence indicated that Southwest held animus
against Roscello's organizing efforts with the Teamsters *and* that Southwest
sought to interfere with the employees' choice of bargaining representative.
Even more, *Roscello* concerned a *precertification* dispute, a scenario where
employees may more easily enforce their 45 U.S.C. § 152, Third and Fourth
rights in court. *See TWA*, 489 U.S. at 440.

Our circuit has recognized, however, that "[f]ederal courts
sometimes have a role" in enforcing these provisions in *post-certification*
disputes "such as when carriers," or companies subject to the RLA, "act

23-10008
c/w Nos. 23-10536, 23-10836

out of 'anti-union animus.'" *Bhd. of Locomotive Eng'rs*, 31 F.4th at 342 (quoting *Ass'n of Prof'l Flight Attendants*, 843 F.2d at 211). Another limited exception allows an employee to enforce 45 U.S.C. § 152, Third and Fourth rights in federal court when alleging a carrier has acted to undermine the union's functionality. *See* Douglas Hall et al., The Railway Labor Act, § 5.III.A (4th ed. 2016) (explaining that, once a collective bargaining agreement is in place, "courts exercise jurisdiction principally to address claims that carrier actions reflect antiunion animus or undermine the effective functioning of the union or cannot be adequately remedied by administrative means").

For example, the doors to federal court may open when a carrier acts out of anti-union animus because there may have been a breakdown in the contemplated dispute resolution scheme. Such a breakdown can occur when a carrier interferes with the union's leadership, potentially tainting the arbitration proceedings involving union representation. *See Ass'n of Pro. Flight Attendants*, 843 F.2d at 211; *see also Wightman v. Springfield Terminal Ry.*, 100 F.3d 228, 234 (1st Cir. 1996) ("[W]e will intervene when a carrier commits acts of intimidation that cannot be remedied by administrative means, or commits a fundamental attack on the collective bargaining process[,] or makes a direct attempt to destroy a union."). In other words, an employee may bring a RLA claim when an employer acts out of anti-union animus because there may not be another available remedy to enforce the rights the statute bestows. *TWA*, 489 U.S. at 441.

Carter contends "animus" does not mean "anti-union animus" but rather the employee's union-related activity was a motivating factor in the employer's decision. Specifically, Carter claims that as a "nonmember union objector who was opposing the union," this court's precedent does not require her "to show Southwest's 'anti-union animus.'"

Our circuit has not recognized a standalone private right of action against an employer under 45 U.S.C. § 152, Third and Fourth without a showing of anti-union animus. *See Roscello*, 726 F.2d at 222 (requiring employee to show the "initial burden . . . that an *anti-union* animus contributed to the employer's decision" (emphasis added)); *Bhd. of Locomotive Eng'rs*, 31 F.4th at 340 (The RLA "gives federal courts the authority to remedy carrier conduct motivated by *antiunion* animus." (emphasis added)); *Sw. Airlines Co.*, 120 F.4th at 486 (conferring jurisdiction after concluding Southwest's actions were "intended to weaken or destroy the operational capacity of the Union" (cleaned up)). Nor have our sister circuits. *See Bhd. of Locomotive Eng'rs v. Kansas City S. Ry. Co.*, 26 F.3d 787, 795 (8th Cir. 1994) (rejecting argument that 45 U.S.C. § 152, Third and Fourth supplies a cause of action in post-certification disputes absent showing of anti-union animus or that carrier sought to interfere with employees' choice of bargaining representative); *Wightman*, 100 F.3d at 234 (similar); *Dempsey v. Atchison, Topeka & Santa Fe Ry. Co.*, 16 F.3d 832, 841–42 (7th Cir. 1994) (similar); *see also Herring v. Delta Air Lines, Inc.*, 894 F.2d 1020, 1023 (9th Cir. 1989) ("No private cause of action exists under the RLA for . . . employees who assert retaliatory conduct based upon employee activities [that] bear no relationship to establishing a union.").

Moreover, Carter did not show that Southwest undermined the effective functioning of the Union or that the RLA's dispute-resolution framework was either ineffective or unavailable. Southwest did not interfere with, influence, or coerce its employees' choice of representatives, nor did it "influence or coerce [Carter] to join or remain or not to join or remain [a] member[] of [Local 556.]" 45 U.S.C. § 152, Fourth. Absent such a showing, there is nothing to suggest that the RLA's dispute-resolution framework was unavailable or ineffective to resolve Carter's dispute.

23-10008
c/w Nos. 23-10536, 23-10836

Adopting Carter's reading would run afoul of the "historically limited role" courts play in enforcing representation rights under the RLA. *Minjares*, 293 F.3d at 899. Put simply, Carter cannot overcome the fact that the RLA exists, by and large, to channel labor disputes in the air and rail industries out of federal court.

We emphasize that Carter had a mechanism to enforce any RLA-protected rights with the dispute resolution process created by the collective bargaining agreement negotiated between the Union and Southwest, but she chose not to pursue her claims though it. *TWA*, 489 U.S. at 441. Carter nonetheless argues her rights under the RLA were "separate and independent" from those presented to the arbitrator. But even as a non-union member, she could have freely argued during her arbitration hearing that she was fired for opposing union leadership as she now argues is her right to do under the RLA. *See Wright v. Union Pac. R.R. Co.*, 990 F.3d 428, 435 (5th Cir. 2021) (holding that an employee being disciplined for requesting a union representative's presence was a claim based on a collective bargaining agreement's "implied terms" and required a resolution in arbitration). After foregoing the opportunity to bring such claims in the appropriate forum, Carter does not get a second chance now to make the argument she waived. *See Mitchell*, 481 F.3d at 234.

Because Carter lacked a cause of action to bring these claims under the RLA in federal court, we AFFIRM the district court's dismissal of Carter's interference claim against Southwest and REVERSE the district court's denial of Southwest's motion for judgment as a matter of law for Carter's retaliation claim.

## B.

Aside from disputes between employees and their employers as carriers, the Supreme Court has recognized that an employee has an implied

23-10008
c/w Nos. 23-10536, 23-10836

right of action to bring a claim against her union for breaching the duty of fair representation under the RLA. *See Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 202–03 (1944); *see also Vaca v. Sipes*, 386 U.S. 171, 177 (1967) ("The statutory duty of fair representation was developed . . . in a series of [pre-Title VII] cases involving alleged racial discrimination by unions . . . under the [RLA]."). A union breaches this duty "if its actions are either 'arbitrary, discriminatory, or in bad faith'" with respect to "all union activity." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991) (quoting *Vaca*, 386 U.S. at 190).

In the district court, Carter alleged that the Union acted arbitrarily when Stone reported Carter's messages to Southwest "based on personal animosity toward Carter's speech and activity opposing the union, her nonmember, agency fee objector status, and her support for the recall effort." In other words, Stone's reporting became the union activity that Carter construed as a breach. The jury agreed, finding that the Union violated the duty of fair representation owed to Carter when Stone arbitrarily reported her to Southwest.[13]

The Union argues a new trial is required because the district court instructed the jury that "abusive, insulting, or hyperbolic [conduct] is protected activity under the [RLA]." The Union's "sole argument is that the union cannot violate its duty [of fair representation] if Carter was not engaged in protected activity." This argument implies that Carter would otherwise have maintained a viable claim for breach of the duty of fair representation but for the fact that the RLA does not protect abusive or insulting conduct. The Union forfeited any other argument that Carter's

---

[13] The jury also found that Stone was acting in her official capacity as union president when she reported Carter to Southwest, a finding the Union does not challenge.

23-10008
c/w Nos. 23-10536, 23-10836

RLA claim lacked validity, including whether a claim for breach of the duty of fair representation was available to resolve internal union disputes.[14]

The jury instructions on Carter's claim for breach of the duty of fair representation explained, *inter alia*, that (1) the "duty means that a union must serve the interests of all employees—whether they are union members or not—without hostility or discrimination toward any, must exercise its discretion with complete good faith and honesty, and must avoid arbitrary conduct"; (2) Carter claims that the Union violated this duty when Stone reported Carter to Southwest; and (3) "[t]he union violates the duty of fair representation when it takes action that is arbitrary, discriminatory, or in bad faith."

The question of whether Carter's Facebook messages amounted to protected activity lacks relevance to whether Stone's *reporting* was "arbitrary, discriminatory, or in bad faith." *See O'Neill*, 499 U.S. at 67. The law presumes unions violate the duty of fair representation by causing or attempting to cause an employee's discharge, although the presumption is rebuttable. *See Acklin Stamping Co.*, 351 N.L.R.B. 1263, 1263 (2007); *Graphic Commc'ns Int'l Union, Local 1-M (Bang Printing, Inc.)*, 337 N.L.R.B. 662, 673 (2002). Whether Carter's messages themselves were protected organizing

---

[14] Although the jury found that the Union violated the RLA in two ways—(1) by retaliating against Carter for engaging in RLA-protected activity, and (2) by breaching its duty of fair representation owed to Carter—the Union conflates the two. The Union challenges Carter's "Railway Labor Act Claim" as if Carter asserted only one such claim and argues that "[i]f [Carter's conduct] is not 'protected,' there is no evidence that [the Union] violated its Duty of Fair Representation to Carter, undermining the Jury's liability finding on this issue." Because the Union understands Carter as having only a single RLA claim against it, we proceed as if the Union appealed only the jury instructions regarding the claim for breach of the duty of fair representation, forfeiting any argument on appeal regarding Carter's retaliation claim. *See Rollins*, 8 F.4th at 397–98.

23-10008
c/w Nos. 23-10536, 23-10836

activity under the RLA does not bear on a claim for breach of the duty of fair representation.

Any error in the jury instruction regarding protected activities did not prejudice the Union. Therefore, we AFFIRM.

## V.

We lastly address challenges to the district court's post-verdict actions.

After the trial against Southwest and the Union, the court provided injunctive relief to Carter for the purpose of prohibiting similar religious discrimination against other flight attendants. In the same order, the court also directed both Southwest and the Union to provide Southwest flight attendants with notice of the jury's verdict and its judgment, and to inform them of their Title VII rights against religious discrimination—including their right to express views on social media about abortion.

Southwest notified its flight attendants in response that "a federal court in Dallas entered a judgment against Southwest" and "ordered us to inform you that Southwest does not discriminate against our Employees for their religious practices and beliefs." However, the district court found Southwest's notice insufficient and held the airline in contempt of court before ordering religious-liberty training for several of Southwest's attorneys involved in this case.

On appeal, the Union challenges the district court's permanent injunction. Southwest challenges the basis for and scope of the district court's contempt order.

## A.

23-10008
c/w Nos. 23-10536, 23-10836

The Union challenges the district court's permanent injunction as both impermissibly vague and overly broad.

We review an order granting a permanent injunction for abuse of discretion. *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016) (per curiam). "Whether an injunction fulfills the mandates of Fed. R. Civ. P. 65(d) is a question of law we review de novo." *Louisiana v. Biden*, 45 F.4th 841, 845 (5th Cir. 2022).

Specifically, the district court enjoined Southwest and the Union from:

> (1) "discriminating against Southwest flight attendants for their religious practices and beliefs, including—but not limited to—those expressed on social media and those concerning abortion";
>
> (2) "failing to reasonably accommodate Southwest flight attendants' sincerely held religious beliefs, practices, and observances"; and
>
> (3) "discriminating against Carter for exercising her rights, under the [RLA], to resign from membership in Local 556 and to object to the forced payment of political and other nonchargeable union expenses, including—but not limited to—objections to union expenditures that are expressed in social media posts."

As a general matter, an order granting an injunction must "(A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1).

Analytically, "vagueness refers [to] the particularity with which the proscribed activity is described," while "the broadness of an injunction

23-10008
c/w Nos. 23-10536, 23-10836

refers to the range of proscribed activity." *Scott*, 826 F.3d at 211 (quotations omitted). "Vagueness is a question of notice, [which implicates] procedural due process, and broadness is a matter of substantive law." *U.S. Steel Corp. v. United Mine Works of Am.*, 519 F.2d 1236, 1246 n.19 (5th Cir. 1975) (cleaned up). Therefore, "an injunction is overly vague if it fails to satisfy the specificity requirements set out in Rule 65(d)(1), and it is overbroad if it is not narrowly tailored . . . to remedy the specific action which gives rise to the order as determined by the substantive law at issue." *Scott*, 826 F.3d at 211 (cleaned up) (citing *Doe v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004)).

We begin with an analysis of whether the injunction is void for vagueness. "Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam). In this sense, the specificity requirement is "designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Id.* "[A]n ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed." *Louisiana*, 45 F.4th at 846 (quotations omitted). An injunction that fails to comply with these specificity requirements must be vacated. *Id.*

The Union's brief is short on detail, but it is easy to understand why it construes the order as vague. While the district court provided commentary about the conduct in which Southwest is prohibited from engaging, the order is less direct on how the Union should comply with its terms. At its clearest, the order directs the Union not to retaliate against Carter or otherwise violate her rights because of her discontinued participation in the labor organization.

23-10008
c/w Nos. 23-10536, 23-10836

But our court has long held that injunctions simply telling a party to "obey the law" are improper. *See Payne v. Travenol Lab'ys, Inc.*, 565 F.2d 895, 897–98 (5th Cir. 1978). Here, as in *Payne*, the injunction broadly instructs the parties not to discriminate in a highly generalized statement without a clear directive. *Id.* But an injunction's "command of specificity is a reflection of the seriousness of the consequences which may flow from a violation of an injunctive order." *Id.* at 897. The district court's injunction lacks sufficient specificity.

The same is true with respect to the injunction's reasonable accommodation provision. Determining what amounts to a "reasonable accommodation" is often a fact-intensive inquiry. Therefore, the Union has little way of knowing what the district court meant by requiring it to reasonably accommodate *all* flight attendants outside of construing it as a directive to simply follow the law.

Analogously, our court discussed a similar scenario in a Ninth Circuit case, where an injunction ordering a sheriff's department to follow its own internal policies and procedures was deemed overly vague because it applied indiscriminately to all internal governing documents without any recognizable specificity. *Scott*, 826 F.3d at 212 (citing *Thomas v. Cnty. of Los Angeles*, 978 F.2d 504 (9th Cir. 1992)). Put simply, our court's standard is when "an ordinary person reading the court's order" would not be able to ascertain what specific conduct the district court has proscribed, the order is void for vagueness. *See Louisiana*, 45 F.4th at 846. The vagueness of the district court's order in detailing how its injunction applies to the Union therefore is a lethal deficiency under Rule 65(d). *See id.*

Separately, the Union argues the injunction is overbroad because it applies to *all* flight attendants rather than targeting the conduct that gave rise to Carter's claims. We agree.

As our court has held before, "an injunction cannot encompass more conduct than was requested or exceed the legal basis of the lawsuit." *E.T. v. Paxton*, 19 F.4th 760, 769 (5th Cir. 2021) (quotations omitted); *see also Scott*, 826 F.3d at 211 (concluding an injunction "is overbroad if it is not narrowly tailored to remedy the specific action which gives rise to the order as determined by the substantive law at issue" (cleaned up)).

As a general matter, the requirement that a "plaintiff's remedy must be tailored to redress the plaintiff's particular injury" is in recognition of a federal court's "constitutionally prescribed role ... to vindicate the individual rights of the people appearing before it." *Gill v. Whitford*, 585 U.S. 48, 72–73 (2018). "Injunctive relief [that] benefits non-parties may sometimes be proper" under limited circumstances, but only where the benefit to non-parties is incidental. *Meyer v. Brown & Root Constr. Co.*, 661 F.2d 369, 374 (5th Cir. 1981). In other words, such breadth must be necessary to give prevailing parties the relief to which they are entitled.

The breadth chosen by the district court here is excessive because it attempts to accomplish more than remedying Carter's injury. *See Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (mem.) (Gorsuch, J., concurring) ("[W]hen a court ... order[s] the [party] to take (or not take) some action with respect to those who are strangers to the suit, it is hard to see how the court could still be acting in the judicial role of resolving cases and controversies."). The injunction covers non-parties by extending to *all Southwest flight attendants* without targeting the conduct that gave rise to Carter's claims in the first place. Instead of simply providing the prevailing party with relief, the permanent injunction appears to broadly call more than the balls and strikes required to resolve the case, thereby "exceed[ing] the legal basis of the lawsuit." *See E.T.*, 19 F.4th at 769 (quotation omitted).

The overbreadth of the district court's injunction against the Union is especially problematic in this case given the complex interplay of the statutory schemes at issue. While federal courts are tasked with providing relief when airlines and unions engage in unlawful discriminatory practices, a carte blanche prohibition against vague conduct applied to a broad class of non-party individuals constitutes an extraordinary use of judicial power similarly unsupported by our constitutional design or legal tradition. *See generally United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020) ("Courts are essentially passive instruments of government. They do not, or should not, sally forth each day looking for wrongs to right. They wait for cases to come to them . . . ." (cleaned up)). Congress envisioned a more limited role for federal courts in resolving disputes between airline employees and their associated union than the one contemplated by the district court's injunctive order. *See* 29 U.S.C. § 104. In simpler terms, the order providing injunctive relief cannot fly.

We conclude the district court's permanent injunction constitutes legal error given its vagueness and overbreadth. Therefore, we VACATE the permanent injunction in full and REMAND for additional proceedings.

## B.

Southwest appeals the district court's order holding it in contempt. The airline contests, *inter alia*, the basis for the contempt order, arguing it "substantially complied" with the court's directives by providing flight attendants with notice of the jury's verdict and the court's judgment.

Recall that as part of its judgment, the district court ordered Southwest to "inform Southwest flight attendants that, under Title VII, [Southwest] may not discriminate against Southwest flight attendants for their religious practices and beliefs, including—but not limited to—those expressed on social media and those concerning abortion." The notice that

Southwest distributed to its flight attendants, however, stated a court "ordered us to inform you that Southwest does not discriminate against our Employees for their religious practices and beliefs." Southwest also published a memo observing that the airline believed Carter's messages were "inappropriate, harassing, and offensive" and "in violation of several Company policies." The memo also expressed the airline's disappointment with the judgment and outlined its intention of appealing.

Carter moved the district court to hold Southwest in contempt, arguing the email merely stated that Southwest "does not discriminate," rather than "may not discriminate," a material deviation from the court's language. She also claimed Southwest's memo demonstrated that it *could* continue to discriminate against flight attendants' religious beliefs and practices if an individual was found in violation of internal policy. The district court agreed with Carter and held Southwest in contempt. As a sanction, the district court ordered Southwest to circulate a statement—verbatim—to its flight attendants "to set the record straight," and ordered three of Southwest's in-house attorneys to attend religious-liberty training with the Alliance Defending Freedom.

As our court has acknowledged, "[a] movant in a civil contempt proceeding bears the burden of establishing by clear and convincing evidence: 1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000) (quoting *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992)).

If the movant has made the above three-part showing, the burden shifts to the respondent to defend against a civil contempt finding by rebutting the conclusion, demonstrating an inability to comply, asserting

23-10008
c/w Nos. 23-10536, 23-10836

good faith in its attempts to comply, showing mitigating circumstances or substantial compliance, or justifying the noncompliance. *F.D.I.C. v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995). As our court has noted, "[s]ubstantial compliance is an absolute defense to civil contempt." *M.D. by Stukenberg v. Abbott*, 119 F.4th 373, 384 (5th Cir. 2024).

We review a district court's contempt finding for abuse of discretion. *Am. Airlines*, 228 F.3d at 578.

### 1.

Southwest contends it "substantially complied" with the district court's order by posting a notice to its flight attendants and distributing the jury's verdict and judgment. *See Whitfield v. Pennington*, 832 F.2d 909, 914 (5th Cir. 1987) ("A court may not hold in contempt a party that substantially complies with an order"). According to Southwest, the distinction between whether it "may not" or "does not discriminate" under Title VII does not materially change the message that "Southwest had violated Title VII by discriminating against Carter."

Carter disagrees, arguing the difference between "may not" and "does not" matters because it shows Southwest willfully misrepresented the court's notice order.[15] According to Carter, the difference in language implies that Southwest did not violate Title VII by firing Carter, indicating Southwest thought the district court erred. This understanding, Carter argues, is supported by Southwest's message to flight attendants that the

---

[15] Although a party's good faith is one of several factors a court considers for evaluating compliance, willfulness is largely irrelevant to the analysis of whether Southwest complied with the district court's order. *See Am. Airlines*, 228 F.3d at 581 ("The contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order.").

23-10008
c/w Nos. 23-10536, 23-10836

airline believed the judgment constituted error, and, accordingly, that Southwest sought an appeal.

In *Abbott*, we explained the factors courts should consider in determining whether a party has substantially complied with a court's contempt order. 119 F.4th at 384. Courts adjudicating civil contempt arguments should "consider[] good faith, or lack thereof" of the respondent. *Id.* "[W]hether compliance was done in good faith or bad faith is relevant to whether it was substantial." *Id.*

We begin by observing that the district court's finding of non-compliance is supported by the record after trial. Informing employees that their employer does not discriminate is indeed different from informing employees their employer is *legally prohibited* from discriminating again. After all, a jury had just found Southwest in fact discriminated against Carter. Southwest's bad-faith, semantic attempt to avoid internal responsibility for its actions by simply notifying its employees of the judgment in no way reflects compliance, let alone compliance describable as substantial. *See Baddock v. Villard (In re Baum)*, 606 F.2d 592, 593 (5th Cir. 1979) ("Contempt is committed when a person violates an order of a court requiring in specific and definite language that a person do or refrain from doing an act." (quotations omitted)).

Southwest failed to convey the specific message as ordered. We therefore cannot say the district court abused its discretion in holding the airline in contempt.

**2.**

Our gears shift next to considering the nature of the sanction and whether the district court intended it to achieve a permissible objective.

23-10008
c/w Nos. 23-10536, 23-10836

The Supreme Court has reasoned that a federal court's ability to punish disobedience is "essential to ensuring that the [j]udiciary has a means to vindicate its own authority without complete dependence on other [b]ranches." *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 796 (1987). A court's contempt power "is not a broad reservoir of power, ready at an imperial hand," but rather a limited and merely "implied power squeezed from the need to make the court function." *In re U.S. Bureau of Prisons*, 918 F.3d 431, 438 (5th Cir. 2019) (quotations omitted). And because "inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980).

In our legal system, there are two types of contempt. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 826–27 (1994). It is our duty at the outset "to determine whether the nature of the contempt proceeding was civil or criminal." *Smith v. Sullivan*, 611 F.2d 1050, 1052 (5th Cir. 1980). Whether a contempt order is civil or criminal turns on the "character and purpose" of the sanction involved. *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 441 (1911).

Civil contempt sanctions must be "remedial" in nature and "designed to compel future compliance with a court order" by either "coerc[ing] the defendant into compliance" or "compensat[ing] the complainant for losses sustained" from non-compliance. *Bagwell*, 512 U.S. at 827–29 (quotations omitted); *Boylan v. Detrio*, 187 F.2d 375, 378 (5th Cir. 1951) ("Civil contempt proceedings are remedial and coercive, not punitive, in their nature, they look only to the future. They are not instituted as punishment for past offenses . . . ."). In other words, a civil contemnor "carries the keys [to] his prison in his own pocket." *Bagwell*, 512 U.S. at 828 (quoting *Gompers*, 221 U.S. at 442).

23-10008
c/w Nos. 23-10536, 23-10836

Criminal contempt sanctions, by contrast, are used to "punish defiance of the court and deter similar actions." *In re Stewart*, 571 F.2d 958, 964 (5th Cir. 1978). Penal in nature, there is no coercive component. A criminal contemnor "is furnished no key, and he cannot shorten the term [of punishment] by promising not to repeat the offense." *Gompers*, 221 U.S. at 442. Generally, "criminal [contempt] penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings." *Bagwell*, 512 U.S. at 826.

As a starting point, we emphasize "civil contempt differs from criminal contempt in that it seeks only to coerce the defendant to do what a court had previously ordered [it] to do." *Turner v. Rogers*, 564 U.S. 431, 441 (2011) (cleaned up). Moreover, "the beneficiary of civil contempt is the *individual litigant*." *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 827 (5th Cir. 1976) (emphasis added).

Southwest argues the district court abused its contempt power by requiring its attorneys to attend "religious-liberty training, which neither secures compliance with an order nor compensates Carter for any noncompliance." According to the airline, "the only permissible sanctions were requiring a new 'may not discriminate' email and awarding Carter contempt-related attorneys' fees, because those are the least-restrictive means of ensuring compliance with the judgment and compensating Carter."

We see no need to examine the full sphere of acceptable sanctions against Southwest under the circumstances, but we agree that religious-liberty training would do little to compel compliance with the order or to compensate Carter. The attorneys ordered to attend training were not involved in the decision to terminate Carter, and no evidence offered at trial suggests they demonstrated animus against Carter or her religious beliefs. *See Stewart*, 571 F.3d at 964 n.4 ("[A] contempt [sanction] is considered civil

only when the punishment is wholly remedial."). Additionally, the training would not be limited to Title VII training but instead was to encompass topics irrelevant to securing compliance with a Title VII judgment. It was plainly not the least-restrictive means of remedying Southwest's non-compliance.[16] *See Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996) ("If there is a reasonable probability that a lesser sanction will have the desired effect, the court must try the less restrictive measure first.").

Carter maintains that courts regularly require legal training "in the relevant subject area" to support her claim that "Title VII training" secures Southwest's compliance with the order. Courts do so, of course, only as a punitive remedy, not as a sanction for civil contempt. The cases Carter cites involve punishments under Rule 11 of the Federal Rules of Civil Procedure, a rule which serves a "much different purpose[]" than civil contempt—which is, in short, "to punish." *Willy v. Coastal Corp.*, 503 U.S. 131, 138–39 (1992).

In our view, the district court's contempt order constituted a punitive remedy with the goal of punishing Southwest for not complying with its decree. *See Bagwell*, 512 U.S. at 831 ("[T]he contempt power . . . uniquely is liable to abuse." (quotations omitted)). For instance, the district court repeatedly emphasized that Southwest's conduct was "willful." But while "criminal contempt requires [a] willful, contumacious, or reckless state of mind," intent is "unimportant to civil contempt." *Sullivan*, 611 F.2d at 1052 (quotations omitted). Additionally, the district court announced that it was seeking to "devise its remedies in this case to vindicate the policies of Title

---

[16] Carter herself interestingly refers to the training as "Title VII training" rather than "religious liberty" training, seemingly in recognition of the overbreadth.

23-10008
c/w Nos. 23-10536, 23-10836

VII." This sort of "public interest" consideration is permissible in the criminal contempt context, *see United States v. United Mine Workers of Am.*, 330 U.S. 258, 303 (1947), but it is inappropriate in the context of civil contempt.

Courts are tasked with resolving limited questions and administering justice to the parties before them. *United States v. Texas*, 599 U.S. 670, 693–94 (2023) (Gorsuch, J., concurring) ("This tracks the founding-era understanding that courts render a judgment or decree upon the rights of the litigants . . . [and] ensures that federal courts respect the limits of their Article III authority to decide cases and controversies . . . ." (citations omitted) (cleaned up)). But when a court's contempt sanction in a civil matter is both overbroad in scope and undoubtedly punitive in nature, the judiciary risks appearing contemptuous like the contemnor. In this civil case, the sanction plainly exceeded remedial bounds and sought to punish Southwest's attorneys through a directive that did little to coerce the airline's compliance with the district court's judgment.

Punitive sanctions exceed the scope of a federal court's civil contempt authority. We therefore VACATE the portion of the district court's contempt order imposing sanctions against Southwest and REMAND for the district court to issue a new sanction. The district court's new sanction must be remedial in nature and narrowly tailored so that it is the least restrictive means of achieving substantial compliance with the district court's order.

## VI.

Accordingly, we REVERSE the judgment against Southwest on Carter's belief-based Title VII claim and REMAND with instructions to enter judgment as a matter of law for Southwest on that claim. We AFFIRM the judgment on Carter's practice-based Title VII claims against Southwest.

23-10008
c/w Nos. 23-10536, 23-10836

We AFFIRM the judgment against the Union on all claims. We GRANT Carter's Motion to Remand the Issue of Appellate Attorneys' Fees to the District Court and REMAND for the district court to determine and award appropriate appellate attorney's fees. We AFFIRM the dismissal of Carter's RLA interference claim and REVERSE the denial of Southwest's motion for judgment as a matter of law on Carter's retaliation claim. We VACATE the permanent injunction in full and REMAND for additional proceedings. We AFFIRM the district court's order holding Southwest in contempt, VACATE the contempt sanction against Southwest, and REMAND for additional proceedings.